**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA; THE FAMILY UNIT, INC.; and GEORGE HOPKINS,<br><br>     Plaintiffs,<br><br>     v.<br><br>MARCI ANDINO, in her official capacity as the Executive Director of the South Carolina State Election Commission; HOWARD M. KNAPP, in his official capacity as Director of Voter Services of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; and JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission,<br><br>     Defendants. | Case No. _____ |

**COMPLAINT**

**INTRODUCTION**

1.      Plaintiffs League of Women Voters of South Carolina and George Hopkins

(collectively, "Plaintiffs") bring this action for immediate injunctive and declaratory relief

against Executive Director of the South Carolina State Election Commission Marci Andino,

Director of Voter Services of the South Carolina State Election Commission Howard M. Knapp,

Chair of the South Carolina State Election Commission John Wells, and members of the South

Carolina State Election Commission JoAnne Day, Clifford J. Edler, Linda McCall and Scott

Moseley (collectively, "Defendants") because South Carolina's failure to provide absentee voters with the opportunity to correct inadvertent minor or technical deficiencies on their absentee ballot envelopes unconstitutionally burdens South Carolinians' fundamental right to vote and deprives them of due process.

2.      In light of the serious risks of in-person voting during the COVID-19 public health crisis, South Carolina has already recognized that absentee voting will be the only feasible method for many South Carolina voters to cast their ballots this November, as reflected in legislation passed by the South Carolina General Assembly on September 15, 2020 ("Act 149"), allowing all qualified voters to vote absentee for the November 2020 General Election.

3.      These circumstances are expected to result in a record-breaking number of South Carolina voters casting absentee ballots for the November 2020 General Election, including many first-time absentee voters.  As of September 30, 2020, approximately 500,000 mail-in absentee ballots had been requested by South Carolina voters—roughly five times the previous record of 106,000 in 2016.  The Charleston County Board alone had received 46,300 ballot requests as of late August—nearly five times the 9,700 received at the same point in 2016.

4.      Absent intervention from this Court, however, many of these voters will be disenfranchised as a result of South Carolina's laws governing absentee voting.  State law requires election officials to reject absentee ballots that are missing the voter's signature on the outside of the ballot return envelope.  S.C. Code. Ann. §§ 7-15-230, 7-15-420.  On information and belief, election officials are also applying signature matching requirements to absentee ballots, despite the fact that this requirement is not provided for in South Carolina law.  Further, there is no opportunity for a voter to challenge or otherwise cure a ballot rejected on these

grounds—in fact, the voter is not even required to be notified that his or her vote is rejected, before or after it happens. *See id*. § 7-15-420(B).

5.     The failure to provide voters with notice and an opportunity to cure these signature-related deficiencies violates voters' constitutional rights and undermines the integrity of South Carolina elections. The state imposes a substantial burden on absentee voters' right to vote by automatically disenfranchising South Carolinians who validly cast and return their own ballots but inadvertently forget to sign them, or use a signature that has changed due to physical or environmental factors, without providing notice.

6.     Automatic rejection of absentee ballots under these circumstances is particularly harsh, as the burden of providing a notice and cure process before rejecting absentee ballots due to signature-related deficiencies is very low. Staff have the capabilities to provide the requisite notice to voters, and the disruption to the voting process is minimal. Moreover, allowing for this additional process increases public confidence in the integrity of elections because absentee voters—who have already completed, signed, and returned an absentee ballot application—are permitted an opportunity to provide evidence of their eligibility to officials.

7.     Plaintiffs thus seek modest, but vitally important, relief. Specifically, plaintiffs requests that Defendants direct county election officials to review absentee ballot envelopes and provide pre-rejection notice to voters by first-class mail and, where available, by email or phone, of any signature-related deficiency; and permit voters whose absentee ballots are deficient on this ground to cure the deficiency up to three days following the election. Alternatively, Plaintiffs request that the Defendants instruct county election officials to classify absentee ballots with signature-related deficiencies as provisional so that they may be cured in accordance with existing procedures established under South Carolina law.

