**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA; THE FAMILY UNIT, INC.; ALBERTUS CLEA and GEORGE HOPKINS,<br><br>    Plaintiffs,<br><br>    v.<br><br>MARCI ANDINO, in her official capacity as the Executive Director of the South Carolina State Election Commission; HOWARD M. KNAPP, in his official capacity as Director of Voter Services of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; and JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission,<br><br>    Defendants. | Case No. 2:20-cv-03537-RMG |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

i

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND..................................................................................................2

     I.     Procedure for Absentee Voting in South Carolina ................................................2

          A.     Applying for an Absentee Ballot.................................................................2
          B.     Casting and Processing an Absentee Ballot................................................3

     II.    South Carolina Law Fails to Provide an Adequate System for Notice and
          Cure of Absentee Ballots Rejected for Signature-Related Deficiencies.................5

ARGUMENT..........................................................................................................................7

     I.     Legal Standard for a Preliminary Injunction .........................................................8
     II.    Plaintiffs Have Standing to Seek a Preliminary Injunction....................................8

          A.     Voter Plaintiffs Albertus Clea and George Hopkins Have Standing .........8
          B.     The League of Women Voters of South Carolina and The Family
               Unit Have Organizational Standing ..........................................................10

     III.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims ..........................11

          A.     Plaintiffs Are Likely to Succeed on Their Procedural Due Process
               Claim ......................................................................................................12
     1.     Plaintiffs Have a Constitutionally Protected Interest in the Right to Vote ...........13
     2.     Due Process Requires that South Carolina Provide Notice and an
Opportunity to Cure Missing Signatures ...............................................................................14

          a)     Plaintiffs' Interest in the Fundamental Right to Vote is Entitled to
               Substantial Weight ..................................................................................15
           b)     There is a High Risk of Erroneous Deprivation that Would be
               Significantly Decreased by Additional Procedures..................................15
           c)     Granting Plaintiffs' Requested Relief Would Advance the Governmental
               Interest in Election Integrity ...................................................................16

          B.     Plaintiffs Are Likely to Succeed on Their Claim that South
               Carolina Law Unduly Burdens the Fundamental Right to Vote...............17

     IV.   Plaintiffs Will Suffer Irreparable Harm Absent this Court's Intervention............21
     V.    The Balance of Harms Favors Granting a Preliminary Injunction .......................22
     VI.   The Requested Relief Would Benefit the Public Interest ....................................24

CONCLUSION.....................................................................................................................24

## TABLE OF AUTHORITIES

CASES

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........................................................................ 13, 17

*Ariz. Democratic Party v. Hobbs*, Nos. 20-16759, 20-16766, 2020 WL 5903488 (9th Cir. Oct. 6, 2020) ............................................................................................................................12

*Burdick v. Takushi*, 504 U.S. 428 (1992) .............................................................................. 17, 19

*Common Cause /Ga. v. Billups*, 554 F.3d 1340 (11th Cir. 2009) ............................................9, 18

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) ............................................... 18, 19

*Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008) ................................................................9

*Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20-CV-457, 2020 WL 4484063 (M.D.N.C. Aug. 4, 2020) ...........................................................................9, 11, 12, 13, 23

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019) ...........11, 15, 19, 20, 21

*Doe v. Walker*, 746 F. Supp. 2d 667 (D. Md. 2010) ..................................................................20

*Frederick v. Lawson*, --- F.3d ---, No. 1:19-cv-01959-SEB-MJD, 2020 WL 4882696 (S.D. Ind. Aug. 20, 2020) ......................................................................... 11, 12, 18, 24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000) ............................8

*Fusaro v. Cogan*, 930 F.3d 241 (4th Cir. 2019) ........................................................................18

*Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018) ...............18

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ..............................................21

*Goldberg v. Kelly*, 397 U.S. 254 (1970).....................................................................................14

*Harding v. Edwards*, 2020 WL 5371350 (M.D. La. Sept. 7, 2020) ............................................24

*Harding v. Edwards*, No. CV 20-495-SDD-RLB, Order, 2020 WL 5543769 (M.D. La. Sept. 16, 2020) ........................................................................................................................24

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966)..........................................................9

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), *superseded on other grounds by statute* .......................................................................................................................10

*Hoblock v. Albany Cty. Bd of Elections*, 341 F. Supp. 2d 169 (N.D.N.Y. 2004) ...................19, 21

*Ingraham v. Wright*, 430 U.S. 651 (1977)..................................................................................12

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) *injunction stayed pending application for certiorari*, 574 U.S. 927 (2014)......... 15, 21, 23, 24

*League of Women Voters of Ohio v. LaRose*, 2020 WL 5757453 (S.D. Ohio Sept. 27, 2020)..................................................................................................................12

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011).........................................................22

*Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006) ...........................................................................14

*Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340-41 (N.D. Ga. 2018), *denying stay pending appeal sub. nom Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019)....................................................................11, 13, 14, 15, 24

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .................................................................................14

*McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215 (4th Cir. 1995) ...........................................18

*Memphis A. Phillip Randolph Inst. v. Hargett*, 2020 WL 5095459 (M.D. Tenn. Aug. 28, 2020) *appeal filed* (6th Cir. Sept. 11, 2020) ...........................................................12

*Morrissey v. Brewer*, 408 U.S. 471 (1972)..................................................................................14

*Ne. Ohio Coal. for Homeless*, *v. Husted*, 696 F.3d 580 (6th Cir. 2012) ....................................19

*Norman v. Reed*, 502 U.S. 279 (1992) ........................................................................................18

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012)............................................................24

*Paul v. Davis*, 424 U.S. 693 (1976) ............................................................................................14

*Purcell v. Gonzalez*, 549 U.S. 1 (2006)................................................................................. 17, 23

*Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354 (D. Ariz. 1990) .............13

*Richardson v. Texas Sec'y of State*, 2020 WL 5367216 (W.D. Tex. Sept. 8, 2020) *appeal docketed* (5th Cir. Sept. 10, 2020)..................................................................................18

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ................................................................ 8, 11

*Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47 (2006) .........................8

*Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D.N.H. 2018) ........................................... 11, 12

*Self Advocacy Sols., N.D. v. Jaeger*, No. 3:20-cv-00071, 2020 WL 2951012 (D.N.D. June 3, 2020).................................................................. 9, 11, 13, 14, 15, 16, 23

