UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

League of Women Voters, *et al.*,

Plaintiff,

v.

Marci Andino, *et al.*,

Defendants.

No.: 2:20-cv-03537-RMG

**State Election Commission Defendants' Opposition to Motion for Preliminary Injunction**

Defendants Marci Andino, John Wells, JoAnne Day, Clifford J. Edler, Linda McCall and Scott Moseley ("Election Defendants"), all of whom have been sued in their official capacities with the State Election Commission, submit this Opposition to the Plaintiffs' Motion for a Preliminary Injunction.

## Introduction

Challenges to absentee-voting laws in this election cycle are nothing new. In fact, this is the fourth case filed in federal district court (and sixth case overall) challenging South Carolina's absentee-voting rules in 2020.

In one of those earlier cases, the district court enjoined the requirement that an absentee voter have a witness watch him sign the voter's oath and then sign below the voter's signature. When State officials appealed that order, the United States Supreme Court stayed the injunction pending the appeal. In its order, the United States Supreme Court (once again) told lower federal courts that they "should not alter state election rules in the period close to an election," *Andino v. Middleton*, No. 20A55, 2020 WL 5887393, at *1 (U.S. Oct. 5, 2020) (Kavanaugh, J., concurring in grant of application for stay).

But the Plaintiffs here ask this Court to do just that. And they do so without even mentioning the Supreme Court's decision in *Middleton*. Instead, the Plaintiffs skip right past that decision and implore the Court—just weeks before a general election—to create a new procedure for curing their own failures to comply with State law. The Court should follow the Supreme Court's command in *Middleton* and decline the Plaintiffs' invitation.

Other considerations also support denying the Plaintiffs' motion for a preliminary injunction. The Supreme Court's *Middleton* decision already instructed South Carolina how to handle unwitnessed absentee ballots in this election. The Supreme Court's *Middleton* decision also directs courts to defer to elected officials' decisions about how to respond to the COVID-19 pandemic. Beyond these Supreme Court edicts, the Plaintiffs are not likely to succeed on the merits. Nor do the equities favor relief.

## **Background**

The General Assembly has adopted the State Election Law. *See* S.C. Code § 7-1-10, *et seq*. Under the State Election Law, South Carolina has both in-person and absentee voting. Any registered voter may vote in person on Election Day. *See* S.C. Code § 7-13-710 *et seq*. Voters must be qualified, however, to vote by absentee ballot. *See id.* § 7-15-320.

South Carolina has allowed absentee voting since 1953. That year, the General Assembly gave members of the armed forces that privilege. *See* 1953 S.C. Acts No. 48 (codified at S.C. Code § 23-441 *et seq*. (1952)). Over the next seven decades, the categories of voters qualified to vote absentee grew into the list that

now exists in section 7-15-320. For this general election, the General Assembly has created an additional qualification for absentee voting that, in effect, allows any voter to vote absentee if he chooses. *See* R.149, § 2, 2020 S.C. Acts No. 143.

But the process of by-mail absentee voting itself is the same.[1] A voter must submit an application to receive an absentee ballot. *See* S.C. Code Ann. § 7-15-330. A county board of voter registration and elections then sends a ballot to this voter. *See id.* § 7-15-370. Along with the ballot, a voter receives three additional things. First, the voter receives a "ballot herein" envelope, in which the ballot itself is placed by the voter, which maintains the secrecy of the ballot. *See* Andino Decl. ¶ 3 & Ex. A. Second, the voter receives a "ballot return" envelope, into which the "ballot herein" envelope is placed and on which are the voter's oath and lines for the voter's signature and witness's signature and address. *See* Andino Decl. ¶ 3 & Ex. B. Third, the voter receives step-by-step instructions for properly completing the absentee ballot, which explain exactly what needs to be done with the ballot and with these envelopes—including the signatures that are required. *See* Andino Decl. ¶ 3 & Ex. C.

