# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA; THE FAMILY UNIT, INC.; ALBERTUS CLEA, and GEORGE HOPKINS, <br><br> Plaintiffs, <br><br> v. <br><br> MARCI ANDINO, in her official capacity as the Executive Director of the South Carolina State Election Commission; HOWARD M. KNAPP, in his official capacity as Director of Voter Services of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; and JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission, <br><br> Defendants. | Case No. 2:20-cv-03537-RMG |

## <u>SECOND AMENDED COMPLAINT</u>

### INTRODUCTION

1.      Plaintiffs League of Women Voters of South Carolina, the Family Unit, Inc.,

Albertus Clea, and George Hopkins (collectively, "Plaintiffs") bring this action for immediate

injunctive and declaratory relief against Executive Director of the South Carolina State Election

Commission Marci Andino, Director of Voter Services of the South Carolina State Election

Commission Howard M. Knapp,  Chair of the South Carolina State Election Commission John

1

Wells, and members of the South Carolina State Election Commission JoAnne Day, Clifford J. Edler, Linda McCall and Scott Moseley (collectively, "Defendants") because South Carolina's failure to provide absentee voters with notice and the opportunity to correct inadvertent minor or technical deficiencies on their absentee ballot envelopes, and its prohibition on allowing individual counties to provide voters with such a notice and opportunity, unconstitutionally burden South Carolinians' fundamental right to vote and deprives them of due process.

2.      Following legislation passed by the South Carolina General Assembly on September 15, 2020 ("Act 149"), allowing all qualified voters to vote absentee for the November 2020 General Election in light of the serious risks of in-person voting during the COVID-19 public health crisis, South Carolina expects a record-breaking number of voters casting absentee ballots for the November 2020 General Election, including many first-time absentee voters.  As of September 30, 2020, approximately 500,000 mail-in absentee ballots had been requested by South Carolina voters—roughly five times the previous record of 106,000 in 2016.  The Charleston County Board alone had received 46,300 ballot requests as of late August—nearly five times the 9,700 received at the same point in 2016.

3.      Absent intervention from this Court, however, many of these voters—and absentee voters in future elections—will be disenfranchised as a result of South Carolina's laws governing absentee voting.  State law requires election officials to reject absentee ballots that are missing the voter's signature on the outside of the ballot return envelope.  S.C. Code. Ann. §§ 7-15-230, 7-15-420.  On information and belief, election officials in some counties are also applying signature matching requirements to absentee ballots—meaning that they will reject ballots where the signature does not "match" a voter signature on file—despite the fact that this requirement is not provided for in South Carolina law.  There is no opportunity for a voter to

challenge or otherwise cure a ballot rejected on these grounds. *See id.* In fact, the voter is not even required to be notified that his or her vote is rejected, before or after it happens. *See id.* § 7-15-420(B). To make matters worse, state officials recently issued guidance stating that after an absentee ballot is returned to a county elections office by mail, county officials may not of their own accord give the voter an opportunity to cure deficiencies such as a missing signature on the absentee ballot-return envelope. This prohibition not only makes South Carolina an outlier nationally, but promises to ensure disenfranchisement of even more South Carolinians in November.

4.     The failure to provide voters with notice and an opportunity to cure signature-related deficiencies violates voters' constitutional rights and undermines the integrity of South Carolina elections. It imposes a substantial burden on absentee voters' right to vote by automatically disenfranchising South Carolinians who validly cast and return their own ballots but inadvertently forget to sign them, or use a signature that has changed due to physical or environmental factors, without notice or any possibility of recourse.

5.     Automatic rejection of absentee ballots under these circumstances is particularly harsh, as the burden of providing a notice and cure process before rejecting absentee ballots due to signature-related deficiencies is very low. Election staff have the capabilities to provide the requisite notice to voters, and the disruption to the voting process is minimal. Moreover, allowing for this additional process increases public confidence in the integrity of elections because absentee voters—who have already completed, signed, and returned an absentee ballot application—are permitted an opportunity to provide evidence of their eligibility to officials.

6.     Plaintiffs thus seek modest, but vitally important, relief. Specifically, plaintiffs request that Defendants direct county election officials to review absentee ballot envelopes and

provide pre-rejection notice to voters by first-class mail and, where available, by email or phone, of any signature-related deficiency as soon as is practicable; and permit voters whose absentee ballots are deficient on this ground to cure the deficiency up to three days following the election—the time period already provided under South Carolina law for voters to cure certain deficiencies in provisional ballots.  Alternatively, Plaintiffs request that the Defendants instruct county election officials to classify absentee ballots with signature-related deficiencies as provisional so that they may be cured in accordance with existing procedures established under South Carolina law.