## PARTIES

8.    Plaintiff LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA ("LWVSC") is a nonpartisan, nonprofit, membership organization, and is an affiliate of the League of Women Voters of the United States.  LWVSC encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy.  LWVSC is dedicated to promoting civic engagement and protecting democracy through advocacy, voter education, and voter assistance.  LWVSC has 1,288 members located in counties across the State of South Carolina. As part of its mission, LWVSC advocates for expansion of voting opportunities, including through absentee voting.  LWVSC expends significant resources in furtherance of its mission, including by organizing voter registration drives, educating the public about the voting process, and assisting voters who have questions or need help navigating the voting process.  LWVSC has seen a substantial increase in the number of its members and other individuals that intend to vote absentee in the upcoming November 2020 elections in South Carolina because they are unable or unwilling to vote in person due to the COVID-19 pandemic.  Under S.C. Code Ann. § 7-15-420(B), these absentee voters face the risk that they will be deprived of the fundamental right to vote if their ballots contain a signature-related deficiency such as a missing or mismatched signature, with no notice or opportunity to cure the alleged deficiency.  As a result of the risk of disenfranchisement due to signature-related deficiencies, LWVSC must divert more resources toward educating voters about the strict signature requirements, warning them of the risk of automatic disenfranchisement without any notice, and answering questions from members of the public after the election is over.  For example, LWVSC members are advising South Carolina voters with respect to how to complete their absentee ballot and voter oath correctly so their ballots will be counted.  LWVSC must also divert resources towards ensuring that all qualified

voters' ballots will be counted, including by placing calls to county elections offices or

facilitating in-person voting.  LWVSC must divert these resources away from its regular

advocacy, voter registration, fundraising, and other activities, affecting its ability to operate and

function with respect to its normal activities.

       9.      Plaintiff THE FAMILY UNIT, INC. ("The Family Unit") is a 501(c)(3), non-

profit, charitable organization that was founded in December 2009.  The Family Unit's mission

is to help improve the well-being of people who live in poverty.  Nearly all of the Family Unit's

membership is African-American and many of its members are uninsured, elderly, disabled,

homeless, incarcerated, or ex-offenders released from incarceration.  The Family Unit works to

improve classroom performance by students of color and those who are of other races, distributes

and disseminates educational documents such as the U.S. Constitution, and informs all persons,

particularly those who have been historically disenfranchised and victims of discrimination and

prejudice, about their constitutional rights.  The Family Unit also conducts voter registration

drives, promotes voter participation, and assists individuals who need help navigating the voting

process.  As a result of the risk of disenfranchisement of absentee voters due to signature-related

deficiencies, The Family Unit must divert more resources toward obtaining records from election

officials and identifying absentee voters who were disenfranchised after each election, including

those who were rejected due to a missing signature.  The Family Unit contacts these voters,

informs them that they were disenfranchised, and helps to educate them to ensure their ballots

are not rejected in the future.  The Family Unit must divert these resources away from its regular

advocacy, voter registration, education assistance, and other activities, affecting its ability to

operate and function with respect to its normal activities.

10.     Plaintiff GEORGE HOPKINS is a South Carolina resident and has been an eligible, registered voter in Charleston County since 1976.  Mr. Hopkins is a retiree who suffered a hemorrhagic stroke in August 2020, which weakened the muscles in his right hand and arm. As a result, Mr. Hopkins has difficulties writing with his dominant hand, and his signature has changed.  Mr. Hopkins wants to vote in the upcoming November 2020 general election and he filed a request for an absentee ballot for that contest months ago. However, his current signature would not match the signature on his absentee ballot application, which he filled out in July 2020, or his signature on file with the County Board of Elections and Voter Registration.  Mr. Hopkins fears that he will be disenfranchised if he votes by mail and an election official determines that his signature is invalid without any notice to him beforehand. He is therefore being forced to choose between possible disenfranchisement and putting his health at risk, in light of the ongoing COVID-19 public health crisis, in order to vote in person.  Mr. Hopkins also wishes to vote in future elections, and he will not do so by absentee ballot without assurance that his ballot would not be rejected without any notice or opportunity to cure.