*Students for Fair Admissions, Inc. v. Univ. of N.C.*, No. 1:14CV954, 2018 WL 4688388 (M.D.N.C. Sept. 29, 2018)..................................................................................10

*Thomas v. Andino*, Nos. 3:20-cv-01552-JMC, 3:20-cv-01730-JMC, 2020 WL 2617329 (D.S.C. May 25, 2020) ......................................................................................21

*White Tail Park, Inc. v. Stroube*, 413 F.3d 451 (4th Cir. 2005) .................................................10

*Wilkinson v. Austin*, 545 U.S. 209 (2005) ............................................................................ 13, 14

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ...................................................................8

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ..............................................................................2, 15

*Zessar v. Helander*, No. 05-C-1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) ......................14

*Zinermon v. Burch*, 494 U.S. 113 (1990) ...................................................................................22

**STATUTES**

42 U.S.C. § 3613(a)(1)(A) ...........................................................................................................10

S.C. Code Ann. § 7-15-320 ............................................................................................................2

S.C. Code Ann. § 7-15-330 .........................................................................................................2, 3

S.C. Code Ann. § 7-15-370 ............................................................................................................3

S.C. Code Ann. § 7-15-420 ........................................................................................... 4, 12, 16, 17

S.C. Code Ann. § 7-13-830 ............................................................................................................4

S.C. Code. Ann. Title 7, Ch. 15, G.5305/R.149 .........................................................................13

S.C. Code § 7-17-10 .....................................................................................................................17

**OTHER AUTHORITIES**

Constitution of the State of South Carolina ...................................................................................3

Federal Rule of Civil Procedure 65(a) ...........................................................................................7

U.S. Constitution................................................................................................................ 12, 14, 21

Election Day. S.C. Election Comm'n, *New Absentee Rules for the 2020 General Election*
    (last visited Oct. 8, 2020), https://www.scvotes.gov/new-absentee-rules-2020-general-
    election....................................................................................................................................4

South Carolina 2016 Primary Runoff Election Results, South Carolina Election
    Commission, https://www.enr-scvotes.org/SC/62799/173206/en/summary.html.................16

Zak Koeske, *SC won't accept absentee ballots that lack witness signature*
    https://www.thestate.com/article246299550.html. ..............................................................6

Anna B. Mitchell, *Greenville County Council candidates concedes District 22 victory to
    Stan Tzouvelekas,* https://www.greenvilleonline.com/story/news/2020/06/11/
    greenville-county-council-race-flips- ....................................................................................16

**INTRODUCTION**

South Carolina election officials will reject absentee ballots cast by eligible voters during the November 2020 election solely because they are unsigned or not "properly signed." When a ballot is rejected on these grounds, South Carolina officials do not furnish voters with notice that their ballot will not be counted or provide an opportunity for the voter to fix the perceived deficiency. State law does not even require that officials notify voters that their ballot was rejected after the election has passed. These laws disenfranchise voters such as Plaintiff Albertus Clea; his absentee ballot was rejected in the June 2018 primary runoff election due to a missing signature, but he did not learn about that rejection until years later.

The failure to provide absentee voters with notice of and the opportunity to cure a signature-related deficiency like Mr. Clea's deprives absentee voters of their fundamental right to vote and their right to due process. Moreover, this "no-notice" policy is haphazardly implemented across the state; the evidence shows that South Carolinians are being arbitrarily disenfranchised based on their county of residence. These laws are unconstitutional when applied to any election, but will disenfranchise a record number of absentee voters in the imminent November general election due to the likely unprecedented number of absentee ballots expected to be cast in the wake of the COVID-19 pandemic.

In view of the impending and irreparable harm awaiting many South Carolina absentee voters, this Motion seeks limited but urgently needed relief. Plaintiffs seek a preliminary injunction enjoining the rejection of absentee ballots before providing absentee voters with pre-rejection notice and an opportunity to cure missing signatures – not only for the upcoming November election but for all elections during the pendency of this litigation.

Other courts have denied requests for relief that would have changed election rules immediately preceding the election, or encroached on states' rights to legislate voting

1

requirements—but those concerns are not present here. Plaintiffs' proposed relief is narrowly tailored and requires no changes to South Carolina's existing absentee voting ballot formats, deadlines, processes, or signature requirements. Plaintiffs do not seek to force the Court to order election officials to simply count absentee ballots containing missing signatures without the voters first confirming their identity. The proposed relief would simply require state election officials to give qualified absentee voters a reasonable opportunity to correct ballots that may otherwise be thrown out in error after being received by election officials, and to do so within the time period already provided to cure provisional ballots under South Carolina law. This relief will mitigate, rather than exacerbate, potential voter confusion by allowing voters to ascertain the status of their ballot before the election and confirm their identity with election officials. This remedy is necessary to safeguard the right to vote– a right that is "preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

## **FACTUAL BACKGROUND**

### I.     Procedure for Absentee Voting in South Carolina

South Carolina law authorizes certain eligible voters to cast absentee ballots by mail. Under normal circumstances, absentee voting in South Carolina is limited to voters who meet specific criteria that excuse them from in-person voting. S.C. Code Ann. § 7-15-320. On September 16, 2020, South Carolina Governor Henry D. McMaster signed bill G.5305/R.149 into law, expanding absentee voting to all qualified voters for the upcoming November 3, 2020 general election only. H.B. 5305, 123rd Gen. Assemb. (S.C. 2020).

### A.     Applying for an Absentee Ballot

The first step in the absentee voting process is for the voter to submit an absentee ballot application by filling out and submitting a specified form. S.C. Code Ann. § 7-15-330. The application form must include the voter's signature attesting to the correctness of the information

2

provided on the form, as well as a sworn statement that the voter is registered to vote and that he or she is the person who is registered. *Id.* § 7-15-340. Applications may be submitted to the county clerk in person up to 5:00 p.m. on the day before Election Day, or by mail if received no later than 5:00 p.m. on Saturday, October 24, 2020. *Id.* § 7-15-330; H.B. 5305, 123rd Gen. Assemb. (S.C. 2020). County election officials must review and vet the application; if the applicant is qualified to receive an absentee ballot, officials must mail an official absentee ballot to the voter "as soon as possible." *See* S.C. Code Ann. § 7-15-370.