The signatures on the "ballot return" envelope are required by section 7-15-380. The voter must swear:

> I hereby swear (or affirm) that I am duly qualified to vote at this election according to the Constitution of the State of South Carolina, that I have not voted during this election, that the ballot or ballots contained in this envelope is my ballot and that I have received no assistance in voting my ballot that I would not have been entitled to receive had I voted in person at my voting precinct.

[1] Absentee voting may be by mail or in person. The Plaintiffs' claims relate only to by-mail absentee voting, as the signature and witness requirements about which they complain are inapplicable to in-person absentee voting.

S.C. Code Ann. § 7-15-380(A). A witness must attest to the voter having signed this oath. *See id.*

If an absentee ballot returned to a county board is not "properly signed and witnessed," then that ballot "may not be counted." *Id.* § 7-15-420(B). This has been the law in South Carolina since at least 1953, *see* 1953 S.C. Acts No. 48 (codified at S.C. Code § 23-441.17 (1952)), and State law has used this exact language since 1982, *see* 1982 S.C. Acts No. 280 (codified at S.C. Code Ann. § 7-15-420(B)).

South Carolina has never had any provision that gives an absentee voter the right to "cure" a voter's failure to comply with the step-by-step instructions for a by-mail absentee ballot. The South Carolina Election Commission does not interpret Title 7 that way. *See* Andino Decl. ¶ 4. The Commission's recent instruction to county boards of voter registration and elections of these rules was prompted by questions from county boards about how to handle unwitnessed absentee ballots in light of *Middleton*. *See* Andino Decl. ¶ 6.

The Plaintiffs challenge the fact that South Carolina does not have a "cure" provision. *See* ECF 20. They filed their original complaint on October 2 (when absentee voting was already underway), *see* ECF 1, and their amended complaint on October 9, *see* ECF 20. The same day they amended their complaint, the Plaintiffs sought a preliminary injunction. *See* ECF 21. This was 25 days before the November 3 general election.

## **Legal Standard**

When plaintiffs seek a preliminary injunction or a temporary restraining order, they must satisfy each of four elements: "(1) they are likely to succeed on the

merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013). This type of preliminary relief is "an extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and even more extraordinary when the injunction sought is a mandatory one as is the case here, (which changes the status quo and requires election officials to take new actions), *see Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) (the power to issue a mandatory preliminary injunction "should be exercised sparingly").

## Argument

### I. *Purcell* prohibits the relief the Plaintiffs seek.

Invoking *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), the Supreme Court has, once again this election cycle, ordered "lower federal courts" not to "alter the election rules on the eve of an election," *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam); *see also Middleton*, 2020 WL 5887393, at *1 (Kavanaugh, J., concurring in grant of application for stay) ("[T]his Court has repeatedly emphasized that federal courts ordinarily should not alter state election rules in the period close to an election."). Yet that is exactly what the Plaintiffs ask this Court to do.

South Carolina has allowed some form of absentee voting since 1953, when members of the armed forces received that privilege. *See* 1953 S.C. Acts No. 48 (codified at S.C. Code § 23-441 *et seq.* (1962)). Over the past seven decades, the General Assembly has added other categories of voters who are qualified to vote

absentee. *See* S.C. Code Ann. § 7-15-320; *see also, e.g.*, 1975 S.C. Acts No. 301; 1966 S.C. Acts No. 977.

But four things have been constant about absentee voting in South Carolina. One, the voter has always had to swear an oath. *Compare* S.C. Code Ann. § 7-15-380, *with* S.C. Code § 23-441.16 (1952). Two, this oath must be accompanied by a witness's signature. *Compare* S.C. Code Ann. § 7-15-380, *with* S.C. Code § 23-441.16 (1952). Three, State law has always required the voter and the witness to have signed the envelope for that ballot to be counted. *Compare* S.C. Code Ann. § 7-15-420(B), *with* S.C. Code § 23-441.17 (1952). Four, State law has never provided any means by which a voter can "cure" a failure to comply with these two signature requirements.