## PARTIES

7.      Plaintiff LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA ("LWVSC") is a nonpartisan, nonprofit, membership organization, and is an affiliate of the League of Women Voters of the United States.  LWVSC encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy.  LWVSC is dedicated to promoting civic engagement and protecting democracy through advocacy, voter education, and voter assistance.  LWVSC has 1,288 members located in counties across the State of South Carolina. As part of its mission, LWVSC advocates for expansion of voting opportunities, including through absentee voting.  LWVSC expends significant resources in furtherance of its mission, including by organizing voter registration drives, educating the public about the voting process, and assisting voters who have questions or need help navigating the voting process.  LWVSC has seen a substantial increase in the number of its members and other individuals that intend to vote absentee in the upcoming November 2020 election in South Carolina because they are unable or unwilling to vote in person due to the COVID-19 pandemic.  Under S.C. Code Ann. § 7-15-

420(B), these absentee voters face the risk that they will be deprived of the fundamental right to vote if their ballots contain a signature-related deficiency such as a missing or mismatched signature, with no notice or opportunity to cure the alleged deficiency.  As a result of the risk of disenfranchisement due to signature-related deficiencies, LWVSC must divert more resources toward educating voters about the strict signature requirements, warning them of the risk of automatic disenfranchisement without any notice, and answering questions from members of the public after the election is over.  For example, LWVSC members are advising South Carolina voters with respect to how to complete their absentee ballot and voter oath correctly so their ballots will be counted.  LWVSC must also divert resources towards ensuring that all qualified voters' ballots will be counted, including by placing calls to county elections offices or facilitating in-person voting.  LWVSC must divert these resources away from its regular advocacy, voter registration, fundraising, and other activities, affecting its ability to operate and function with respect to its normal activities.

8.      Plaintiff THE FAMILY UNIT, INC. ("The Family Unit") is a 501(c)(3), non-profit, charitable organization that was founded in December 2009.  The Family Unit's mission is to help improve the well-being of people who live in poverty.  Nearly all of the Family Unit's membership is African-American and many of its members are uninsured, elderly, disabled, homeless, incarcerated, or ex-offenders released from incarceration.  The Family Unit works to improve classroom performance by students of color and those who are of other races, distributes and disseminates educational documents such as the U.S. Constitution, and informs all persons, particularly those who have been historically disenfranchised and victims of discrimination and prejudice, about their constitutional rights.  The Family Unit also conducts voter registration drives, promotes voter participation, and assists individuals who need help navigating the voting

process.  As a result of the risk of disenfranchisement of absentee voters due to signature-related deficiencies, The Family Unit must divert more resources toward obtaining records from election officials and identifying absentee voters who were disenfranchised after each election, including those who were rejected due to a missing signature.  The Family Unit contacts these voters, informs them that they were disenfranchised, and helps to educate them to ensure their ballots are not rejected in the future.  The Family Unit must divert these resources away from its regular advocacy, voter registration, education assistance, and other activities, affecting its ability to operate and function with respect to its normal activities.

9.     Plaintiff ALBERTUS CLEA is a South Carolina resident and registered voter in Sumter County who has voted for many years. Mr. Clea is a Black man and a senior citizen.  He attempted to vote by absentee ballot in South Carolina's June 26, 2018 primary runoff election. After applying for and receiving an absentee ballot, Mr. Clea completed it and submitted it to county election officials.  He is limited in his literacy skills and did not understand the instructions on the voter's oath envelope.  He did not know that he had to sign the voter's oath envelope, and thus did not sign it.  Mr. Clea's ballot was rejected by the Sumter County election officials because it was unsigned.  Mr. Clea was not contacted by the Sumter County Voter Registration and Elections Office before, after, or during the June 2018 primary to inform him that his ballot was unsigned or that it would be rejected as a consequence.  In fact, Mr. Clea did not learn that his ballot was rejected until 2020, when he was informed by Dr. Brenda C. Williams of The Family Unit.  Mr. Clea was shocked, disappointed, and saddened to learn that his vote had not been counted and that he was disenfranchised.  Mr. Clea intends to vote by absentee ballot in the November 2020 general election, but fears election officials will disregard his absentee ballot if he forgets to sign the voter's oath envelope or makes any other error.  Mr.

Clea also intends to vote in future elections, and would consider voting by absentee ballot so long as he has some assurances that election officials will not reject his ballot due to a missing signature or due to other minor discrepancies.