11.     Defendant MARCI ANDINO is sued in her official capacity as Executive Director of the South Carolina State Election Commission.  The Executive Director is the Chief Administrative Officer for the State Election Commission and is required by law to supervise the County Boards of Elections and Voter Registration.  S.C. Code Ann. § 7-3-20.  In this role, she is tasked with ensuring that those County Boards comply with state and federal law in conduct of elections and voter registration.  *Id*. at § 7-3-20(C).

12.     Defendant JOHN WELLS is the Chair of the South Carolina Election Commission and is sued in his official capacity.  Defendants JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL and SCOTT MOSLEY are members of the South Carolina Election

Commission and are sued in their official capacities.  The Executive Director serves at the pleasure of the South Carolina Election Commission. S.C. Code Ann. § 7-3-20(A).  The South Carolina Election Commission is responsible for carrying out all laws related to absentee registration and voting and with promulgating relevant regulations.  *Id*. § 7-15-10.  The enumerated mission of the Commission is, in relevant part, to ensure that every eligible citizen has the opportunity to participate in fair and impartial elections with the assurance that every vote will count.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

15.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

16.     This Court has personal jurisdiction over the Defendants, who are sued only in their official capacities as officials of the State of South Carolina.  The Defendants are statewide officials charged with implementing and enforcing the election laws of South Carolina throughout the state, including in this District.  The violations complained of concern their conduct in such capacity.

17.     Venue in the District of South Carolina is proper pursuant to 28 U.S.C. § 1391 and Local Civ. Rule 3.01 (D.S.C.) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and will occur in this judicial district, and because all

defendants are residents of South Carolina and a substantial number of LWVSC members and George Hopkins reside within this judicial district.

## FACTUAL BACKGROUND

### Absentee Voting in South Carolina

18.     The South Carolina Constitution guarantees that "every inhabitant of this State possessing the qualifications provided for in this Constitution shall have an equal right to elect officers and be elected to fill public office."  S.C. Const. Art. I, § 5.  To that end, the South Carolina Constitution requires that the "General Assembly shall provide for… absentee voting." S.C. Const. art. II, § 10.  Absentee voting in South Carolina is primarily governed by Title 7, Chapter 15 of the South Carolina Code.  By its own terms, Title 7, Chapter 15 requires the articles governing absentee registration and voting to be "liberally construed in order to effectuate their purpose."  S.C. Code. Ann. § 7-15-20.

19.     Until recently, absentee voting in South Carolina was limited to individuals who met specific criteria that excused them from voting in-person in South Carolina.  *Id*. § 7-15-320. On September 16, 2020, South Carolina Governor Henry D. McMaster signed bill G.5305/R.149 into law, expanding absentee voting to all qualified voters for the upcoming November 3, 2020 general election only.

20.     To vote by absentee ballot under the existing South Carolina absentee ballot provisions, qualified voters must first request an absentee ballot by filling out an application form.  S.C. Code Ann. § 7-15-330.

21.     The completed application must be returned to the County Board of Voter Registration and Elections in person or by mail by 5:00 p.m. on the fourth day before the election, except that the County Board must accept applications received by 5:00 p.m. the day

immediately preceding the election, if the voter appears in person and is qualified to vote by absentee ballot.  *Id.*  The application form must include the voter's signature attesting to the correctness of the information provided on the form, the voter's name, registration certificate number, address, absentee address, election of ballot request, election date, runoff preference, party preference, reason for request, and a sworn oath that the voter is registered to vote and is the person who seeks to vote by absentee ballot.  *Id*. § 7-15-340.