### B.    Casting and Processing an Absentee Ballot

Absentee ballots sent to voters must include (1) instructions for marking and returning the ballot and signing and returning the required oath, (2) an envelope marked "Ballot Herein" into which the voter will place the completed ballots, (3) a return-addressed envelope containing an oath on the back to be signed by the voter and a witness, which the voter will use to return the interior ballot envelope to the board of voter registration and elections, and (4) any other materials necessary to enable the absentee ballot applicant to lawfully execute and return a ballot. S.C. Code Ann. § 7-15-370(2)-(5). The return envelope has the words "Absentee ballots for _____ County, _____ (county seat), South Carolina" printed on its face in the upper left corner. *Id.* § 7-15-375. These blanks are filled in by the county board prior to mailing the absentee ballot to the applicant. *Id.* On the back of the return envelope, there are blanks for the voter to fill in his or her name and address and to sign the oath, which states: "I hereby swear (or affirm) that I am duly qualified to vote at this election according to the Constitution of the State of South Carolina, that I have not voted during this election, that the ballot or ballots contained in this envelope is my ballot and that I have received no assistance in voting my ballot that I would not have been entitled to receive had I voted in person at my voting precinct." *Id*. § 7-15-380. There are also blanks for the witness to fill in her or his name, address, and signature. *Id.*

3

Absentee ballots may be hand-delivered by the voter or returned by mail to the county voter registration office or extension office, so long as the ballot is received by 7:00 p.m. on Election Day.  S.C. Election Comm'n, *New Absentee Rules for the 2020 General Election* (last visited Oct. 8, 2020), https://www.scvotes.gov/new-absentee-rules-2020-general-election.  At 7:00 a.m. on Sunday, November 1, 2020, election officials may begin the process of examining the return-addressed envelopes that have been received by the county board of voter registration and elections.   H.B. 5305, 123rd Gen. Assemb. (S.C. 2020).  All return-addressed envelopes received by the county election officials before the polls close must be examined so the eligibility of the voter may be determined.  *See* S.C. Code Ann. § 7-15-420(B).

A ballot may not be counted unless the oath is "properly signed."  *Id*.  After all return-addressed envelopes have been emptied, but no earlier than 7:00 a.m. on Election Day, the election managers remove the ballots contained in the envelopes marked "Ballot Herein" and place them in the appropriate ballot box.  H.B. 5305, 123rd Gen. Assemb. (S.C. 2020); S.C. Code Ann. § 7-15-420(C).  Beginning at 7:00 a.m. on Election Day, election officials may begin tabulating absentee ballots.  H.B. 5305, 123rd Gen. Assemb. (S.C. 2020).

Under South Carolina law, when an absentee voter's qualifications are challenged by a third party during the tabulation process, the voter must be given reasonable notice of the challenge.  S.C. Code Ann. §§ 7-15-420(D), 7-13-830.  That absentee ballot is considered to be a provisional vote; county election officials then consider each ballot and decide the merits of the challenge.  *Id.* § 7-13-830.  If the county officials do not sustain the challenge, the ballot is no longer considered provisional and is counted.  *Id.*

**II.    South Carolina Law Fails to Provide an Adequate System for Notice and Cure of Absentee Ballots Rejected for Signature-Related Deficiencies**

South Carolina does not provide absentee voters in the November 2020 general election or in future elections with pre-rejection notice or an opportunity to cure where their absentee ballots are rejected because they are not "properly signed." Because there has been no statewide law, missing signatures have been treated differently depending on the county where the voter has submitted his or her absentee ballot. Some counties have contacted voters to inform them of the deficiency and allow them an opportunity to cure, while others have not—and some counties have taken steps to create or impose a signature-matching requirement.

As explained by Dr. Michael P. McDonald, a leading expert on U.S. elections, data gathered from the Election Administration and Voting Survey Datasets ("**EAVS**") "reveal an uneven administration of the missing signature requirement by South Carolina election officials." Declaration of Dr. Michael P. McDonald, attached as Ex. 1 ("McDonald Decl."), at 4.

Dr. McDonald's analysis demonstrates that some county election officials are consistently more likely to reject mail ballots for the reason of no voter signature than others, thereby resulting in South Carolina voters being unequally treated with respect to counting their ballots. *Id.* at 5. The EAVS data confirms that a handful of counties – Richland (50 rejections), Sumter (34), Orangeburg (32), Berkeley (29), Horry (29), and Lexington (23) are responsible for approximately half (49.1%) of all of the 401 reported missing-signature absentee ballot rejections in South Carolina in the November 2016 and November 2018 elections, although voters in those counties only accounted for about a quarter (28.5%) of all absentee ballots cast. *Id.* at 6, 8. In an extreme case, Orangeburg County was somehow responsible for 17.9 percent (25 rejections) of all of the 140 missing-signature rejections in South Carolina in the November 2018 election, although Orangeburg County voters only cast 2.9 percent of all of the absentee

5

ballots submitted in South Carolina in that election (2,065 out of 72,806). *Id.* By contrast, in Charleston, there were nearly five times as many absentee ballots cast—over 10,000—with *zero* missing-signature rejections in 2018, and 13 South Carolina counties reported zero rejected ballots in both 2016 and 2018. *Id.* at 5, 8.

The South Carolina State Election Commission voted on October 7 to prohibit county election officials from allowing voters to "cure" absentee ballots that are received without witness signatures. Zak Koeske, *SC won't accept absentee ballots that lack witness signature*, The State, Oct. 8, 2020, https://www.thestate.com/article246299550.html. If this prohibition on curing absentee ballots with witness signature-related deficiencies is also applied to absentee ballots that lack signatures, even more voters will be disenfranchised in the upcoming election and beyond. Regardless, the risk of increased voter disenfranchisement is heightened in the November 2020 election, where South Carolina election officials are expecting "as many as 1 million absentee ballots to be cast statewide." *Id.*

Finally, Dr. McDonald points out that South Carolina's signature requirements are not borne equally by all voters. *See* McDonald Decl. at 5. He notes the unique "obstacles faced by illiterate or near-illiterate citizens." *Id.* He points to the declaration of Sumter County resident Albertus Clea, which he reviewed, as a "poignant reminder" of these burdens. *Id.*

Mr. Clea is an African-American Sumter County voter who attempted to vote by absentee ballot in South Carolina's June 26, 2018 primary runoff election. Declaration of Albertus Clea, attached as Ex. 3; ("Clea Decl.") ¶¶ 3-5. However, because he did not understand the instructions on the voter's oath envelope, he did not sign his ballot return envelope, and his ballot was thus rejected for being unsigned. *Id.* ¶¶ 5-7. Mr. Clea was not contacted by the Sumter County Voter Registration and Elections Office either before, after, or during the primary to