Now, just 25 days before November's general election, the Plaintiffs invite this Court to create a new provision in the State Election Law. That is, however, exactly what *Purcell* forbids. Indeed, it is why federal courts of appeals around the country are consistently citing *Middleton* and *Purcell* to stay or reverse injunctions that change election rules. *See, e.g.*, *Common Cause Ind. v. Lawson*, No. 20-2911, 2020 WL 6042121, at *2 (7th Cir. Oct. 13, 2020); *Mi Familia Vota v. Hobbs*, No. 20-16932, 2020 WL 6044502, at *4 (9th Cir. Oct. 13, 2020); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-2835, 2020 WL 5951359, at *2 (7th Cir. Oct. 8, 2020).

The statistics on absentee voting demonstrate how late this claim is. Even before the district court entered its injunction in *Middleton* on September 18, more than 1,000 absentee ballots had been mailed out. By the time the original complaint was filed on October 2, that number had grown to almost 168,000. And today, it is

up to 420,000. *See* Fact Sheets, S.C. Election Comm'n, https://www.scvotes.gov/fact-sheets.

The Plaintiffs offer a brief response to *Purcell* in their motion, insisting that their "requested remedy will not change the deadlines, requirements, or process for submitting an absentee ballot." ECF 21-1 at 28. But this reads *Purcell* far too narrowly. The Supreme Court has interpreted *Purcell* to mean that courts "should not alter state election *rules* in the period close to an election." *Middleton*, 2020 WL 5887393, at *1 (Kavanaugh, J., concurring in grant of application for stay) (emphasis added). Whether framed as a change or creation, the Plaintiffs' claims here unquestionably involve an election *rule*.

In fact, another judge in this District rejected this very argument just days ago. In a lawsuit seeking to extend the voter-registration deadline, Judge Lewis, after citing Justice Kavanaugh's concurring opinion in *Middleton*, emphatically rejected this attempt to distinguish *Purcell*:

> In the [Plaintiff's] reply, it maintains the factors that animated the Supreme Court's concern in *Purcell* are not present here because the injunction at issue does not involve any change at all to the actual election process. But, this is simply not so. No discussion is merited. Period.

Order 12, *S.C. Progressive Network Educ. Fund v. Andino*, No. 3:20-cv-3503 (D.S.C. Oct. 9, 2020), ECF 40 (Lewis, J.) (internal quotation marks and citation omitted). That paragraph applies with equal force here. Such a dramatic change to the State Election Law—in the form of a mandatory (*i.e.*, more dramatic) injunction—is precisely what *Purcell* holds is improper.

Then, in their supplement to their preliminary injunction motion, the Plaintiffs change tacks on *Purcell*. Now, they claim, the Commission is actually the one trying to alter election rules. *See* ECF 41 at 8. Not so.

Two points need to be made on this front. First, the Plaintiffs' claim now is irreconcilable with the first allegation they make in their original complaint and in their proposed second amended complaint. *See* ECF 1 at 1–2; 40-2 at 1–2. At bottom, the Plaintiffs' complaint is based on their assertion that State law violates the U.S. Constitution by not allowing voters to "cure" their failure to comply with the signature and witness requirements. Now, more than ten days after the complaint was filed and less than a week before the hearing on their preliminary injunction motion, the Plaintiffs are claiming that the Commission is changing the rules by *not* allowing voters to "cure" these failures.

Second, the Plaintiffs are wrong when they claim the Commission is changing anything. The Commission and county boards have only that authority given to them by statute. *See Med. Soc. of S.C. v. Med. Univ. of S.C.*, 513 S.E.2d 352, 355 (S.C. 1999) ("An agency created by statute has only the authority granted it by the legislature."). And the Commission and county boards have no authority to create any "cure" procedure.