10.     Plaintiff GEORGE HOPKINS is a South Carolina resident and has been an eligible, registered voter in Charleston County since 1976.  Mr. Hopkins is a retiree who suffered a hemorrhagic stroke in August 2020, which weakened the muscles in his right hand and arm. As a result, Mr. Hopkins has difficulties writing with his dominant hand, and his signature has changed.  Mr. Hopkins wants to vote in the upcoming November 2020 general election and he filed a request for an absentee ballot for that contest months ago. However, his current signature would not match the signature on his absentee ballot application, which he filled out in July 2020, or his signature on file with the County Board of Elections and Voter Registration.  Mr. Hopkins fears that he will be disenfranchised if he votes by mail and an election official determines that his signature is invalid without any notice to him beforehand.  He is therefore being forced to choose between possible disenfranchisement and putting his health at risk, in light of the ongoing COVID-19 public health crisis, in order to vote in person.  Mr. Hopkins also wishes to vote in future elections, and he will not do so by absentee ballot without assurance that his ballot would not be rejected without any notice or opportunity to cure.

11.     Defendant MARCI ANDINO is sued in her official capacity as Executive Director of the South Carolina State Election Commission.  The Executive Director is the Chief Administrative Officer for the State Election Commission and is required by law to supervise the County Boards of Elections and Voter Registration.  S.C. Code Ann. § 7-3-20.  In this role, she is tasked with ensuring that those County Boards comply with state and federal law in conduct of elections and voter registration.  *Id*. at § 7-3-20(C).

12.     Defendant JOHN WELLS is the Chair of the South Carolina Election Commission and is sued in his official capacity.  Defendants JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL and SCOTT MOSLEY are members of the South Carolina Election Commission and are sued in their official capacities.  The Executive Director serves at the pleasure of the South Carolina Election Commission. S.C. Code Ann. § 7-3-20(A).  The South Carolina Election Commission is responsible for carrying out all laws related to absentee registration and voting and with promulgating relevant regulations.  *Id*. § 7-15-10.  The enumerated mission of the Commission is, in relevant part, to ensure that every eligible citizen has the opportunity to participate in fair and impartial elections with the assurance that every vote will count.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

15.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

16.     This Court has personal jurisdiction over the Defendants, who are sued only in their official capacities as officials of the State of South Carolina.  The Defendants are statewide officials charged with implementing and enforcing the election laws of South Carolina throughout the state, including in this District.  The violations complained of concern their conduct in such capacity.

17.     Venue in the District of South Carolina is proper pursuant to 28 U.S.C. § 1391 and Local Civ. Rule 3.01 (D.S.C.) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and will occur in this judicial district, and because all defendants are residents of South Carolina and a substantial number of LWVSC members reside within this judicial district.

## FACTUAL BACKGROUND

### Absentee Voting in South Carolina

18.     The South Carolina Constitution guarantees that "every inhabitant of this State possessing the qualifications provided for in this Constitution shall have an equal right to elect officers and be elected to fill public office."  S.C. Const. Art. I, § 5.  To that end, the South Carolina Constitution requires that the "General Assembly shall provide for… absentee voting." S.C. Const. art. II, § 10.  Absentee voting in South Carolina is primarily governed by Title 7, Chapter 15 of the South Carolina Code.  By its own terms, Title 7, Chapter 15 requires the articles governing absentee registration and voting to be "liberally construed in order to effectuate their purpose."  S.C. Code. Ann. § 7-15-20.

19.     Until recently, absentee voting in South Carolina was limited to individuals who met specific criteria that excused them from voting in-person in South Carolina.  *Id*. § 7-15-320. On September 16, 2020, South Carolina Governor Henry D. McMaster signed bill G.5305/R.149 into law, expanding absentee voting to all qualified voters for the upcoming November 3, 2020 general election only.

20.     To vote by absentee ballot under the existing South Carolina absentee ballot provisions, qualified voters must first request an absentee ballot by filling out an application form.  S.C. Code Ann. § 7-15-330.

21.     The completed application must be returned to the County Board of Voter Registration and Elections in person or by mail by 5:00 p.m. on the fourth day before the election, except that the County Board must accept applications received by 5:00 p.m. the day immediately preceding the election, if the voter appears in person and is qualified to vote by absentee ballot.  *Id*.  The application form must include the voter's signature attesting to the correctness of the information provided on the form, the voter's name, registration certificate number, address, absentee address, election of ballot request, election date, runoff preference, party preference, reason for request, and a sworn oath that the voter is registered to vote and is the person who seeks to vote by absentee ballot.  *Id*. § 7-15-340.