22.     Once the County Board approves an application, officials must, as soon as possible, send the absentee voter a packet containing the ballot, instructions for marking and returning the ballot and signing and returning the required oath, an envelope marked "Ballot Herein" into which the voter will place the completed ballots, a return-addressed envelope containing an oath on the back to be signed by the voter, which the voter will use to return the interior ballot envelope to the board of voter registration and elections, and any other materials necessary to enable the absentee ballot applicant to execute and return a ballot legally acceptable by the officials charged with conducting the election.  *Id*. § 7-15-370.

23.     The return envelope that must be sent with each absentee ballot pursuant to Section 7-15-370 must have printed on its face in the upper left corner the words "Absentee ballots for _____ County, _____ (county seat), South Carolina."  *Id*. § 7-15-375 (2020). That information and other blanks on the front of the envelope are filled in by the county board prior to issuing the absentee ballot to the applicant.  *Id*.

24.     The back of the return envelope has blanks for the voter to fill in his or her name and address, and for the voter to sign the oath.  *Id*. §§ 7-15-375, 7-15-380.  That oath states: "I hereby swear (or affirm) that I am duly qualified to vote at this election according to the Constitution of the State of South Carolina, that I have not voted during this election, that the

ballot or ballots contained in this envelope is my ballot and that I have received no assistance in voting my ballot that I would not have been entitled to receive had I voted in person at my voting precinct." *Id*. § 7-15-380.

25.    All absentee ballots must be received by the county voter registration office or extension office by 7:00 p.m. on Election Day, Tuesday, November 3, 2020.  The state board of elections allows voters to check the status of their absentee ballots online.

26.    Ordinarily, at 9:00 a.m. on the calendar day immediately preceding Election Day, election officials may begin the process of examining the return-addressed envelopes that have been received by the county board of voter registration and elections.  *Id.* § 7-15-420(B).  All return-addressed envelopes received by the county board of voter registration and elections before the polls close must be examined in this manner.  *Id*.

27.    A ballot may not be counted unless the oath is properly signed, nor may any ballot be counted which is received by the County Board of Voter Registration and Elections after the polls close.  *Id*.  After all return-addressed envelopes have been emptied, but no earlier than 9:00 a.m. on Election Day, the election managers remove the ballots contained in the envelopes marked "Ballot Herein" and place them in the ballot box provided for the applicable contest.  *Id*. § 7-15-420(C).  Beginning at 9:00 a.m. on Election Day, the absentee ballots may be tabulated. *Id*. § 7-15-420(D).

28.    South Carolina law mandates that specific procedures be followed when an absentee voter's qualifications are challenged during this tabulation process.  State law provides that "[i]f any ballot is challenged, the return-addressed envelope must not be opened, but must be put aside and the procedure set forth in Section 7-13-830 must be utilized; but the absentee voter must be given reasonable notice of the challenged ballot."  *Id.* § 7-15-420(D).  In the case of a

challenged absentee ballot, the unopened return-addressed envelope must be placed in an

envelope on which must be written the name of the voter and that of the challenger.  *Id*. § 7-13-

830.  A challenged vote becomes a provisional vote that is separated and not counted, but is

turned over to county election officials.  *Id*.  These challenged votes are then addressed at

meetings of election officials required by South Carolina law, and if the challenges are not

sustained by the challenger, the ballot is no longer considered provisional, and is counted in the

total election returns. *Id*.  As of now, this procedure is not guaranteed for voters whose absentee

ballots are rejected for signature-related deficiencies, though nothing in South Carolina law

would prevent county election officials from providing pre-rejection notice and a cure process on

these grounds.

### Increased Use of Absentee Ballots in South Carolina and Past Rejection Data

29.     South Carolina expects a record shattering increase in the number of absentee

ballots cast during the upcoming general election.