6

inform him that his ballot was unsigned, or that it would be rejected as a consequence. *Id.* ¶ 8. Mr. Clea did not learn that his ballot was rejected until 2020, when he was informed by Dr. Brenda C. Williams of The Family Unit. *Id.* Mr. Clea was shocked, disappointed, and saddened to learn that his vote had not been counted and that he was disenfranchised. *Id.* ¶¶ 8-9. Mr. Clea intends to vote by absentee ballot in the November 2020 general election, but fears election officials will reject his absentee ballot if he forgets to sign the voter's oath on the ballot return envelope or makes any other error. *Id.* ¶¶ 10-11. Charleston County voter George Hopkins is similarly concerned that his absentee ballot will be rejected without notice and an opportunity to cure any signature-related issue; he suffered a hemorrhagic stroke in August 2020 which has caused weakness in his right hand and arm, making writing and properly signing the voter oath difficult. Declaration of George Hopkins, attached as Ex. 2 ("Hopkins Decl.") ¶¶ 5-6, 9-10. Both Mr. Clea and Mr. Hopkins are considering voting by absentee ballot in future elections. *Id.*; Clea Decl. ¶ 12.

## ARGUMENT

Plaintiffs urgently seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) that would enjoin election officials from rejecting absentee ballots on the basis that they are not "properly signed" without providing pre-rejection notice and an opportunity to cure. Specifically, Plaintiffs request that Defendants direct county election officials to review absentee ballot envelopes and provide pre-rejection notice to voters by first-class mail and, where available, by email or phone, of any signature-related deficiency as soon as is practicable; and permit voters whose absentee ballots are deficient on this ground to cure the deficiency up to three days following the election—the time period already provided under South Carolina law for voters to cure certain deficiencies in provisional ballots. Alternatively, Plaintiffs request that the Defendants instruct election officials to apply the existing process through which voters may

7

cure certain deficiencies in their provisional ballots up to the Friday following the election to ballots that are found to have signature-related deficiencies; and that the Defendants update their election guides, manuals, guidance, instructional materials, etc., to conform with the revised procedures.

## I.     Legal Standard for a Preliminary Injunction

"A party 'seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

## II.     Plaintiffs Have Standing to Seek a Preliminary Injunction

Plaintiffs have standing to bring this action.  To satisfy the Article III standing requirement, Plaintiffs must demonstrate that they have "(1) . . . suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000) (internal citation omitted).  The "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (internal citation omitted).  Here, all Plaintiffs meet the requirements for standing.

### A.     Voter Plaintiffs Albertus Clea and George Hopkins Have Standing

Individual voter Plaintiffs George Hopkins and Albertus Clea have standing to bring suit in this case.  The requirement of "injury in fact" is satisfied where the plaintiffs' "threatened

injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734–735 (2008) (finding sufficient injury in the context of an "asymmetrical" campaign financing amendment). In the voting context, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue,' so long as their claimed injuries are 'distinct from a generally available grievance about the government.'" *Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20-CV-457, 2020 WL 4484063, at *13-14 (M.D.N.C. Aug. 4, 2020) (internal citations omitted). Here, Plaintiff Albertus Clea in particular is at risk of an imminent injury resulting from failure to sign the voter oath—which has occurred in the past because he is challenged with his literacy and cannot easily read the instructions—and not receiving notice that his ballot will be rejected or the opportunity to cure. This risk is concrete and has already caused injury to Mr. Clea in the past, as he was disenfranchised by the same failure to provide pre-rejection notice and cure in the June 2018 primary runoff election. *Compare* Clea Decl. ¶¶ 5-7, *with Student Challenging Reg. Agency Proc. (SCRAP)*, 412 U.S. 669, 689 n. 14 (1973) (noting an alleged injury need not be substantial because an "identifiable trifle is enough for standing"). Mr. Clea and Mr. Hopkins have standing even if they are ultimately able to vote in the November 2020 election. *See*, *e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667-68 (1966) (inability of a voter to pay a poll tax is not required to challenge the statute imposing such tax); *Common Cause /Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). Moreover, the imminent, direct injury to Mr. Clea and Mr. Hopkins is traceable to the Defendants because it "stem[s] from failure to adopt adequate procedures" for processing absentee ballots. *Self Advocacy Sols., N.D. v. Jaeger*, No. 3:20-cv-00071, 2020 WL 2951012, at *5-6 (D.N.D. June 3, 2020).

**B.     The League of Women Voters of South Carolina and The Family Unit Have Organizational Standing**

Plaintiff League of Women Voters of South Carolina ("LWVSC") also has standing to seek a preliminary injunction.

The doctrine of Article III standing applies to individuals and organizations alike. *Students for Fair Admissions, Inc. v. Univ. of N.C.*, No. 1:14CV954, 2018 WL 4688388, at *3 (M.D.N.C. Sept. 29, 2018) (citing *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005)).  A determination as to whether an organization has standing in its own right is separate from an analysis of the standing of its members.  *Id.* Among other recognized forms of harm, if an organization's ability to function or to provide its core services is impaired by an allegedly unlawful action, and it suffers "the consequent drain on [its] resources" as a result, that organization has standing to bring suit.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 369, 378–379 (1982), *superseded on other grounds by statute* 42 U.S.C. § 3613(a)(1)(A).

Both LWVSC and The Family Unit have organizational standing because their ability to provide the services that are core to their missions have been impaired by Defendants' failure to require that absentee voters in South Carolina be given pre-rejection notice and an opportunity to cure before their ballots are discarded.   Both organizations are being forced to divert resources from their usual activities, which include voter registration, education assistance, and fundraising, towards educating voters about South Carolina's policy of rejecting unsigned absentee ballots and to responding to numerous calls or messages from voters seeking assistance with respect to complying with the nuances of the absentee voting process, including communications relating directly to concerns about signature deficiencies.  Ulbrich Decl. ¶ 22; Williams Decl. ¶ 16.  LWVSC and The Family Unit expect that, after the 2020 general election, they will be forced to divert resources to respond to inquiries from voters who learn that their

10

absentee ballot was rejected due to signature-related discrepancies such as a missing signature. Ulbrich Decl. ¶ 23; Williams Decl. ¶ 21.  For example, in February 2020, The Family Unit's Executive Director, Dr. Brenda Williams, obtained records concerning signature-related absentee ballot rejections from Sumter County Election Director Patricia Jefferson and contacted individual voters, including Albertus Clea, to inform them that they were disenfranchised, and help to educate them about the signature requirement to ensure their ballots are not rejected in the future.  Williams Decl. ¶¶ 9-10, 12, 17.