That's because Title 7 includes no "cure" provision. Indeed, the Plaintiffs never cite such a provision in Title 7. And the Commission does not take the position that Title 7 allows for any "cure" procedure to be employed. *See* Andino Decl. ¶ 4. Contrary to the claims of the Plaintiffs and their amicus, this is not a new position as of this month: As just one example, the Commission's handbook from last

year includes detailed instructions that counties are given, and it contains nothing about a "cure" procedure. *See* Andino Decl. Ex. D at 58–59. And as another, the Plaintiffs' own declaration from Duncan Buell undercuts their position that the Andino's October 7 statement is a change, as Buell's sworn statement and the PowerPoint he attaches show that no "cure" procedure is allowed and the Commission's statement of that fact is nothing new. *See* ECF 41-3 at 3; 41-5 at 14.

To the extent that Charleston County is employing a "cure" procedure not contemplated by Title 7, that is not a reason expand that procedure across the State. Rather, it is something to stop. And stopping a county from doing something not contemplated by statute is not, as the Plaintiffs cast it, a *Purcell* issue. Rather, it ensures that all counties are following the law that the General Assembly has enacted.[2]

## II. The Supreme Court has already instructed the State how to handle unwitnessed ballots for this general election.

The Plaintiffs seek to have this Court create a method for how election officials must address signature deficiencies on absentee ballots. Really, this is a primarily a request to allow voters who fail to get a witness to remedy their mistake. (Their amicus, the South Carolina Alliance of Retired Americans, admits as much. *See* ECF 43 at 9.) In 2016, only 261 of the 2,954 (or less than nine percent of) absentee ballots that were rejected were rejected for missing the voter's own signature. Of those 2,954 rejected ballots, 1,575 (or more than half) were rejected for

[2] To the extent the Plaintiffs ask the Court to enjoin elections after November's general election, they have not identified what elections those are. Given the specificity required by Federal Rule of Civil Procedure 65, the Court should not entertain such an open-ended request.

missing the witness signature.[3] *See* Andino Decl. ¶ 7. Similarly, in 2018, 2,450 absentee ballots were rejected; 802 were rejected for missing a witness but only 145 for missing the voter's signature. *See* Andino Decl. ¶ 8.

But this Court has no need to decide what the State must do with unwitnessed ballots for this election. The Supreme Court has already done that. The Supreme Court stayed the injunction of the Witness Requirement, which means that someone voting absentee by mail must have a witness as required by S.C. Code Ann. § 7-15-380. *See Middleton*, 2020 WL 5887393, at *1. At the same time, the Supreme Court instructed the State on what to do about unwitnessed ballots. That Court ordered that "any ballots cast before this stay issues and received within two days of this order [*i.e.*, October 7] may not be rejected for failing to comply with the witness requirement." But any ballot received October 8 or later must comply with the Witness Requirement that is in effect, and if that ballot does not, State law provides that the ballot "may not be counted." S.C. Code Ann. § 7-15-420(B).

The Court should reject the backdoor attempt to circumvent the Supreme Court's order in *Middleton*. Such an attempt ignores that this Court "must follow the dictates of the Supreme Court." *Miracle of Life, LLC v. N. Am. Van Lines, Inc.*, 368 F. Supp. 2d 494, 498 (D.S.C. 2005); *see also McCray v. Burrell,* 516 F.2d 357, 365 (4th Cir. 1975) ("Our duty is clear: We must follow the Supreme Court, not attempt to lead it.").

[3] The remaining ballots in 2016 and 2018 were rejected for being returned after 7:00 PM on Election Day. *See* S.C. Code § 7-15-420(B).

## III. The Supreme Court requires courts to defer to elected officials' responses to the pandemic.

Repeatedly during the COVID-19 pandemic, the Supreme Court has commanded lower courts that "the Constitution principally entrusts the safety and health of the people to the politically accountable officials of the States." *Middleton*, 2020 WL 5887393, at *1 (Kavanaugh, J., concurring in grant of application for stay) (internal quotation mark omitted). These officials have "especially broad" authority to act "in areas fraught with medical and scientific uncertainties." *Id.* Federal courts should not "second-guess[]" officials' decisions in these areas. *Id.*; *see also S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief). Justice Kavanaugh cited this deference as an "independent" reason for granting the stay in *Middleton*. *Middleton*, 2020 WL 5887393, at *1 (Kavanaugh, J., concurring in grant of application for stay).