22.     Once the County Board approves an application, officials must, as soon as possible, send the absentee voter a packet containing the ballot, instructions for marking and returning the ballot and signing and returning the required oath, an envelope marked "Ballot Herein" into which the voter will place the completed ballots, a return-addressed envelope containing an oath on the back to be signed by the voter, which the voter will use to return the interior ballot envelope to the board of voter registration and elections, and any other materials necessary to enable the absentee ballot applicant to execute and return a ballot legally acceptable by the officials charged with conducting the election.  *Id*. § 7-15-370.

23.     The return envelope that must be sent with each absentee ballot pursuant to Section 7-15-370 must have printed on its face in the upper left corner the words "Absentee ballots for _____ County, _____ (county seat), South Carolina."  *Id*. § 7-15-375 (2020). That information and other blanks on the front of the envelope are filled in by the county board prior to issuing the absentee ballot to the applicant.  *Id*.

24.    The back of the return envelope has blanks for the voter to fill in his or her name and address, and for the voter to sign the oath.  *Id*. §§ 7-15-375, 7-15-380.  That oath states: "I hereby swear (or affirm) that I am duly qualified to vote at this election according to the Constitution of the State of South Carolina, that I have not voted during this election, that the ballot or ballots contained in this envelope is my ballot and that I have received no assistance in voting my ballot that I would not have been entitled to receive had I voted in person at my voting precinct."  *Id*. § 7-15-380.

25.    All absentee ballots must be received by the county voter registration office or extension office by 7:00 p.m. on Election Day, Tuesday, November 3, 2020.  The state board of elections allows voters to check the status of their absentee ballots online.

26.    Ordinarily, at 9:00 a.m. on the calendar day immediately preceding Election Day, election officials may begin the process of examining the return-addressed envelopes that have been received by the county board of voter registration and elections.  *Id*. § 7-15-420(B).  All return-addressed envelopes received by the county board of voter registration and elections before the polls close must be examined in this manner.  *Id*.

27.    A ballot may not be counted unless the oath is properly signed, nor may any ballot be counted which is received by the County Board of Voter Registration and Elections after the polls close.  *Id*.  After all return-addressed envelopes have been emptied, but no earlier than 9:00 a.m. on Election Day, the election managers remove the ballots contained in the envelopes marked "Ballot Herein" and place them in the ballot box provided for the applicable contest.  *Id*. § 7-15-420(C).  Beginning at 9:00 a.m. on Election Day, the absentee ballots may be tabulated. *Id*. § 7-15-420(D).

28.     South Carolina law mandates that specific procedures be followed when an absentee voter's qualifications are challenged during this tabulation process.  State law provides that "[i]f any ballot is challenged, the return-addressed envelope must not be opened, but must be put aside and the procedure set forth in Section 7-13-830 must be utilized; but the absentee voter must be given reasonable notice of the challenged ballot."  *Id.* § 7-15-420(D).  In the case of a challenged absentee ballot, the unopened return-addressed envelope must be placed in an envelope on which must be written the name of the voter and that of the challenger.  *Id.* § 7-13-830.  A challenged vote becomes a provisional vote that is separated and not counted, but is turned over to county election officials.  *Id.*  These challenged votes are then addressed at meetings of election officials required by South Carolina law, and if the challenges are not sustained by the challenger, the ballot is no longer considered provisional, and is counted in the total election returns. *Id.*  As of now, this procedure is not guaranteed for voters whose absentee ballots are rejected for signature-related deficiencies., though nothing in South Carolina law would prevent county election officials from providing pre-rejection notice and a cure process for ballots rejected on these grounds.

29.     However, on or about October 7, 2020, Defendant Andino, Executive Director of the South Carolina State Election Commission, issued a directive prohibiting county officials from providing cure opportunities to voters who failed to sign the oath on the absentee ballot return envelope.

30.     On or about October 7, 2020, Defendant Andino issued a directive on the ElectionNet platform used by state and local election officials in South Carolina on behalf of the Commission stating that "… after an absentee ballot is returned to your office by mail, the voter cannot be given the opportunity to cure deficiencies."

31.    According to State Election Commission director of public information Chris Whitmire and Richland County Board of Voter Registration and Elections member Duncan Buell, deficient ballot return envelopes are not opened or counted.  Additionally, voters who submit deficient absentee ballot return envelopes are prohibited from voting in person and cancelling their deficient ballot.  These voters are thus effectively disenfranchised by Defendant Andino's Directive.