30.     In a July 17, 2020 letter to state legislative leaders, Defendant Andino explained

that mail-in absentee voting for South Carolina's June 2020 primaries increased by 370%

compared to the 2016 primaries, and predicted that if that trend continues, more than one million

ballots will be cast by mail in the November election.  Letter from Marci Andino, Exec. Dir.,

S.C. Election Comm'n, to Harvey Peeler Jr., President, S.C. Senate, and Jay Lucas, Speaker,

S.C. House of Representatives 2 (July 17, 2020), https://my.lwv.org/sites/default/files/sec_2020-

07-17_letter_to_gen_assembly_covid_changes_for_ge_final.pdf.  As of September 30, 2020,

nearly 500,000 mail-in absentee ballots had been requested by South Carolina voters—

approximately five times the previous record of 106,000 in 2016. *See* Nic Jones, *Record number

of absentee voters in South Carolina continues to grow*, News 19-WLTX, (Sept. 30, 2020),

2:20-cv-03537-RMG     Date Filed 10/02/20     Entry Number 1     Page 12 of 21

https://www.wltx.com/article/news/politics/elections/record-number-of-absentee-voters-in-south-carolina-continues-to-grow/101-aa3e73b4-8ac1-4b93-9e05-7ac413886a1b; Chase Laudenslager, *SC Board of Elections reports record breaking number of absentee ballots*, Count On News 2 (Sept. 4, 2020), https://www.counton2.com/news/your-local-election-hq/sc-board-of-elections-reports-record-breaking-number-of-absentee-ballots/.

31.     According to Chris Whitmire, the director of public information for the South Carolina Election Commission, the state could see as many as 1.5 million people vote absentee, with over one million of them voting absentee by mail-in ballot.  Julia Kauffman, *South Carolina Prepares for Influx of Absentee Voters*, News19-WLTX (Aug. 21, 2020), https://www.wltx.com/article/news/politics/elections/south-carolina-prepares-for-influx-of-absentee-voting/101-891899fd-39cf-4e95-a7bf-ea2d5c6d7975.  Whitmire has also stated that the previous records for absentee voting were around 520,000 absentee votes total and around 140,000 absentee votes by mail.  *Id.*  In 2016, a total of 502,819 people voted absentee, representing 23.7% of the 2,123,584 total ballots cast.  South Carolina Election Commission, *Absentee Voting History, South Carolina Election Commission Fact Sheets*, https://www.scvotes.gov/sites/default/files/Absentee%20Voting%20History%20(1998-2018)_0.pdf (last accessed October 2, 2020).  Even if in-person voter turnout in South Carolina increases in 2020 as compared to 2016, the number of absentee ballots is projected to double.

32.     According to Director of Voter Registration and Elections for Richland County, Alexandria Stephens, county offices of voter registration and elections are hiring additional staff and opening satellite offices to prepare for an increased number of absentee ballots.  Kauffman, *South Carolina Prepares for Influx of Absentee Voters*, News19-WLTX.

33.    During the 2016 General Election, South Carolina voters cast 497,436 absentee ballots, of which 2,907 were rejected.  Election Administration and Voting Survey Datasets ("EAVS 2016") (2016), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys. A total of 261 ballots were rejected because the voter's signature was missing.  *Id.*  Likewise, during the 2018 election, South Carolina voters cast 72,806 absentee ballots, of which 2,248 were rejected.  *See Election Administration and Voting Survey Dataset 2018 Version 1.3* ("EAVS 2018") (Feb. 18, 2020), https://www.eac.gov/research-and-data/datasets-codebooks-andsurveys.  Of these rejections, 140 were due to the voter's missing signature.  *Id.*  None of these voters were required to be notified that their ballot was rejected.