## III.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims

In seeking a preliminary injunction, a plaintiff need only "make a clear showing that [they are] likely to succeed at trial," and "need not establish a certainty of success."  *Roe v. Dep't of Def.*, 947 F.3d at 219.  Here, Plaintiffs have exceeded this threshold.  Courts across the country, including in this circuit, have granted injunctive relief after finding that similar absentee ballot signature regimes that lack adequate notice and cure procedures are likely unconstitutional deprivations of due process or burdens on the fundamental right to vote. *See, e.g*., *Democracy N.C. v. N.C. State Bd. of Elections*, 2020 WL 4484063, at *53-55 ("[W]hen the ballot is rejected for a reason that is curable, such as incomplete witness information, or a signature mismatch, and the voter is not given notice or an opportunity to be heard on this deficiency, the court finds this 'facially effect[s] a deprivation of the right to vote.'"); *Jaeger*, 2020 WL 2951012, at *11-12; *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340-41 (N.D. Ga. 2018), *denying stay pending appeal sub. nom Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1263 (11th Cir. 2019); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D.N.H. 2018); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019); *Frederick v. Lawson*, --- F.3d ---, No. 1:19-cv-01959-SEB-

11

MJD, 2020 WL 4882696, at *13-16 (S.D. Ind. Aug. 20, 2020).[1]  Here too, Plaintiffs are likely to succeed on the merits of both of their claims.

### A.     Plaintiffs Are Likely to Succeed on Their Procedural Due Process Claim

Plaintiffs are likely to succeed on the merits of their procedural due process claim. The Due Process Clause of the Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  In assessing whether a state action violates the Due Process Clause, the Court first inquires whether "the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property'"; and then determines "what procedures constitute 'due process of law.'"  *Ingraham v. Wright*, 430 U.S. 651, 672 (1977) (internal citations omitted).

Indeed, Courts across the country have found that absentee ballot schemes that invalidate ballots for signature deficiencies must provide some form of notice or opportunity to cure in order to provide voters their constitutionally-protected right to Due Process.  *See, e.g.*, *Frederick*, 2020 WL 4882696, at *15 (finding that Indiana's "lack of any notification of the ballot rejection to the affected voter or opportunity to challenge the rejection" violated procedural Due Process); *Democracy N.C.*, 2020 WL 4484063, at *54-55; *Saucedo*, 335 F. Supp. 3d at 214-216, 222 (collecting cases and finding, that  "in light of the fundamental importance of

---

[1]     *But see Memphis A. Phillip Randolph Inst. v. Hargett*, 2020 WL 5095459, at *7-8 (M.D. Tenn. Aug. 28, 2020) (finding no cognizable liberty interest) *appeal filed* (6th Cir. Sept. 11, 2020).  Cases like *Ariz. Democratic Party v. Hobbs*, Nos. 20-16759, 20-16766, 2020 WL 5903488 (9th Cir. Oct. 6, 2020) and *League of Women Voters of Ohio v. LaRose*, 2020 WL 5757453 (S.D. Ohio Sept. 27, 2020) are inapposite because both states already provide for notice and cure, while South Carolina does not – and does not even provide notice when an absentee ballot is rejected.  *Compare Hobbs*, 2020 WL 5903488, at *1 ("If an early voter returns a ballot with an unsigned affidavit, Arizona has afforded him or her an opportunity to cure the problem" until "7:00 PM on Election Day"); *LaRose*, 2020 WL 5757453, at *10 ("Electors wishing to vote absentee have . . . an opportunity to cure . . ."), *with* S.C. Code Ann. § 7-15-420(B).

the right to vote," New Hampshire's signature-matching system violated procedural due process because of, among others, it granted "sole, unreviewable discretion" to election officials; *see also Martin*, 341 F. Supp. 3d at 1339–40. South Carolina's failure to provide a notice and cure violates procedural due process because voters are not notified of the discrepancy at any stage of the voting process – even after their ballot is rejected – although these disenfranchised voters already successfully completed an absentee ballot application and received and submitted an otherwise valid ballot. South Carolina already provides an opportunity to cure in other circumstances, such as challenged absentee ballots or circumstances when a voter fails to provide photo identification.

### 1. Plaintiffs Have a Constitutionally Protected Interest in the Right to Vote

The fundamental right to vote is a core liberty interest under the Due Process Clause; a person cannot be deprived of that right without due process. *Jaeger*, 2020 WL 2951012, at \*8 ("Beyond debate, the right to vote is a constitutionally protected liberty interest."); s*ee also Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983). South Carolina has created a statutory right to absentee voting to effectuate this fundamental right, *see* S.C. Code. Ann. Title 7, Ch. 15, G.5305/R.149, and having done so, has provided absentee voters with a protected liberty interest. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.") (internal citations omitted). Thus, "[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege." *See, e.g.*, *Democracy N.C.*, 2020 WL 4484063, at \*53 (citing *Martin*, 341 F. Supp. 3d at 1338 (quoting *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990)); *Jaeger*, 2020 WL 2951012, at

13

*8 ("[A] state that creates a system for absentee voting 'must administer it in accordance with the Constitution.'") (citing *Martin*, 341 F. Supp. 3d at 1338 (quoting *Zessar v. Helander*, No. 05-C-1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006)) *vacated due to amendment of statute sub nom Zessar v. Keith*, 536 F.3d 788 (7th Cir. 2008); *see also Paul v. Davis*, 424 U.S. 693, 710–11 (1976) (explaining that liberty or property interests can "attain [] constitutional status by virtue of the fact that they have been initially recognized and protected by state law" and observing that the Supreme Court has "repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status"); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (finding statutory entitlement to welfare benefits triggered protection of the due process clause).