The authority to establish election procedures, including rules for absentee voting, belongs to the General Assembly. *See* S.C. Const. art. II, § 10; *see also* U.S. Const. art. I, § 4, cl. 1. The General Assembly has passed two bills (both signed into law by the Governor) that made certain changes to absentee voting in light of COVID-19. *See* R.138, 2020 S.C. Acts No. 133; R. 149, 2020 S.C. Acts No. 143. The General Assembly did not choose to create a process for curing failures to comply with the signature and witness requirements.

## IV. The Plaintiffs are unlikely to prove that State law violates the Constitution.

Even if the Plaintiffs could overcome all of these threshold hurdles, they would still fail to show a likelihood of success on the merits. They attack the State's lack of a "cure" provision on both procedural due process and undue burden grounds. Although the legal frameworks vary, the Plaintiffs' arguments (and their weaknesses) are similar, and they fail to offer sufficient evidence to show that they are likely to succeed on the merits.

A procedural due process claim first requires a plaintiff to show a cognizable life, liberty, or property interest. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013). If a plaintiff does that, this claim is then "governed by a three-factor balancing test, weighing (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation with the procedures presently used; and (3) the government's interest, including the function involved and the fiscal and administrative burdens associated with additional procedures." *United States v. White*, 927 F.3d 257, 264 (4th Cir. 2019).

On an undue burden claim, a court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate,'" on the one hand, "against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" on the other. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). When it is a "reasonable, nondiscriminatory" restriction, "the State's important regulatory interests are generally sufficient to justify" it. *Id.*

Turning to the merits of the Plaintiffs' claims, it is important to remember that this case involves *absentee* voting, not the *right to vote* itself. Indeed, the Supreme Court has held that absentee voting does not go to "the fundamental right to vote" when voters have other options for casting a ballot. *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969). Thus, courts around the country have rejected challenges during this pandemic to absentee-voting rules based on claims that the fundamental right to vote was at issue. *See, e.g*, *Tully v. Okeson*, No. 20-2605, 2020 WL 5905325, at *3 (7th Cir. Oct. 6, 2020); *New Ga. Project v. Raffensperger*, No. 20-13360-D, 2020 WL 5877588, at *7 (11th Cir. Oct. 2, 2020).

As an initial matter on the procedural due process claim, the Plaintiffs do not have a cognizable liberty interest in absentee voting. The Middle District of Tennessee has provided a compelling explanation for why there is no such *procedural-due-process* liberty interest in the right to vote. *See Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-cv-374, 2020 WL 5095459, at *9 (M.D. Tenn. Aug. 28, 2020). A state-created liberty interest for procedural due process "is narrow, relating only to freedom from restraint." *Id.*; *see also Byrd v. Drew*, No. 1:11-cv-1193-MBS-SVH, 2011 WL 4936294, at *2 (D.S.C. Sept. 7, 2011) (applying this rule in a prisoner lawsuit), *report and recommendation adopted,* No. CA 1:11-1193-MBS, 2011 WL 4936405 (D.S.C. Oct. 17, 2011). Other constitutional doctrines—such as the First Amendment and substantive due process—protect the right to vote. *See Memphis A. Phillip Randolph Inst.*, 2020 WL 5095459, at *9. In

other words, the Plaintiffs really have only an undue burden claim under the *Anderson-Burdick* framework.

But even if they do have both claims, neither has merit. Looking first at the burden or risk of deprivation, the Plaintiffs overstate these concerns. The analysis of this burden or risk must start with the fact that every voter who receives an absentee ballot by mail receives a one-page set of instructions.[4] *See* Andino Decl. ¶ 3 & Ex. C. These instructions provide step-by-step directions for completing the ballot properly *and* include a reminder at the bottom of the page that the signatures are required.