**Increased Use of Absentee Ballots in South Carolina and Past Rejection Data**

32.    South Carolina expects a record shattering increase in the number of absentee ballots cast during the upcoming general election.

33.    In a July 17, 2020 letter to state legislative leaders, Defendant Andino explained that mail-in absentee voting for South Carolina's June 2020 primaries increased by 370% compared to the 2016 primaries, and predicted that if that trend continues, more than one million ballots will be cast by mail in the November election.  Letter from Marci Andino, Exec. Dir., S.C. Election Comm'n, to Harvey Peeler Jr., President, S.C. Senate, and Jay Lucas, Speaker, S.C. House of Representatives 2 (July 17, 2020), https://my.lwv.org/sites/default/files/sec_2020-07-17_letter_to_gen_assembly_covid_changes_for_ge_final.pdf.  As of September 30, 2020, nearly 500,000 mail-in absentee ballots had been requested by South Carolina voters— approximately five times the previous record of 106,000 in 2016. *See* Nic Jones, *Record number of absentee voters in South Carolina continues to grow*, News 19-WLTX, (Sept. 30, 2020), https://www.wltx.com/article/news/politics/elections/record-number-of-absentee-voters-in-south-carolina-continues-to-grow/101-aa3e73b4-8ac1-4b93-9e05-7ac413886a1b; Chase Laudenslager, *SC Board of Elections reports record breaking number of absentee ballots*, Count On News 2

(Sept. 4, 2020), https://www.counton2.com/news/your-local-election-hq/sc-board-of-elections-reports-record-breaking-number-of-absentee-ballots/.

34.    According to Chris Whitmire, the South Carolina Election Commission public information director, the state could see as many as 1.5 million people vote absentee, with over one million of them voting absentee by mail-in ballot.  Julia Kauffman, *South Carolina Prepares for Influx of Absentee Voters*, News19-WLTX (Aug. 21, 2020), https://www.wltx.com/article/news/politics/elections/south-carolina-prepares-for-influx-of-absentee-voting/101-891899fd-39cf-4e95-a7bf-ea2d5c6d7975.  Whitmire has also stated that the previous records for absentee voting were around 520,000 absentee votes total and around 140,000 absentee votes by mail.  *Id.*  In 2016, a total of 502,819 people voted absentee, representing 23.7% of the 2,123,584 total ballots cast.  South Carolina Election Commission, *Absentee Voting History, South Carolina Election Commission Fact Sheets*, https://www.scvotes.gov/sites/default/files/Absentee%20Voting%20History%20(1998-2018)_0.pdf (last accessed October 2, 2020).  Even if in-person voter turnout in South Carolina increases in 2020 as compared to 2016, the number of absentee ballots is projected to double.

35.    According to Director of Voter Registration and Elections for Richland County, Alexandria Stephens, county offices of voter registration and elections are hiring additional staff and opening satellite offices to prepare for an increased number of absentee ballots.  Kauffman, *South Carolina Prepares for Influx of Absentee Voters*, News19-WLTX.

36.    After the 2020 General Election, absentee ballot numbers are likely to remain above pre-2020 rates even if the South Carolina Legislature does not renew the temporary expansion of absentee voting.  Elections in 2021 and beyond may continue to be affected by the COVID-19 pandemic, particularly for voters who are at high risk due to their age or certain

medical conditions.  Further, prior to the 2020 election cycle and the emergence of the pandemic,

voters' reliance on absentee and mail-in voting was steadily rising across the United States.  *See*

*Voting by Mail and Absentee Voting*, MIT Election Data and Science Lab,

https://electionlab.mit.edu/research/voting-mail-and-absentee-voting.

37.    During the 2016 General Election, South Carolina voters cast 497,436 absentee

ballots, of which 2,907 were rejected.  Election Administration and Voting Survey Datasets

("EAVS 2016") (2016), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

A total of 261 ballots were rejected because the voter's signature was missing.  *Id.*  Likewise,

during the 2018 election, South Carolina voters cast 72,806 absentee ballots, of which 2,248

were rejected.  *See Election Administration and Voting Survey Dataset 2018 Version 1.3*

("EAVS 2018") (Feb. 18, 2020), https://www.eac.gov/research-and-data/datasets-codebooks-

andsurveys.  Of these rejections, 140 were due to the voter's missing signature.  *Id.*  None of

these voters were required to be notified that their ballot was rejected.