34.    The EAVS data shows that the rates at which absentee ballots are rejected due to a missing signature vary based on the voter's county of residence and other factors, indicating a lack of consistency in how missing signatures are treated across the state.  Some counties reject significant numbers of absentee ballots due to a missing signature while others reject none.  In Charleston County, three absentee ballots were rejected in 2016 and zero absentee ballots were rejected in 2018 due to a missing signature, even though Charleston County voters cast more than 58,000 and 11,000 absentee ballots, respectively, in those elections.  EAVS 2016; EAVS 2018.  By contrast, in 2016 alone, there were 21 missing-signature rejections in Berkeley County (out of 15,643 absentee ballots cast), 14 such rejections in Dorchester County (out of 14,936 absentee ballots cast), 11 in Greenwood County (out of 6,890 absentee ballots cast), and 10 in Marion County (out of 3,542 absentee ballots cast), even though there were substantially fewer numbers of absentee ballots cast in those counties.  EAVS 2016.  In 2018, there were 25 missing-signature rejections in Orangeburg County even though voters cast relatively few absentee ballots (2,084) in that election.  EAVS 2018.

35.     On information and belief, Charleston County election officials provide pre-rejection notice and an opportunity to cure to voters whose absentee ballots are rejected due to a signature-related deficiency.  The EAVS data thus confirms that providing notice and an opportunity to cure prevents erroneous voter disenfranchisement.

36.     There is no consistent, statewide process governing signature matching for absentee ballots, and election officials in some counties have indicated that they will impose a signature matching requirement while others have not. At a meeting of the Richland County Board of Elections on October 1, 2020, for example, election officials described plans to hire a vendor, Tritek Technologies, Inc., to institute a computerized signature verification process for absentee ballots.  The particularities of this process, and whether other counties will implement similar processes, are unknown.  Relying on signature verification is an inherently flawed means of determining whether an absentee or mail ballot was fraudulently or inappropriately cast.  No two signatures are identical, even if provided by the same signer.  Indeed, a wide variety of factors may cause the appearance of a person's signature to vary from one signing to another, including physical and mental factors such as a person's age, level of health, stress, change in physical or mental condition, eyesight, or use of medications, and environmental factors, such as the type of writing utensil, surface, or paper the signatory uses.

37.     Signature matching is also highly prone to error, particularly when conducted by a layperson without sufficient training in handwriting analysis.  In one study, laypersons—as compared to Forensic Document Examiners—incorrectly concluded that signatures were inauthentic 26% of the time. Moshe Kam et al., *Signature Authentication by Forensic Document Examiners*, 46 J. FORENSIC SCI. 884 (2001),

38.     Given the record number of absentee ballots that will be cast in the November 2020 general election, South Carolina officials will likely reject a record number of absentee ballots due to signature-related deficiencies without voters even being aware that their vote was tossed aside.

39.     Much of the increase in mail-in absentee votes is likely to come from voters who are availing themselves of this method of voting for the first time.  Such voters are more likely to make inadvertent errors resulting in the rejection of their ballots.

40.     If hundreds or perhaps thousands of absentee ballots are rejected for signature-related deficiencies, such as a missing or mismatched signature, that result could be significant and even outcome determinative.  Indeed, it is not uncommon for elections in South Carolina to be decided by a matter of just several hundred votes.  For example, a June 9, 2020 Greenville City Council District 22 Republican primary between Stan Tzouvelekas and Kenneth Cosgrove was decided by three votes.  Anna B. Mitchell, *Greenville County Council candidates concedes District 22 victory to Stan Tzouvelekas*, Greenville News, June 12, 2020, https://www.greenvilleonline.com/story/news/2020/06/11/greenville-county-council-race-flips-again-count-provisional-ballots/5342472002/.  Similarly, a June 14, 2016 primary runoff election for South Carolina House District 81 between Bark Blackwell and K.T. Ruthven was decided by thirty-three votes.  South Carolina 2016 Primary Runoff Election Results, South Carolina Election Commission, https://www.enr-scvotes.org/SC/62799/173206/en/summary.html.