### 2.     Due Process Requires that South Carolina Provide Notice and an Opportunity to Cure Missing Signatures

"[O]nce it is determined that due process applies," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), the Court must apply the three-factor test established by the Supreme Court in *Mathews v. Eldridge* to determine what process is due, balancing "(1) the private interest affected by the government action; (2) the risk of erroneous deprivation through the procedures used and the probable value, if any, of alternative or additional procedures; and (3) the state's interest, including the function involved and the fiscal and administrative burdens of added safeguards." *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006) (citing *Wilkinson v. Austin*, 545 U.S. 209, 211 (2005) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976))). Each of these elements militates in Plaintiffs' favor.

14

**a)    Plaintiffs' Interest in the Fundamental Right to Vote is Entitled to Substantial Weight**

There can be no real dispute that the private interests affected by South Carolina's failure to provide absentee voters with pre-rejection notice and an opportunity to cure—namely, the right to vote of the individual Plaintiffs and the organizational Plaintiffs' members—are "entitled to substantial weight." *Jaeger*, 2020 WL 2951012 (quoting *Martin*, 341 F. Supp. 3d at 1338). The right to vote has long been ranked by the Supreme Court as one of the most precious political rights because it is "preservative of all rights." *Yick Wo*, 118 U.S. 356, 370 (1886).

**b)    There is a High Risk of Erroneous Deprivation that Would be Significantly Decreased by Additional Procedures**

Here, the risk of erroneous deprivation of voters' rights is high. *First*, the State's failure to provide any opportunity to cure a ballot rejected for a missing signature creates a significant risk that qualified voters' absentee ballots will be discarded. A missing signature is typically the result of simple, benign error by the voter, rather than evidence that a voter is not qualified to submit an absentee ballot. As Mr. Clea experienced in the June 2018 primary election, absentee voters in South Carolina are not notified of these technical errors before their ballots are discarded, let alone provided an opportunity to cure a missing signature. As Dr. McDonald observes, the EAVS data shows absentee voters being rejected arbitrarily in certain counties in each major election. This is the case although absentee voters in all counties have taken the necessary steps to identify themselves as qualified voters by applying for, filling out, and submitting an absentee ballot application as a prerequisite to obtaining their ballot. This is impermissible, as "even one disenfranchised voter . . . is too many." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) *injunction stayed pending application for certiorari*, 574 U.S. 927 (2014); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d

15

1312, 1318, 1321 (11th Cir. 2019) *motion to vacate denied sub nom Dem. Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790 (11th Cir. 2020) (same).

*Second*, the procedural safeguards currently provided by the state are minimal at best, and are clearly insufficient to protect against erroneous deprivation. There is no statewide requirement that election officials give voters an opportunity to respond to or challenge the decision to reject his or her ballot because of a signature-related discrepancy, or to correct the alleged discrepancy. Nor is there any requirement that the voter receive notice that his or her ballot has been rejected—either before or after the election. S.C. Code Ann. § 7-15-420(B).

### c)     Granting Plaintiffs' Requested Relief Would Advance the Governmental Interest in Election Integrity

Instituting a notice and cure process does not frustrate the governmental interest in election integrity. Rather, "allowing voters to verify the validity of their ballots *demonstrably advances*—rather than hinders—these goals." *Jaeger*, 2020 WL 2951012, at \*10 (emphasis added). The stakes are particularly high considering that multiple recent elections in South Carolina were decided by just a few hundred votes—far more than will likely be discounted due to South Carolina's failure to provide pre-rejection notice and an opportunity to cure for signature-related deficiencies.[2]

Plaintiffs' requested relief would entail minimal fiscal and administrative burden in return, especially since South Carolina already maintains a notice process for absentee ballots

---

[2]     For example, a June 9, 2020 Greenville City Council District 22 Republican primary between Stan Tzouvelekas and Kenneth Cosgrove was decided by three votes. Anna B. Mitchell, *Greenville County Council candidates concedes District 22 victory to Stan Tzouvelekas*, Greenville News, June 12, 2020, https://www.greenvilleonline.com/story/news/2020/06/11/greenville-county-council-race-flips- again-count-provisional-ballots/5342472002/. Similarly, a June 14, 2016 primary runoff election for South Carolina House District 81 between Bark Blackwell and K.T. Ruthven was decided by thirty-three votes. *South Carolina 2016 Primary Runoff Election Results*, South Carolina Election Commission, https://www.enr-scvotes.org/SC/62799/173206/en/summary.html.

challenged during the absentee ballot tabulation process.  S.C. Code Ann. § 7-15-420(D).

County election officials already have contact information, including phone and email addresses, for many registered voters, and could similarly provide notice to voters whose ballot-return envelope is missing the voter's Oath signature, with minimal additional burden.  The state's "compelling interest in preserving the integrity of its election process," *see Purcell v. Gonzalez*, 549 U.S. 1 (2006), is in fact *enhanced* by the requested relief, because it allows absentee voters the opportunity to comply with the state's signature requirements and to demonstrate that the signature on the ballot is really theirs.  As such, to the extent that the purpose of the signature requirement is to prevent voter fraud, allowing a notice and cure process does not in any way hinder that interest.  Further, because South Carolina law already provides for a hearing on provisional ballots the Friday following the election, S.C. Code §§ 7-17-10; 7-13-830, Plaintiffs' requested relief would not extend the date for the final outcome of the election.

**B.     Plaintiffs Are Likely to Succeed on Their Claim that South Carolina Law Unduly Burdens the Fundamental Right to Vote**

Plaintiffs also have a strong likelihood of success on the merits of their claim that the lack of pre-rejection notice and opportunity to cure unduly burdens the fundamental right to vote, in violation of the First and Fourteenth Amendments.

Instances in which state election regulations burden the fundamental right to vote are adjudicated under the *Anderson-Burdick* standard—a flexible sliding scale under which courts must "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460

17

U.S. 780, 789 (1983)).  The Fourth Circuit has stated that when applying the *Anderson-Burdick* test, courts "must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that 'order, rather than chaos, is to accompany the democratic processes.'"  *Fusaro v. Cogan*, 930 F.3d 241, 258 (4th Cir. 2019) (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995)).

Where the burden imposed on voting is significant, the State must show that its "interest [is] sufficiently weighty to justify the limitation." *Norman v. Reed*, 502 U.S. 279, 288-89 (1992); *see also Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (same). Here, South Carolina's failure to provide pre-rejection notice and an opportunity to cure signature-related deficiencies arbitrarily and summarily disenfranchises eligible absentee voters. This imposes a substantial burden on the right to vote of impacted voters such as Mr. Clea under the *Anderson-Burdick* framework because they are disenfranchised due to a minor mistake or discrepancy they were notified of.  Courts routinely hold that lesser impositions unduly burden the right to vote. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring); *see also Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (finding that citizenship verification procedure burdened the right to vote for individuals inaccurately flagged as non-citizens where it involved "burdensome process" for those voters to prove their citizenship).