The supposed "burden" or "risk," when it comes to signatures, is twofold. One is that the voter must sign the envelope herself. That's hardly a burden, given that a voter already must have a pen to mark the ballot and already must put the ballot in the envelope to return it. And there is little risk of a deprivation of any protected interest (if there is a cognizable interest) when the voter is told—twice, no less—that her own signature is required, and the voter has complete control over her ballot.

The other is that the voter must get a witness. The United States Supreme Court has answered the question about that burden. *See Middleton*, 2020 WL 5887393, at *1. And the risk is equally low as with the voter's own signature, given that the ballot is in the voter's control during the entire process of getting the witness signature.

---

[4] Absentee voters have actually received such instructions since 1953. *See* 1953 S.C. Acts No. 48 (codified at S.C. Code § 23-441.3 (1952)).

On the other side of the proverbial ledger, the State has important interests served by the current process. Election officials are busy preparing for Election Day, and particularly busy in this election with a record number of absentee voters in the weeks ahead of Election Day. It would be difficult to implement a new, safe, uniform process for curing failures to comply with the signature and witness requirements at this time. *See* Andino Decl. ¶ 9. In other words, it is hardly a "minimal" change as the Plaintiffs describe it. ECF 21-1 at 21. Second, without an established "cure" procedure already in place, rushing to implement one now risks confusion and mistake, which potentially undermines confidence in the electoral process. *Cf. Purcell*, 549 U.S. at 4 ("A State indisputably has a compelling interest in preserving the integrity of its election process.").

As an additional consideration, only 18 States have a statutory "cure" provision. *See States that Permit Voters to Correct Signature Discrepancies*, Nat'l Conf. of State Legislatures (Sept. 21, 2020), https://tinyurl.com/yxmel39b (last visited Oct. 16, 2020). If not having a "cure" provision is unconstitutional, it's remarkable that so many States have historically lacked them.

A final note on the merits: The Plaintiffs' alternative relief of using the process for challenging ballots as a window for curing signature failures is simply another attempt to have the Court rewrite State law. South Carolina has had a provision for challenging absentee ballots since 1953. *See* 1953 S.C. Acts No. 48 (codified at S.C. Code § 23-441.17 (1952)). That process has never been used as an opportunity for fixing failures to comply with the process of absentee voting. Rather,

challenges are typically about the eligibility of a voter to vote in that election or in the way the voter tried to vote.

## V. The Plaintiffs do not face an irreparable harm without an injunction.

The Plaintiffs' irreparable-harm argument assumes that their merits argument is correct. But the Plaintiffs are wrong on that point.

Moreover (and even if the Plaintiffs were right about the merits), their irreparable-harm argument is undermined by their conduct before and during this litigation. Before this litigation, at least one plaintiff admittedly knew about the signature issues raised here in February, but the lawsuit was not filed until October 2. *See* ECF 21-1 at 16; ECF 21-8 at 2. In this litigation, the Plaintiffs did not move for a preliminary injunction for seven days after filing their complaint. *See* ECF 21. Their lack of urgency belies their contention of irreparable harm.

## VI. The equities and the public interest counsel against an injunction.

Taking these factors together, at least three considerations counsel against an injunction.

The first is logistical. Election Day is less than three weeks away, and absentee voting is already underway. Election officials have even more to do in this election than in "normal" years. It is far from certain that a new, uniform, secure method could be implemented in time. *See* Andino Decl. ¶ 9.