38.    The EAVS data shows that the rates at which absentee ballots are rejected due to

a missing signature vary based on the voter's county of residence and other factors, indicating a

lack of consistency in how missing signatures are treated across the state.  Some counties reject

significant numbers of absentee ballots due to a missing signature while others reject none.  In

Charleston County, three absentee ballots were rejected in 2016 and zero absentee ballots were

rejected in 2018 due to a missing signature, even though Charleston County voters cast more

than 58,000 and 11,000 absentee ballots, respectively, in those elections.  EAVS 2016; EAVS

2018.  By contrast, in 2016 alone, there were 21 missing-signature rejections in Berkeley County

(out of 15,643 absentee ballots cast), 14 such rejections in Dorchester County (out of 14,936

absentee ballots cast), 11 in Greenwood County (out of 6,890 absentee ballots cast), and 10 in

Marion County (out of 3,542 absentee ballots cast), even though there were substantially fewer numbers of absentee ballots cast in those counties.  EAVS 2016.  In 2018, there were 25 missing-signature rejections in Orangeburg County even though voters cast relatively few absentee ballots (2,084) in that election.  EAVS 2018.

39.     On information and belief, Charleston County election officials have provided pre-rejection notice and an opportunity to cure to voters whose absentee ballots are rejected due to a signature-related deficiency in past elections.  The EAVS data thus confirms that providing notice and an opportunity to cure prevents erroneous voter disenfranchisement.  On information and belief, Charleston County election officials were providing pre-rejection notice and an opportunity to cure for this November's election prior to Defendant Andino's Directive.

40.     There is no consistent, statewide process governing signature matching for absentee ballots, and election officials in some counties have indicated that they will impose a signature matching requirement while others have not.

41.     Greenville County election officials are implementing a signature match requirement for the November 2020 election using paid personnel.

42.     At a meeting of the Richland County Board of Elections on October 1, 2020, election officials described plans to hire a vendor, Tritek Technologies, Inc., to institute a computerized signature verification process for absentee ballots.  The particularities of this process, and whether other counties will implement similar processes, are unknown.

43.     Relying on signature verification is an inherently flawed means of determining whether an absentee or mail ballot was fraudulently or inappropriately cast.  No two signatures are identical, even if provided by the same signer.  Indeed, a wide variety of factors may cause the appearance of a person's signature to vary from one signing to another, including physical

and mental factors such as a person's age, level of health, stress, change in physical or mental condition, eyesight, or use of medications, and environmental factors, such as the type of writing utensil, surface, or paper the signatory uses.

44.      Signature matching is also highly prone to error, particularly when conducted by a layperson without sufficient training in handwriting analysis.  In one study, laypersons—as compared to Forensic Document Examiners—incorrectly concluded that signatures were inauthentic 26% of the time. Moshe Kam et al., *Signature Authentication by Forensic Document Examiners*, 46 J. FORENSIC SCI. 884 (2001),

45.      Given the record number of absentee ballots that will be cast in the November 2020 general election, South Carolina officials will likely reject a record number of absentee ballots due to signature-related deficiencies without voters even being aware that their vote was tossed aside.

46.      Much of the increase in mail-in absentee votes is likely to come from voters who are availing themselves of this method of voting for the first time.  Such voters are more likely to make inadvertent errors resulting in the rejection of their ballots.

47.      If hundreds or perhaps thousands of absentee ballots are rejected for signature-related deficiencies, such as a missing or mismatched signature, that result could be significant and even outcome determinative.  Indeed, it is not uncommon for elections in South Carolina to be decided by a matter of just several hundred votes.  For example, a June 9, 2020 Greenville City Council District 22 Republican primary between Stan Tzouvelekas and Kenneth Cosgrove was decided by three votes.  Anna B. Mitchell, *Greenville County Council candidates concedes District 22 victory to Stan Tzouvelekas*, Greenville News, June 12, 2020, https://www.greenvilleonline.com/story/news/2020/06/11/greenville-county-council-race-flips-

again-count-provisional-ballots/5342472002/.  Similarly, a June 14, 2016 primary runoff election

for South Carolina House District 81 between Bark Blackwell and K.T. Ruthven was decided by

thirty-three votes.  South Carolina 2016 Primary Runoff Election Results, South Carolina

Election Commission, https://www.enr-scvotes.org/SC/62799/173206/en/summary.html.

## CLAIMS FOR RELIEF

### Count I: The Challenged Provisions Result in the Denial of Procedural Due Process in Violation of the Fourteenth Amendment

48.    Plaintiffs reallege and incorporate by reference the allegations in the preceding

paragraphs.