## CLAIMS FOR RELIEF

### Count I: The Challenged Provisions Result in the Denial of Procedural Due Process in Violation of the Fourteenth Amendment

41.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

42. The United States Constitution prohibits states from depriving "any person of . . . liberty . . . without due process of law . . .." U.S. Const. amend. XIV, § 1. Although there is no constitutional right to vote by absentee ballot, once the state creates an absentee voting regime, its citizens retain a liberty interest in voting by absentee ballot, and any state laws governing that regime must comply with the Due Process Clause. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.").

43. Where an individual's liberty interest is at stake, the court must determine what process is due by applying the three-factor test announced in *Mathews v. Eldridge*. 424 U.S. 319, 335 (1976). That test requires balancing: (i) the private interest affected by the official action; (ii) the risk of an erroneous deprivation and "the probable value, if any, of additional or substitute procedural safeguards"; and (iii) the governmental interest, including "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail." *Id.*

44. S.C. Code Ann. § 7-15-420 violates the Due Process Clause by mandating the rejection of absentee ballots with signature-related deficiencies, without providing procedural due process to voters in the form of pre-rejection notice and an opportunity to cure the deficiency.

45. The private interest at stake in having one's vote counted is substantial. It is well-settled that the right to vote is a precious "fundamental political right" because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

46. In every major election, election officials across South Carolina are disenfranchising hundreds of eligible absentee voters due to a missing or mismatched signature

on the outer absentee ballot envelope without providing any notice to them or an opportunity to cure the error.  South Carolina law provides for the automatic rejection of these ballots due to these minor, technical deficiencies without an opportunity to cure even though the voter already completed, signed, and submitted an absentee ballot application and their absentee ballot otherwise complies with South Carolina law.

47.    There is a substantial risk of erroneously depriving an individual of their right to vote by authorizing state officials to reject ballots from qualified, registered voters due to inadvertent errors.  Providing voters with pre-rejection notice and an opportunity to cure signature-related deficiencies would minimize the risk that the state will deny qualified voters their validly-cast votes in error.

48.    The governmental interest in maintaining the integrity of an election also weighs in favor of extending notice and an opportunity to cure a signature-related deficiency, as the integrity of an election depends on counting all ballots that are legitimately cast.  Further, extending notice and an opportunity to cure better serves any governmental interest in preventing fraud, because it allows qualified voters to confirm their identity rather than the state erroneously concluding that another individual has submitted their ballot.

49.    Any additional burden the government may incur would be minimal.   In the case of missing signatures, officials receiving absentee ballot return-addressed envelopes can easily and immediately tell if there is a deficiency because the relevant signatures are on the outside of these envelopes.  Absentee ballot applications are kept on file by the County Board of Voter Registration and Elections, and can be traced to any individual absentee ballot.  The state therefore possesses the information necessary to provide notice as promptly as practicable to voters whose ballot envelopes contain a signature-related deficiency.

50.     Further, South Carolina already has a notice process for provisional ballots cast by voters whose qualifications have been challenged by poll workers, and the state allows voters who cast provisional ballots to remedy certain deficiencies at a hearing the Friday after the election.  S.C. Code Ann. §§ 7-13-830, 7-17-10.  Under existing deadlines, state officials would have ample time to notify voters of signature-related deficiencies and allow them the opportunity to cure those deficiencies.

51.     Plaintiffs' requested relief would alter neither the timeline nor procedure for voters to return their ballots. Pre-rejection notice and an opportunity to cure are already available to those who cast ballots that are challenged for other reasons, namely, a suspected lack of voter qualifications. There is no legitimate state interest justifying South Carolina's failure to either provide a similar cure period for ballots with signature-related deficiencies, or extend the existing cure process for provisional ballots to absentee voters whose ballots contain a signature-related deficiency.

## Count II: The Challenged Provisions Burden the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments

52.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

53.     The First and Fourteenth Amendments to the United States Constitution protect the fundamental right to vote.  *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  A state government may not burden the right to vote without adequate justification. S.C. Code Ann. § 7-15-420 imposes a substantial burden on voters' rights by mandating the rejection of absentee ballots with signature-related deficiencies without providing notice or an opportunity to cure.