Other courts have found that analogous legal regimes that fail to allow voters to cure simple ballot deficiencies impose a serious burden on the right to vote under the *Anderson-Burdick* test. *See, e.g.*, *Frederick v. Lawson*, No. 1:19-cv-01959-SEB-MJB, 2020 WL 4882696 at *16 (S.D. Ind. Aug. 20, 2020) (determining that the signature matching system without pre-rejection notice or opportunity to cure created a "significant burden" on voters); *Richardson v.*

18

*Texas Sec'y of State*, 2020 WL 5367216 at \*33 (W.D. Tex. Sept. 8, 2020) *appeal docketed* (5th Cir. Sept. 10, 2020) (finding the existing signature matching process imposed burden "because voters who have their ballots rejected due to a perceived signature mismatch are provided untimely notice of rejection and no *meaningful* opportunity to cure") (emphasis in original).

The fact that many voters are able to comply with the signature requirement does not influence the burden analysis, which measures the effect as applied to negatively impacted voters. Courts have also confirmed that even where the disputed laws affect a relatively small number of voters in comparison to the entire voter count, the system may nevertheless impose a serious burden on the protected right. *See, e.g.*, *Lee*, 915 F.3d at 1321–22 (11th Cir. 2019) *motion to vacate denied sub nom Dem. Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790 (11th Cir. 2020) (finding statute imposes "at least a serious burden" although "less than 5 hundredths of a percent of the more than 9 million total ballots cast" were rejected for signature mismatch); *Ne. Ohio Coal. for Homeless*, *v. Husted*, 696 F.3d 580, 593 (6th Cir. 2012) (finding statute likely unconstitutional although it affected only 0.248% of ballots cast); *Hoblock v. Albany Cty. Bd of Elections*, 341 F. Supp. 2d 169, 177-78 (N.D.N.Y. 2004) (right to vote burdened where only 27 absentee ballots invalidated). Further, given the substantially higher number of absentee ballots expected for the November election this year, which the state has already recognized, the number of absentee ballots rejected—even if it is the same percentage as in past elections—will also increase.

Where, as here, the burden on voting rights is substantial, the disputed state action must be drawn with precision to advance a compelling state interest, *Burdick*, 504 U.S. at 434, though even a "slight" burden "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191

19

(2008) (Stevens, J., controlling opinion) (internal citation and quotation marks omitted). Here, any alleged state interest in failing to provide pre-rejection notice and an opportunity to cure could not justify the corresponding burden on voters. The existing system whereby absentee ballots missing signatures are discarded without *any* notice or opportunity to cure, and *some* counties (but not others) haphazardly impose a signature requirement, directly undermines public faith in elections. *See Lee*, 915 F.3d at 1324 ("[V]ote-by-mail voters who followed the ostensible deadline for their ballots only to discover that their votes would not be counted and that they would have no recourse were the ones to experience a clash with their expectations and fundamental fairness.").

Even if the Court applies a deferential standard of review, South Carolina's interest in preserving signature-related requirements, with no notice or opportunity to cure deficiencies, cannot satisfy the *Anderson-Burdick* test. The lack of a legitimate justification for prohibiting or failing to provide for a notice-and-cure procedure for an absentee ballot missing a voter signature is akin to the circumstances faced by the court in *Price v. New York State Board of Elections*, where the Second Circuit found a constitutional violation related to the absentee voting process:

> We do not hold that there is a general constitutional right to obtain absentee ballots. Nor do we hold that there is a constitutional right to obtain absentee ballots in all county committee races . . . Instead, after applying a deferential standard of review, and after examining the record in this as-applied challenge, we conclude that the arguments proffered by the State are so extraordinarily weak that they cannot justify the burdens imposed by [the restriction].

540 F.3d 101, 112 (2d Cir. 2008). Indeed, courts have frequently applied the principle that once a state has set up a system in place to allow absentee voting, it cannot restrict or deny that right arbitrarily to state-level absentee ballot laws or practices. *See*, *e.g.*, *Doe v. Walker*, 746 F. Supp. 2d 667, 681 (D. Md. 2010) (concluding that "where a state has authorized the use of absentee ballots, any restriction it imposes on the use of those absentee ballots" is subject to scrutiny

20

under *Anderson-Burdick*); *Hoblock*, 341 F. Supp. 2d at 178 (observing the right "is too essential to permit a mere technicality to strip innocent citizens of their right to vote"). There is no legitimate state interest in implementing a regime that rejects absentee ballots cast by legitimate South Carolina voters who already successfully submitted a vote-by-mail application, received the ballot at the correct address, and mailed a ballot that is otherwise valid, without notifying them of the minor discrepancy and giving the voter the chance to prove who they say they are. *See Lee*, 915 F.3d at 1322 (holding that "Defendants have identified no fraud-prevention interest that justifies depriving legitimate vote-by-mail and provisional voters of the ability to cure the signature mismatch, thereby disenfranchising them").

For the foregoing reasons, Plaintiffs are likely to succeed on the merits under either cause of action, and thus satisfy the first preliminary injunction factor.

## IV.    Plaintiffs Will Suffer Irreparable Harm Absent this Court's Intervention

The remaining preliminary injunction factors militate in favor of Plaintiffs. "To demonstrate a need for injunctive relief, a plaintiff must show how the harm suffered is such that other forms of damages in the normal course of litigation are not enough." *Thomas v. Andino*, Nos. 3:20-cv-01552-JMC, 3:20-cv-01730-JMC, 2020 WL 2617329, at \*21 (D.S.C. May 25, 2020). Where the deprivation of the Plaintiffs' fundamental right to vote is at risk, the second preliminary injunction factor, irreparable harm, is clearly met. *See League of Women Voters of N.C.*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002) (threat of the "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury."). The disenfranchisement at risk here is irreversible and the harm is plainly irreparable. *See League of Women Voters of N.C.*, 769 F.3d at 247 ("And once the

21

election occurs, there can be no do-over and no redress."); *see also Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011).