The second is precedential. Plaintiffs should be encouraged to act diligently in bringing claims. Laches is one way the law promotes that diligence. *See Costello v. United States*, 365 U.S. 265, 282 (1961) ("Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the

party asserting the defense."). Here, the Plaintiffs challenge provisions that have been in State law for decades. Failing to act quickly, as the Plaintiffs failed to do, puts this Court, the Election Commission, and the County Boards in an untenable position. That is why courts have refused to grant relief when plaintiffs delay, even in election cases. *See, e.g.*, *Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012) ("Despite the fact he was able to bring these constitutional challenges for over four months before the filing deadline of December 22, 2011, Movant waited until the eleventh hour to pursue his claims. . . . This deliberate delay precludes the possibility of equitable relief."); *Simkins v. Gressette*, 631 F.2d 287, 296 (4th Cir. 1980) (holding that the plaintiffs' delay in bringing a suit until the eve of an election was a sufficient basis to deny their claims); *Smith v. S.C. Election Comm'n*, 874 F. Supp. 2d 483, 498 (D.S.C. 2012) (three-judge court) (holding that a delay of forty days in filing a complaint was sufficient for laches to apply).

As Judge Lewis observed in another election case just days ago, "[i]f the timing [of the lawsuit] was a strategy that backfired, it is disturbing." Order 15, *S.C. Progressive Network Educ. Fund v. Andino*, No. 3:20-cv-3503 (D.S.C. Oct. 9, 2020), ECF 40. "If, however, it was a deadline that was overlooked, or some other time-related factor the [plaintiff] was unable to remedy, it is, in the present case, simply defeating." *Id.* Either way, the lawsuit was too late.

The delay here is particularly concerning. The League of Women Voters claims to be "dedicated to promoting civic engagement and protecting democracy through advocacy, voter education, and voter assistance." ECF 21-6 at 3. The organization thus presumably knew about the issues raised in this lawsuit long

before October 2, 2020, yet the complaint wasn't filed until that day. Similarly, the Family Unit has been looking at the signature provisions challenged here since at least February—more than seven months before this lawsuit was filed. *See* ECF 21-1 at 16; ECF 21-8 at 2.

But the Family Unit's situation is even more troubling than this delay. The Family Unit was also a plaintiff in *Thomas v. Andino*, No. 3:20-cv-1552-JMC (D.S.C.), in which those plaintiffs challenged the Witness Requirement, just like the *Middleton* plaintiffs. The Family Unit never even attempts to explain why it did not assert the claims in this case in the lawsuit it brought almost six months ago—in which it was represented by some of the same counsel that represent it here.

The third is constitutional. The role of courts in our constitutional republic is to interpret the law. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803). It is not to rewrite the law. *See Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1949 (2016). The procedure for completing an absentee ballot is straightforward, and the Court is bound to apply those provisions as the General Assembly adopted them. *See id.* at 1946 ("The plain text of the [statute] begins and ends our analysis."); *see also* S.C. Const. art. II, § 10 (giving the General Assembly the responsibility to "provide for the administration of elections and for absentee voting"). As a three-judge panel once said in a challenge to election law, "[t]he public has an interest in ensuring that the State's general election is conducted pursuant to state law." *Smith v. S.C. State Election Comm'n*, 901 F. Supp. 2d 639, 649 (D.S.C. 2012) (three-judge court). At its essence, the Plaintiffs' request is for the Court to rewrite the South Carolina Election Law because, in part, COVID-19 has impacted

all of society. To do so would violate the Constitution and fall into the trap of which Justice Holmes warned in *Northern Securities Co. v. United States*: "Great cases, like hard cases, make bad law" because legal principles give way to the urgency of the moment. 193 U.S. 197, 365 (1904) (Holmes, J., dissenting).

## Conclusion

The motion for a preliminary injunction should be denied.

Respectfully Submitted,

s/ Wm. Grayson Lambert
Wm. Grayson Lambert
Fed. ID No. 11761
M. Elizabeth Crum
Fed. ID No. 372
Jane W. Trinkley
Fed. ID No. 4143
BURR & FORMAN LLP
Post Office Box 11390
Columbia, SC 29211
(803) 799-9800

*Counsel for Election Defendants*