49.    The United States Constitution prohibits states from depriving "any person of . . .

liberty . . . without due process of law . . .." U.S. Const. amend. XIV, § 1.  Although there is no

constitutional right to vote by absentee ballot, once the state creates an absentee voting regime,

its citizens retain a liberty interest in voting by absentee ballot, and any state laws governing that

regime must comply with the Due Process Clause.  *See Wilkinson v. Austin*, 545 U.S. 209, 221

(2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an

expectation or interest created by state laws or policies.").

50.    Where an individual's liberty interest is at stake, the court must determine what

process is due by applying the three-factor test announced in *Mathews v. Eldridge*.  424 U.S.

319, 335 (1976).  That test requires balancing: (i) the private interest affected by the official

action; (ii) the risk of an erroneous deprivation and "the probable value, if any, of additional or

substitute procedural safeguards"; and (iii) the governmental interest, including "the function

involved and the fiscal and administrative burdens that the additional or substitute procedural

requirement[s] would entail." *Id.*

51.     S.C. Code Ann. § 7-15-420 violates the Due Process Clause by mandating the rejection of absentee ballots with signature-related deficiencies, without providing procedural due process to voters in the form of pre-rejection notice and an opportunity to cure the deficiency.

52.     The private interest at stake in having one's vote counted is substantial.  It is well-settled that the right to vote is a precious "fundamental political right" because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

53.     In every major election, election officials across South Carolina are disenfranchising hundreds of eligible absentee voters due to a missing or mismatched signature on the outer absentee ballot envelope without providing any notice to them or an opportunity to cure the error.  South Carolina law provides for the automatic rejection of these ballots due to these minor, technical deficiencies without an opportunity to cure even though the voter already completed, signed, and submitted an absentee ballot application and their absentee ballot otherwise complies with South Carolina law.  Defendant Andino's Directive makes such rejections mandatory, depriving county officials of discretion to offer voters an opportunity to cure ballots that would otherwise be discarded.

54.     There is a substantial risk of erroneously depriving an individual of their right to vote by authorizing state officials to reject ballots from qualified, registered voters due to inadvertent errors.  Providing voters with pre-rejection notice and an opportunity to cure signature-related deficiencies would minimize the risk that the state will deny qualified voters their validly-cast votes in error.

55.     The governmental interest in maintaining the integrity of an election also weighs in favor of extending notice and an opportunity to cure a signature-related deficiency, as the

integrity of an election depends on counting all ballots that are legitimately cast.  Further, extending notice and an opportunity to cure better serves any governmental interest in preventing fraud, because it allows qualified voters to confirm their identity rather than the state erroneously concluding that another individual has submitted their ballot.

56.     Any additional burden the government may incur would be minimal.   In the case of missing signatures, officials receiving absentee ballot return-addressed envelopes can easily and immediately tell if there is a deficiency because the relevant signatures are on the outside of these envelopes.  Absentee ballot applications are kept on file by the County Board of Voter Registration and Elections, and can be traced to any individual absentee ballot.  The state therefore possesses the information necessary to provide notice as promptly as practicable to voters whose ballot envelopes contain a signature-related deficiency.

57.     Further, South Carolina already has a notice process for provisional ballots cast by voters whose qualifications have been challenged by poll workers, and the state allows voters who cast provisional ballots to remedy certain deficiencies at a hearing the Friday after the election.  S.C. Code Ann. §§ 7-13-830, 7-17-10.  Under existing deadlines, state officials would have ample time to notify voters of signature-related deficiencies and allow them the opportunity to cure those deficiencies.

58.     Plaintiffs' requested relief would alter neither the timeline nor procedure for voters to return their ballots. Pre-rejection notice and an opportunity to cure are already available to those who cast ballots that are challenged for other reasons, namely, a suspected lack of voter qualifications. There is no legitimate state interest justifying South Carolina's failure to either provide a similar cure period for ballots with signature-related deficiencies, or extend the

existing cure process for provisional ballots to absentee voters whose ballots contain a signature-related deficiency.

### Count II: The Challenged Provisions Burden the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments

59.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

60.     The First and Fourteenth Amendments to the United States Constitution protect the fundamental right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). A state government may not burden the right to vote without adequate justification. S.C. Code Ann. § 7-15-420 imposes a substantial burden on voters' rights by mandating the rejection of absentee ballots with signature-related deficiencies without providing notice or an opportunity to cure. Defendant Andino's Directive exacerbates that burden by preventing county officials from offering voters such an opportunity if they believe it is merited under the circumstances.