54.    The failure to provide a consistent, state-wide process for notifying voters of a missing or mismatched signature, and allowing voters a chance to cure these deficiencies, imposes a substantial burden on the right to vote. It arbitrarily disenfranchises hundreds of eligible South Carolina absentee voters in election after election due to minor signature-related deficiencies. The failure to provide pre-rejection notice and an opportunity to cure also adversely impacts the integrity of the election process, which depends on every qualified voter's vote being counted.

55.    No governmental interest justifies the failure to provide voters with notice and an opportunity to cure a signature-related deficiency in their absentee ballots. South Carolina already maintains a similar notice process for provisional ballots that contain an identity or qualification challenge, and the state allows voters who cast those provisional ballots to remedy those deficiencies in their ballots up to three days after the election. Thus, any interest in election administration is minimal, and does not outweigh the burden on voters.

56.    Providing notice and an opportunity to cure signature-related deficiencies is likely to further the state's interest in maintaining voters' confidence in the integrity of the electoral process by ensuring that qualified voters do not see their ballots rejected erroneously or because of inadvertent error. Allowing voters an opportunity to verify their ballots also furthers the state's interest in preventing voter fraud by allowing the state to confirm the identity of voters before their votes are counted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.    Issue a judgment declaring that S.C. Code Ann. § 7-15-420, as currently applied in the context of the ongoing COVID-19 pandemic and South Carolina's temporary expansion of

absentee voting pursuant to Act 149, deprives voters of procedural due process in violation of the

Fourteenth Amendment and imposes an undue burden on the right to vote in violation of the First

and Fourteenth Amendments to the Constitution of the United States by disenfranchising

absentee voters without first providing them with notice and an opportunity to be heard or to

otherwise cure alleged signature-related deficiencies;

      b.      Issue preliminary and permanent injunctions enjoining the Defendants from

enforcing S.C. Code Ann. § 7-15-420 to the extent that it fails to provide absentee voters with

pre-rejection notice and a hearing or other opportunity to resolve signature-related deficiencies;

specifically,  Plaintiffs request that Defendants direct county election officials to review absentee

ballot envelopes and provide pre-rejection notice to voters by first-class mail and, where

available, by email or phone, of any signature-related deficiency; and permit voters whose

absentee ballots are deficient on this ground to cure the deficiency up to three days following the

election.  Alternatively, Plaintiffs request that the Defendants instruct election officials to expand

the existing process through which voters may cure certain deficiencies in their provisional

ballots up to the statutorily-mandated meetings on the Friday following the election to include

absentee ballot deficiencies based on missing or mismatched signature; and that the Defendants

update their election guides, manuals, guidance, instructional materials, etc., to conform with the

revised procedures;

      c.      Award reasonable attorneys' fees and costs to Plaintiffs under 42 U.S.C. § 1988;

and

      d.      Grant any additional or alternative relief the Court may deem appropriate under

the circumstances.

Dated:  October 2, 2020                  Respectfully submitted,

____s/ Susan K. Dunn_____
Susan K. Dunn (Fed. Bar #647)
Shirene C. Hansotia (Fed. Bar #12558)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTH CAROLINA
P.O. Box 20998
Charleston, South Carolina 29413-0998
Telephone: (843) 282-7953
Facsimile: (843) 720-1428
Email: sdunn@aclusc.org
Email: shansotia@aclusc.org

Ezra Rosenberg*
erosenberg@lawyerscommittee.org
John Powers*
jpowers@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Phone: (202) 662-8389
Fax: (202) 783-0857

Catherine Amirfar*
camirfar@debevoise.com
Tara Ganapathy*
tganapathy@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*pro hac vice motions forthcoming

Counsel for Plaintiffs

Julianne J. Marley
jjmarley@debevoise.com
Rhianna Hoover
rhoover@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

Of Counsel for Plaintiff