Here, the imminent risk to Plaintiffs—as well as to the large number of absentee voters whose ballots are likely to be discarded during elections held during the pendency of this litigation—weighs heavily in favor of finding irreparable harm and granting Plaintiffs' requested relief. Providing absentee voters with pre-rejection notice and the opportunity to cure is necessary to ensure that Plaintiffs Mr. Clea and Dr. Hopkins are not precluded from having their votes cast and counted on the basis of a technicality that has no bearing on their eligibility to vote. Plaintiffs' requested remedy would also ensure that LWVSC and The Family Unit are able to continue providing services in South Carolina in support of their organizational missions, without having to divert resources to addressing the state's failure to provide a consistent, state-wide process for providing pre-rejection notice and the opportunity to cure.

## V.     The Balance of Harms Favors Granting a Preliminary Injunction

Here, the threatened injury unquestionably outweighs any (minor, administrative) burden an injunction may impose. *See Legend Night Club*, 637 F.3d at 302 (finding that plaintiffs' loss of a business license and business opportunities due to unlawful censorship "easily outweigh[ed] whatever burden the injunction may impose" upon the state).

The serious risk that Plaintiffs will be disenfranchised or significantly impaired in offering their core services during the November 2020 general election plainly offsets "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Indeed, the respective burden on the state is minimal, given that the remedy Plaintiffs seek is merely to apply procedures similar to those already provided to other absentee voters. *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 137 (1990) ("[W]e cannot say that predeprivation process was impossible" where state

"already has an established procedure"); *League of Women Voters of N.C.*, 769 F.3d at 248. If anything, the requested relief would bring clarify to the administration of South Carolina elections during the pendency of the litigation. It would help officials ascertain the answer to the question of whether absentee ballots containing minor signature-related discrepancies were cast by eligible voters and therefore should be counted.

Further, Plaintiffs' requested remedy will not change the deadlines, requirements, or process for submitting an absentee ballot. As such, the requested remedy will have no impact at all on the procedures and requirements voters must follow in initially casting their absentee ballots, and the provision of a reasonable opportunity to cure will actually mitigate—not exacerbate—the risk of voter confusion in the coming election. Plaintiffs' requested relief thus also does not run afoul of the Supreme Court's admonition in *Purcell* against altering election rules as the election draws closer, because it comprises "relatively minor expanded circumstances" that have only a minimal impact on election officials, and does not run the risk of causing voter confusion before an impending election. *See League of Women Voters of N.C.*, 769 F.3d at 248 (*Purcell* does not control because "counting out-of-precinct ballots merely requires the revival of previous practices or, however accomplished, the counting of a relatively small number of ballots"); *see also Jaeger*, 2020 WL 2951012, at *11 ("To the extent the impact on election officials alone is relevant under *Purcell*, the Court has previously weighed that impact and found the countervailing threat of the deprivation of the fundamental right to vote more significant.").

Courts across the country have granted similarly targeted relief in the lead-up to elections where the risk of disenfranchisement was high—as here. *See, e.g.*, *Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20CV457, 2020 WL 4484063, at *63–64 (M.D.N.C. Aug. 4, 2020);

23

*Frederick v. Lawson*, No. 1:19-cv-01959-SEB-MJD, 2020 WL 4882696, at \*17 (S.D. Ind. Aug. 20, 2020); *Harding v. Edwards*, No. CV 20-495-SDD-RLB, Order, 2020 WL 5543769, at \*20 (M.D. La. Sept. 16, 2020); *see also Harding v. Edwards*, 2020 WL 5371350, at \*12 (M.D. La. Sept. 7, 2020); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341–42 (N.D. Ga. Oct. 2018) *stay denied sub. nom Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2018).  Under the particular circumstances of this case, granting the requested relief does not impose a hardship on the State proportionate to the harm of disenfranchising eligible voters.

## VI.    The Requested Relief Would Benefit the Public Interest

Finally, with respect to South Carolina's public interest, as discussed above, the present system undermines the integrity of the election process by rejecting valid absentee ballots that are not "properly signed" without providing any pre-rejection notice or opportunities to cure.  In contrast, Plaintiffs' proposed relief would directly contribute to the public interest, since "[b]y definition, 'the public interest favors permitting as many qualified voters to vote as possible.'" *League of Women Voters of N. C.*, 769 F.3d 224, 247  (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)).  Requiring county election officials to provide pre-rejection notice and an opportunity to cure would also ensure consistency in absentee voting procedures across the state.

Because Defendants will suffer minimal harm if Plaintiffs' requested relief is granted and whereas absentee voters in South Carolina like Mr. Clea and Mr. Harris are at risk of imminent disenfranchisement absent relief from the Court, the balance of equities clearly weighs in favor of granting Plaintiffs' request for a preliminary injunction.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be granted.

24

Dated: October 9, 2020                    Respectfully submitted,


                                          ___s/ Susan K. Dunn_____
Julianne J. Marley                        Susan K. Dunn (Fed. Bar #647)
Rhianna Hoover                            sdunn@aclusc.org
DEBEVOISE & PLIMPTON LLP                  Shirene C. Hansotia (Fed. Bar #12558)
919 Third Avenue                          shansotia@aclusc.org
New York, NY 10022                        AMERICAN CIVIL LIBERTIES FOUNDATION
(212) 909-6000                            OF SOUTH CAROLINA
                                          P.O. Box 20998
*Of Counsel for Plaintiffs*               Charleston, South Carolina 29413-0998
                                          Telephone: (843) 282-7953
                                          Facsimile: (843) 720-1428

                                          Ezra Rosenberg*
                                          erosenberg@lawyerscommittee.org
                                          John Powers^
                                          jpowers@lawyerscommittee.org
                                          LAWYERS' COMMITTEE FOR CIVIL RIGHTS
                                          UNDER LAW
                                          1500 K Street NW, Suite 900
                                          Washington, DC 20005
                                          Phone: (202) 662-8389
                                          Fax: (202) 783-0857

                                          Catherine Amirfar*
                                          camirfar@debevoise.com
                                          DEBEVOISE & PLIMPTON LLP
                                          919 Third Avenue
                                          New York, NY 10022
                                          (212) 909-6000

                                          Tara Ganapathy*
                                          tganapathy@debevoise.com
                                          DEBEVOISE & PLIMPTON LLP
                                          801 Pennsylvania Avenue NW
                                          Washington, DC 20004
                                          202-383-8000

                                          *pro hac vice motion forthcoming

                                          ^ pro hac vice motion pending

                                          Counsel for Plaintiffs


25