61.     The failure to provide a consistent, state-wide process for notifying voters of a missing or mismatched signature and allowing voters a chance to cure these deficiencies – and now an outright prohibition on utilizing any such process for the November 2020 election – imposes a substantial burden on the right to vote. It arbitrarily disenfranchises hundreds of eligible South Carolina absentee voters in election after election due to minor signature-related deficiencies. The failure to provide pre-rejection notice and an opportunity to cure also adversely impacts the integrity of the election process, which depends on every qualified voter's vote being counted.

62.     No governmental interest justifies the failure to provide voters with notice and an opportunity to cure a signature-related deficiency in their absentee ballots. South Carolina

already maintains a similar notice process for provisional ballots that contain an identity or qualification challenge, and the state allows voters who cast those provisional ballots to remedy those deficiencies in their ballots up to three days after the election.  Thus, any interest in election administration is minimal, and does not outweigh the burden on voters.

63.    Providing notice and an opportunity to cure signature-related deficiencies is likely to further the state's interest in maintaining voters' confidence in the integrity of the electoral process by ensuring that qualified voters do not see their ballots rejected erroneously or because of inadvertent error.  Allowing voters an opportunity to verify their ballots also furthers the state's interest in preventing voter fraud by allowing the state to confirm the identity of voters before their votes are counted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.    Issue a judgment declaring that S.C. Code Ann. § 7-15-420 and Defendant Andino's Directive deprive voters of procedural due process in violation of the Fourteenth Amendment and impose an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the Constitution of the United States to the extent that they disenfranchise absentee voters without first providing them with notice and an opportunity to be heard or to otherwise cure alleged signature-related deficiencies;

b.    Issue preliminary and permanent injunctions enjoining the Defendants from enforcing S.C. Code Ann. § 7-15-420 and Defendant Andino's Directive to the extent that they fail to provide absentee voters with pre-rejection notice and a hearing or other opportunity to resolve signature-related deficiencies; specifically, Plaintiffs request that Defendants direct county election officials to review absentee ballot envelopes and provide pre-rejection notice to

voters by first-class mail and, where available, by email or phone, of any signature-related deficiency; and permit voters whose absentee ballots are deficient on this ground to cure the deficiency up to three days following the election.  Alternatively, Plaintiffs request that the Defendants instruct election officials to expand the existing process through which voters may cure certain deficiencies in their provisional ballots up to the statutorily-mandated meetings on the Friday following the election to include absentee ballot deficiencies based on missing or mismatched signature; and that the Defendants update their election guides, manuals, guidance, instructional materials, etc., to conform with the revised procedures;

       c.       Award reasonable attorneys' fees and costs to Plaintiffs under 42 U.S.C. § 1988; and

       d.       Grant any additional or alternative relief the Court may deem appropriate under the circumstances.

Dated:  October 19, 2020                Respectfully submitted,

                         ___s/ Susan K. Dunn_____

Julianne J. Marley              Susan K. Dunn (Fed. Bar #647)
Rhianna Hoover                sdunn@aclusc.org
DEBEVOISE & PLIMPTON LLP     Shirene C. Hansotia (Fed. Bar #12558)
919 Third Avenue             shansotia@aclusc.org
New York, NY 10022          AMERICAN CIVIL LIBERTIES UNION
(212) 909-6000              FOUNDATION OF SOUTH CAROLINA
                         P.O. Box 20998
*Of Counsel for Plaintiffs*         Charleston, South Carolina 29413-0998
                         Telephone: (843) 282-7953
                         Facsimile: (843) 720-1428

                         Ezra Rosenberg*
                         erosenberg@lawyerscommittee.org
                         John Powers (admitted *pro hac vice*)
                         jpowers@lawyerscommittee.org
                         LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
                         1500 K Street NW, Suite 900

Washington, DC 20005
Phone: (202) 662-8389
Fax: (202) 783-0857

Catherine Amirfar (admitted *pro hac vice*)
camirfar@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

Tara Ganapathy (admitted *pro hac vice*)
tganapathy@debevoise.com
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue NW
Washington, DC 20004
202-383-8000

*\*pro hac vice motion forthcoming*

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 19, 2020, I filed a copy of the above Motion, accompanying Memorandum of Law, and Exhibit A, with the Court's electronic filing system, which will send notice to:

> Jane W. Trinkley
> jtrinkley@burr.com
> BURR AND FORMAN LLP
> PO Box 11390
> Columbia, SC 29211
> 803-799-9800
>
> Mary Elizabeth Crum
> lcrum@burr.com
> William Grayson Lambert
> glambert@burr.com
> BURR AND FORMAN LLP
> 1221 Main Street
> Suite 1800
> Columbia, SC 29201
> 803-799-9800
>
> *Attorneys for Defendants*

/s/ Susan K. Dunn