**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

|  |  |
|---|---|
| LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA; THE FAMILY UNIT, INC.; ALBERTUS CLEA and GEORGE HOPKINS, <br><br> Plaintiffs, <br><br> v. <br><br> MARCI ANDINO, in her official capacity as the Executive Director of the South Carolina State Election Commission; HOWARD M. KNAPP, in his official capacity as Director of Voter Services of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; and JOANNE DAY, CLIFFORD J. EDLER, LINDA MCCALL and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission, <br><br> Defendants. | Case No. 2:20-cv-03537-RMG |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs demonstrated in their opening brief that, at a time when record numbers of South Carolinians will cast absentee ballots, they are likely to succeed on their procedural due process and fundamental right to vote claims, and that the requested relief bolsters rather than hinders the State's and public's interests in election integrity.  Defendants have since conceded that, pursuant to Defendant Andino's October 7 Directive, counties are prohibited from offering voters an opportunity to cure any signature-related deficiency and do not contest that, as a result, voters whose ballots are rejected due to those discrepancies will be disenfranchised.

In their response, Defendants ignore the key issue in this case: Defendants' failure to provide notice and the opportunity to cure for absentee voters whose ballots are rejected for signature deficiencies leaves those voters with absolutely no recourse against erroneous disenfranchisement.  When voters have submitted an absentee ballot to election officials, they cannot cast an in-person ballot that will count.  Nor can they apply for a second absentee ballot— even if their first absentee ballot is rejected due to a missing signature.  Defendants ignore that this lack of notice and cure is why hundreds of absentee ballots cast by eligible voters were rejected in 2016 and 2018 – including that of Plaintiff Albertus Clea – and Defendants do not dispute that more legitimate ballots will be rejected in future elections.

Defendants' primary arguments are diversions.  They argue that this case presents a non-justiciable question, ignoring Supreme Court precedent and a raft of recent case law conclusively demonstrating that it is justiciable.  Then, they argue laches and the *Purcell* doctrine bar this motion, even though Plaintiffs' remedy does not impact casting absentee ballots on the front end and thus creates no legitimate risk of voter confusion.  Finally, their position that that no right to vote or liberty interest exists when legitimate absentee ballots are rejected due to technical

1

deficiencies without providing voters notice and an opportunity to cure is at odds with decisions from virtually every court in the country to consider the question.

None of Defendants' arguments touches upon the crux of this case—that South Carolina's statutory regime will cause legitimate absentee ballots to be rejected arbitrarily absent relief from this Court. Plaintiffs' relief poses a negligible burden on the state since it draws entirely from South Carolina's existing procedures for processing challenged ballots. Ultimately, that relief is necessary to prevent the irreparable risk of erroneous disenfranchisement to Plaintiffs, Plaintiffs' members, and other absentee voters going forward.

## **ARGUMENT**

## I.     **Plaintiffs' Claims are Justiciable**

The Court should reject Intervenor-Defendants' misguided suggestion that Plaintiffs' claims are non-justiciable due to the inapposite political question doctrine, *see* Dkt. 46 at 6-8. Plaintiffs have alleged that election procedures established by South Carolina's General Assembly violate the Constitution. While the authority to establish election procedures "belongs exclusively to the General Assembly," Dkt. 46 at 11, the authority to determine whether such election procedures, once established, violate the U.S. Constitution belongs to the Court. *See Marbury v. Madison*, 5 U.S. 137, 178 (1803) (resolving conflicts between statutory law and the Constitution is the "very essence of judicial duty."). The Supreme Court has, time and time again, analyzed the justiciable question of whether state election laws violate the Constitution. *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992) (conducting an "inquiry into the propriety of a state election law" and collecting prior Supreme Court cases applying the Constitution to election laws). No court is "bound to apply" unconstitutional election procedures adopted by a

State General Assembly.[1]  In fact, Intervenor-Defendants concede, as they must, that the Court

has "authority, and even an obligation to resolve constitutional challenges."  Dkt. 46 at 7.[2]

While Defendants rely on partisan gerrymandering redistricting cases to argue this case is

not justiciable, these cases are inapplicable.  While the Framers may have concluded that a

"jurisdiction may engage in constitutional political gerrymandering" through redistricting plans,

*Rucho v. Common Cause*, 139 S. Ct. 2484, 2497 (2019), that does not permit States to violate the

Constitution.  *See*, *e.g.*, *Baker v. Carr*, 369 U.S. 186, 217-34 (1962) (rejecting political question

defense in an apportionment case).  This principle applies to violations of the fundamental right

to vote through election procedures like those at issue in this case.

Outside of the unique political circumstances present in the partisan gerrymandering

context, courts routinely apply the *Anderson-Burdick* framework to state election laws because it

is a judicially manageable standard.  *See Middleton v. Andino*, No. 3:20-CV-01730-JMC, 2020

WL 5591590, at *24 (D.S.C. Sept. 18, 2020) (finding claim justiciable because plaintiffs

"moor[ed] their claims to constitutional standards"), *stayed on other grounds*, No. 20A55, 2020

WL 5887393 (U.S. Oct. 5, 2020); *Democracy N. Carolina v. N. Carolina State Bd. of Elections*,

No. 1:20CV457, 2020 WL 4484063, at *21 (M.D.N.C. Aug. 4, 2020) (similar); *Texas*

*Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917, at *7-8 (5th Cir. Sept. 10, 2020)

(holding that whether a state election law on absentee voting violated the Constitution was "a

---

[1] For this same reason, *Bailey v. S.C. State Election Comm'n*, which "present[ed] only a question of statutory construction," *see* 430 S.C. 268, 271 n.2, (2020), is inapposite.
[2] Defendants' claim that ordering relief would somehow amount to "legislating from the bench" also does not apply because  Plaintiffs ask this court to rule upon the meaning of the *U.S. Constitution* – to "say what the law is."  *See Marbury*, 5 U.S. at 177.

question susceptible to judicial resolution without interfering with the political branches" because it was a "constitutional issue at its core"); *Harding v. Edwards*, No. CV 20-495-SDD-RLB, 2020 WL 5371350, at \*3 (M.D. La. Sept. 7, 2020) (finding election law claims justiciable and observing that "the Court hardly lacks jurisdiction to assess the constitutionality of the state's voting scheme simply because the scheme arises out of the political process").

Against the weight of this authority, Intervenor-Defendants' reliance on *Coalition for Good Governance v. Raffensperger* is misplaced. *See* Case No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996, at \*6-10 (N.D. Ga. May 14, 2020). The *Raffensperger* plaintiffs sought a broad re-engineering of Georgia's 2020 primary election due to the COVID-19 pandemic. *See id.* (plaintiffs seek "postponement of the [June primary] election until June 30, along with myriad other changes to the voting process," including requiring use of paper ballots rather than electronic voting machines, due to public health and safety reasons but court cannot determine "how early is too early to hold the election or how many safety measures are enough"). The court also distinguished that case from those—like Plaintiffs' here—involving "a burden on the right to vote that was created by the Government." *Id.* The Fifth Circuit has similarly distinguished *Coalition* as challenging "the *wisdom* of Georgia's policy choices," including "whether to use electronic voting machines or paper ballots," rather than raising substantive constitutional issues. *See Texas Democratic Party v. Abbott*, 961 F.3d 389, 398–99 (5th Cir. 2020). Here, however, Plaintiffs are not challenging the manner of the process by which voters cast their ballots, or the date of the election; rather, Plaintiffs simply seek the application of a narrowly tailored and straightforward notice-and-cure process that the State already uses for other types of ballot deficiencies, to be applied to ballots found deficient for missing voter

signatures.  This presents a justiciable legal question regarding the constitutionality of South

Carolina's scheme for signature-related deficiencies.  This Court should adjudicate these claims.

## II.     Plaintiffs are Likely to Succeed on the Merits

Defendants' litany of merits arguments mischaracterize the constitutional injury and the

interests at issue in this case and rely on authorities that arose in very different circumstances and

are easily distinguished.  Defendants' arguments thus lack merit and fail to rebut the strong

likelihood of success on the merits Plaintiffs have already demonstrated.  *See* Dkt. 21-1 at

### A.     Plaintiffs are Likely to Succeed in Showing a Violation of Procedural Due Process

#### 1.     Plaintiffs Have a Protected Liberty Interest

Defendants' argument that there is no cognizable liberty interest in the right to vote is

unsupported and contrary to the weight of decisions both within this Circuit and without, as

Plaintiffs have already illustrated.  *Compare* Dkt. 48, at 13 *with* Dkt. 21-1 at 13-14.  Defendants

entirely fail to address the myriad cases in support of this well-established rule. "The right to

vote is a constitutionally protected liberty interest." *Democracy N.C.*, 2020 WL 4484063, at *53

(citing *Burdick*, 504 U.S. at 433). This conclusion is "[b]eyond debate." *Self Advocacy Sols.,*

*N.D. v. Jaeger*, --- F. Supp. 3d ---, No. 3:20-cv-00071, 2020 WL 2951012, at *8 (D.N.D. June 3,

2020); *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from

the Constitution itself . . . or it may arise from an expectation or interest created by state laws or

policies.") (internal citations omitted).

Defendants base their position solely on an unreported district court decision from

outside this Circuit, *see* Dkt. 48, at 13 (citing *Memphis A. Phillip Randolph Inst. v. Hargett*, 2020

WL 5095459, at *4 (M.D. Tenn. Aug. 28, 2020)), whose rationale the Sixth Circuit declined to

adopt on appeal.  *See*, – F.3d --, 2020 WL 6074331, at *6 (6th Cir. Oct. 15, 2020).  The only

other case Defendants cite is *Byrd v. Drew*, an unpublished ruling discussing the reduced due

process rights retained by prison inmates in habeas corpus proceedings.  *See* 2011 WL 4936294,

at *2 (D.S.C. Sept. 7, 2011).  *Byrd* is inapposite and does not undermine the slew of cases that

have reviewed voting rights violations under a procedural due process framework, according to

which Plaintiffs are likely to prevail.  *See* Dkt. 21-1, at 16-18 (collecting cases).

> **2.      Plaintiffs are Likely to Succeed on the Merits under the *Mathews v. Eldridge* Framework**

None of Defendants' arguments undercuts Plaintiffs' showing that Defendants' actions

do not pass constitutional muster under *Mathews v. Eldridge*.

*First*, while Defendants attempt to frame the issue as one of "absentee voting, not the

right to vote itself," *see* Dkt. 48 at 13, this characterization purposely sidesteps the real issue in

this case. Plaintiffs' claims are not about whether they may cast an absentee ballot, but whether

South Carolina can disenfranchise Plaintiffs and unconstitutionally deprive them of their right to

vote by refusing to notify them before Election Day that their absentee ballot is deficient and

permit them an opportunity to cure.  *See* Dkt. 21-1 at 10, 17-20.  Courts across the country,

including within this Circuit, have recognized that while absentee voting is a privilege, "this does

not grant the state the latitude to deprive citizens of due process with respect to the exercise of

this privilege." *Democracy N.C.*, 2020 WL 4484063, at *53 (quoting *Martin v. Kemp*, 341 F.

Supp. 3d 1326, 1338 (N.D. Ga. 2018), *stay denied sub nom. Ga. Muslim Voter Project v. Kemp*,

918 F.3d 1262 (11th Cir. 2019)); *see also Jaeger*, 2020 WL 2951012, at *8 ("[A] state that

creates a system for absentee voting must administer it in accordance with the Constitution.")

(quotation omitted).

*Second*, Defendants' attempt to minimize the risk of erroneous deprivation by pointing to instructions provided with absentee ballots fails in the face of the evidence Plaintiffs have set forth.  Low-literacy voters like Mr. Clea may be disenfranchised for missing signatures repeatedly; moreover, the rate of ballots rejected varies significantly by county.  *Compare* Dkt. 21-1 at 10-12; McDonald Decl. at 5; *with Democracy N.C.*, 2020 WL 4484063, at *53-54. Defendants further overlook that when an eligible voter fails to sign their otherwise-valid ballot, disenfranchisement is not a mere risk but a *certainty*: due to Defendant Andino's Directive, county election officials have no authority to allow voters to cure any deficiencies.  Dkt. 53 ¶¶ 29-31.  Even if a voter were to learn their ballot had been rejected well in advance of Election Day, they would still be unable to cast a vote by any other means, including in person.  *Id.* ¶ 31. Defendants do not and cannot contest that additional procedures—namely, notice and the opportunity to cure—would greatly reduce if not eliminate the risk of erroneous deprivation.

*Third*, Defendants overstate their case as to the burden that Plaintiffs' requested relief would impose on them.  Plaintiffs are not seeking to change existing ballots, voter instructions, or the process by which absentee votes are cast or returned.  Defendants must simply contact voters who have submitted unsigned ballots and ask them to cure that deficiency.  This remedy is no different than what some counties, such as Charleston County, practiced without apparent incident, *see* Dkt. 48 at 9, prior to Defendant Andino's Directive.  Courts across the country have ordered cure procedures shortly before elections and States have been able to implement them without issue.  *See, e.g.*, *Martin*, 341 F. Supp. 3d at 1341-42 (October 24 order for November 6 election); *Jaeger*, 2020 WL 2951012, at *11 (June 3 order for June 9 election).  Further, given that the number of ballots rejected statewide for missing signatures in the 2016 and 2018 South Carolina general elections was in the low hundreds, *see* Dkt. 48-1 ¶¶ 7-8, providing notice and

7

opportunity to cure for voters who inadvertently omit signatures this year would likely not present a significant burden, even with the expected significant increase in voting by mail. Importantly, Defendants can make use of the system currently in place for challenged ballots as a last opportunity for voters to cure absentee ballots.  *See* Dkt. 21-1, at 7-8.  Defendants do not show why they could not simply use existing procedures to contact absentee voters as well.

> **B.** **South Carolina's Regime Unconstitutionally Burdens the Fundamental Right to Vote**

Defendants' arguments fail to explain or excuse the substantial burden that South Carolina's absentee ballot regime places on affected voters, nor answer its lack of justification under the *Anderson-Burdick* standard.  Dkt. 21-1 at 28-30.[3]

> **1.** **Plaintiffs' Claims Must be Assessed Under the *Anderson-Burdick* Standard**

Relying on *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), Defendants and *amici* mistakenly argue that this case is not susceptible to *Anderson-Burdick* scrutiny because there is no right to cast an absentee ballot.  *See* Dkt. 45 at 6, Dkt. 48 at 13.  This argument fails because it relies on the same misapprehension of Plaintiffs' claims identified above: because absentee voters whose ballots are rejected for signature deficiencies are barred from correcting their mistake or casting a ballot that will count through other means (including in person), this action is not about the right to vote absentee but the right to vote *at all*.

---

[3] Beyond the Attorney General of South Carolina's discussion of *League of Women Voters of Ohio v. LaRose*, No. 2:20-cv-3843, 2020 WL 5757453 (S.D. Ohio, Sept. 27, 2020) (discussed *infra* Section II.B.2), neither Defendants nor amici dispute Plaintiffs' arguments about the appropriate way to view the *Anderson-Burdick* framework in this case.  With regard to these arguments, which are unchallenged, Plaintiffs stand on their moving brief.

Moreover, a cavalcade of Supreme Court rulings subsequent to *McDonald* make clear that the scope of the decision is narrow and that Defendants' reading is unsupportable. *See, e.g.*, *Goosby v. Osser*, 409 U.S. 512, 521 (1973) (declining to follow *McDonald*); *O'Brien v. Skinner*, 414 U.S. 524, 529, 531 (1974) (again declining to follow *McDonald* and holding that *McDonald* "rested on failure of proof" rather than absence of a right to equal protection); *Hill v. Stone*, 421 U.S. 289, 300 n.9 (1974) (explaining that, in *McDonald*, "there was nothing in the record to indicate that the challenged Illinois statute had any impact" on the right to vote, but that the case had acknowledged that "[a]ny classification actually restraining the fundamental right to vote … would be subject to close scrutiny"); *Am. Party of Tex. v. White*, 415 U.S. 767 (1974) (abandoning *McDonald*'s reasoning and finding that minor party voters had a right to vote absentee in their primary where that right had been extended to major party voters, notwithstanding that minor party voters had the alternative option to vote in-person); *see also Tex. Democratic Party v. Abbott*, --- F.3d ---, No. 20-50407, 2020 WL 5422917, at *17 (5th Cir. Sep. 10, 2020) (noting the prior motions panel's failure to wrestle with *American Party of Texas* in relying on *McDonald*). Critically, *McDonald* was decided decades before *Anderson*, *Burdick*, and their progeny created a balancing test for evaluating burdens on the right to vote and set forth a sliding scale of scrutiny linked to the extent of the restriction.

Furthermore, *McDonald* is simply irrelevant here because it dealt with whether prisoners had a right to vote absentee, as opposed to whether those afforded absentee voting rights under a pre-existing statutory scheme were entitled to have their votes cast and counted. *See McDonald*, 394 U.S. at 811. It is well settled that once a state authorizes the use of absentee ballots, any restrictions it imposes on their use must comply with the Constitution and are subject to *Anderson-Burdick* review. *See, e.g.*, *Doe v. Walker*, 746 F. Supp. 2d 667, 681 (D. Md. 2010).

9

Accordingly, courts have repeatedly affirmed that absentee ballot procedures implicate and can violate the fundamental right to vote. Dkt. 21-1 at 18-19; *see Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019); *Democracy N.C.*, 2020 WL 4484063, at *53 (citing *Martin*, 341 F. Supp. 3d at 1338 (quoting *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990)). Defendants cite no governing authority for the proposition that the fundamental right to vote is not implicated where, as here, a plaintiff seeks to vindicate constitutional protections over absentee voting rights already extended to them by state statute.[4]

### 2. The Lack of Notice and Cure Places a Serious Burden on the Fundamental Right to Vote

None of Defendants', Intervenor Defendants', or *amici*'s arguments upset Plaintiffs' showing that South Carolina's regime is unconstitutional under the *Anderson-Burdick* standard.

Contrary to *amici*'s argument, *see* Dkt. 45 at 7, comparing *League of Women Voters of Ohio v. LaRose* with this case shows just how seriously South Carolina's regime burdens Plaintiffs' fundamental right to vote. In *LaRose*, the plaintiffs challenged Ohio's measures pertaining to absentee ballot signature deficiencies. Critically, and unlike in this case, Ohio already had in place a notice-and-cure procedure. *LaRose*, 2020 WL 5757453, at *2-3, *10. While the court there denied the preliminary injunctive relief that the plaintiffs sought –

---

[4] While Defendants rely on a string of recent cases discussing *other* rights concerning absentee voting generally, none is applicable to the case at hand. Defendants rely on *Tully v. Okeson*, but this case involves voters' ability to qualify for an absentee ballot in the first place, *see* No. 20-2605, 2020 WL 5905325 (7th Cir. Oct. 6, 2020), which is entirely different from a signature-match restriction on qualified absentee voters. The Seventh Circuit rightfully concluded in *Tully* that "Indiana's *whole* absentee-voting scheme does not affect Plaintiffs' right to vote" because access to the process makes "casting a ballot easier." *Id.* at *5. Similarly, *New Georgia Project v. Raffensperger* involved the rejection of all absentee ballots arriving after a stated deadline. *See* No. 20-13360-D, 2020 WL 5877588 (11th Cir. Oct. 2, 2020).

enjoining enforcement of the signature requirement altogether – the court specifically noted that there would have been "an erroneous deprivation of the right to vote absentee *if Plaintiffs do not receive notice and an opportunity to cure*." *Id.* at \*13 (emphasis added). That is precisely the case here, where South Carolina voters are prohibited from curing even if they learn that their ballot will be rejected for a signature-related deficiency. *Compare* Dkt. 21-1, at 17, *with* Dkt. 48 at 8-9. The South Carolina regime imposes a substantial burden that is not supported by a legitimate governmental interest. *See Lee*, 915 F.3d at 1321-25.

Defendants' reliance on *Crawford v. Marion County Election Board*, which involved a photo identification requirement, is similarly misplaced. 553 U.S. 181 (2008). There, failure to comply with the identification requirement did not mean that one's ballot was cast aside; rather, it was rendered provisional—one of the forms of relief Plaintiffs are requesting here. *See id.* at 197-98 (stating that "the availability of the right to cast a provisional ballot provides an adequate remedy for" the burdens caused by inadvertent failure to comply with the ID requirement). Further, *Crawford*'s holding was premised on the lack of credible evidence indicating any voter would actually be disenfranchised by the challenged measure. *See id.* at 200 (noting district court expert report put forth by plaintiffs was "utterly incredible and unreliable"). Defendants here, in stark contrast, must concede that under the current regime, voters will be disenfranchised if their absentee ballots have signature deficiencies. *See* Dkt. 21-1 at 10-11, 20.

### 3. The State's Interests in Election Integrity Support Granting the Requested Relief

While Defendants correctly identify the State's legitimate interest in preventing voter fraud and preserving public faith in the electoral process, *see* Dkt. 46 at 6, Dkt. 45 at 7, that interest militates in Plaintiffs' favor here. As the Eleventh Circuit and other courts have

observed, "if a voter is able to cure the signature-match problem, no fraud protected against by the signature-match provision even arguably occurs" and therefore "Defendants have identified no fraud-prevention interest that justifies depriving legitimate vote-by-mail . . . voters of the ability to cure the signature mismatch." *Lee*, 915 F.3d at 1322; *see also Jaeger*, 2020 WL 2951012, at *10 (observing that notice and cure procedures ensure the same person that signed the ballot application is the person casting the ballot, "preventing voter fraud and increasing confidence in our electoral system"); *Martin*, 341 F. Supp. 3d at 1340 (concluding that providing a cure for signature match rejection "strengthens" the "integrity of the election process").

For these reasons and for the reasons stated in Plaintiffs' opening brief, *see* Dkt. 21-1 at 22-26, Plaintiffs are likely to succeed on the merits.

### III.    *Purcell* Does Not Preclude Relief

*Purcell v. Gonzalez*, 549 U.S. 1 (2006), does not preclude Plaintiff's requested relief. Contrary to Defendants' and *amici*'s suggestions, *see* Dkt. 45 at 3, Dkt. 46 at 2-4, Dkt. 48 at 5-9, "Purcell did not create a per se rule prohibiting" this Court from granting Plaintiffs' motion; instead, it "requires this Court to take into account critical considerations such as voter confusion that may result from a judicial order." *Namphy v. DeSantis*, 2020 WL 5994268, at *6-7 (N.D. Fla. Oct. 9, 2020). "*Purcell* is not a magic wand that defendants can wave to make any unconstitutional election restriction disappear so long as an impending election exists." *People First of Ala. v. Sec'y of State for Ala.*, 815 F. App'x 505, 514 (11th Cir. 2020) (Rosenbaum, J. & Pryor, J., concurring). Here, the concern about the potential for judicially-created confusion that troubled the Supreme Court in *Purcell* and *Republican National Committee v. Democratic National Committee*, 140 S. Ct. 1205 (2020), is not present. *See, e.g., Self Advocacy Sols*. N.D.

v. Jaeger, No. 2:c0-CV-00071, 2020 WL 2951012, at *11 (D.N.D. June 3, 2020) (finding the same).

Defendants concede *Purcell*'s motivating concern is whether "a court order altering electoral procedures will itself disenfranchise voters by creating 'voter confusion and consequent incentive to remain away from the polls.'"  Dkt. 46 at 2, Dkt. 48 at 15.  Yet in recounting the "electoral chaos" they argue would follow a grant of Plaintiffs' narrowly-tailored requested relief, *see* Dkt. 46 at 9-10 at 11, Defendants sidestep the fact that there is simply "no potential for voter confusion or dissuasion from voting because the process for submitting an absentee ballot will remain unchanged" if Plaintiffs' relief is granted.  *Jaeger*, 2020 WL 2951012, at *11.

A.    **Plaintiffs' Proposed Relief does not Fundamentally Alter the Election**

Plaintiffs do not seek to change an election rule, impose a substantial burden on county officials, or "fundamentally alter the nature of the election."  Dkt. 48, at 5.  Plaintiffs here do not, as Defendants suggest, *see* Dkt. 48 at 7, seek to alter procedures on the "front end" of the voting process—the existing processes for requesting, filling out, or submitting an absentee ballot or the procedures for voter registration or ballot initiatives are not being challenged.  There is no risk of voter confusion due to conflicting orders because South Carolina's signature requirement remains in place regardless of the outcome of this case; the existing voter instructions on the 420,000 absentee ballots that have been mailed out will remain accurate.  *See* Dkt. 48 at 6-7.

The only question is whether the few voters whose absentee ballots will be rejected due to the signature requirement – like Plaintiff Albertus Clea in 2018 – will be notified on the back end and given an opportunity to cure before they are disenfranchised.  *See* Dkt. 21-1 at 6.  Plaintiffs' proposed cure procedure could be instituted within existing provisions of South Carolina law.  Dkt. 21-1 at 14; 21-22 (describing voter challenge procedures pursuant to S.C.

13

Code Ann. §§ 7-15-420(D), 7-13-830).  The cure would take place only after officials process absentee ballots and would have no effect on how voters apply for, complete, and submit ballots. *Compare League of Women Voters of N. Carolina*, 769 F.3d at 248 (distinguishing *Purcell* because "counting out-of-precinct ballots merely requires the revival of previous practices or, however accomplished, the counting of a relatively small number of ballots"), *with Republican Nat'l Comm.*, 140 S. Ct. at 1207 (granting a stay of preliminary injunction that "afford[ed] relief that the plaintiffs themselves did not ask for.").  In any event, "the countervailing threat of the deprivation of the fundamental right to vote [is] more significant" than the "impact on election officials."  *Jaeger*, 2020 WL 2951012, at *11 (weighing the balance of equities in Plaintiffs' favor despite *Purcell*).

### B.     *Middleton* Does Not Preclude the Requested Relief Here

Defendants rely on *Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020), *see* Dkt. 46 at 3, 8-9, Dkt. 48 at 1-2, and suggest it controls here.  That case, however, involves a challenge to a different requirement and different relief.  Plaintiffs do not challenge the witness requirement and do not seek to "circumvent" *Middleton*, contra Dkt. 48 at 10. Plaintiffs' complaint does not use the word "witness" once, *see* Dkt. 53, and Plaintiffs' papers narrowly focus on absentee ballot deficiencies based on "missing or mismatched signatures." *See, e.g.*, Dkt. 53 ¶¶ 3, 7-9, 37-38, 47, (prayer for relief); Dkt. 21 at 1-2 (challenging rejection of ballots that are not "properly signed" without opportunity to cure and referring to "missing signature"), Dkt 41.  Plaintiffs' omission of the "and witnessed" language in the relevant South Carolina statute from its papers was intentional.  *See* S.C. Code Ann. § 7-15-420(B) ("A ballot may not be counted unless the oath is properly signed *and witnessed*…") (emphasis added).

14

The relief requested in this case is materially different from the relief sought in *Middleton*. The district court's order in Middleton enjoined a witness signature requirement for voting by absentee ballot. *Middleton*, 2020 WL 5591590, at *38. To effectuate the district court order, South Carolina officials were required to notify voters and broadly educate the public that they no longer needed a witness signature to submit an absentee ballot. *Middleton*, 2020 WL 5591590, at *38 (ordering Defendants "to immediately and publicly inform South Carolina voters about the elimination of the Witness Requirement for absentee voting," including by "providing updated information … on all relevant websites, social media outlets (i.e., Facebook, Instagram, Twitter, etc.), and other means of public dissemination"). By contrast, Plaintiffs here do not challenge the signature requirement writ large. *See* Dkt. 21. Plaintiffs also do not seek a public education campaign and the proposed relief will in no way impact the vast majority of absentee ballots that have been mailed out or received. *See* Dkts. 20 (prayer for relief), 21. Officials need to simply attempt to contact any voters impacted by a failure to sign and, for the subset that provide the necessary cure, tabulate their votes. *Id*.

Defendants' suggestion that Justice Kavanaugh's warning that courts should "defer to elected officials' decisions about how to respond to the COVID-19 pandemic," *see* Dkt. 48 at 2 (citing *Middleton*, 2020 WL 5887393, at *1), is belied by their own arguments. Defendants tout the fact that South Carolina's signature requirement has deep roots long predating the pandemic, *see* Dkt. 48 at 5-6, and suggest that Defendant Andino's Directive does not reflect any change in procedures, *id*. at 8-9. With respect to the latter point, Defendants cannot have it both ways. In any event, to the extent that they are wrong and Defendant Andino's Directive prohibiting cure procedures for absentee ballots does reflect a change in procedure, Defendants do not – and could not – suggest the Directive is motivated by a desire to address the COVID-19 outbreak.

15

Moreover, Plaintiffs' position is that the absence of a notice-and-cure procedure for signature-related absentee ballot rejections is unconstitutional in every election, regardless of whether COVID-19 is present. For this reason, should this court deem that *Purcell* applies with the respect to the November 2020 election, the appropriate course of action is not to deny Plaintiffs' motion for preliminary injunction but to order relief for subsequent elections during the pendency of the litigation. *See, e.g., Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1407, 1410 (N.D. Ga. 2019) (ordering Georgia "[t]o refrain from the use of the GEMS/DRE [electronic voting] system in conducting elections after 2019" because "it would be unwise to require the State to implement an intermediate hand-marked paper ballot system for the 2019 elections").

### C.     The Nature of Plaintiffs' Proposed Relief Distinguishes this Case from Those Cited by Defendants

Defendants also stress that this case is like *S.C. Progressive Network Educ. Fund. v. Andino*, 2020 WL 5995325 (D.S.C. Oct. 9, 2020), *see* Dkt. 46 at 9, Dkt. 48 at 7, but they are mistaken. The plaintiffs delayed filing that lawsuit until the end of the day on October 2, 2020, even though they sought a preliminary injunction to push back the October 4 and October 5 voter registration deadlines (depending on the method of registration) while citing no extenuating circumstances aside from the COVID-19 pandemic. *See* 2020 WL 5995325 at \*1-2. Those circumstances have no bearing on this case, which was filed 32 days before the election, *see* Dkt. 1, and has nothing to do with registration deadlines or the front end of the voting process.

The other cases cited by the Legislative Defendants, *see* Dkt. 46 at 4-5, are irrelevant for similar reasons. *Merrill v. People First of Ala.*, No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020), like Middleton, involves a state's requirements for filling out and submitting absentee ballots in the first instance, which is not at issue here. *New Ga. Project v. Raffensperger*, 2020

16

WL 5877588 (11th Cir. Oct. 2, 2020), involved an across-the-board change to Georgia's

deadline for receipt of absentee ballots.  Finally, Defendants exaggerate the significance of

*Richardson v. Texas Sec'y of State*, No. 20-50774 (5th Cir. Sept. 11, 2020), *staying* No. SA-19-

CV-963-OLG, 2020 WL 5367216 (W.D. Tex. Sept. 8, 2020), because the Fifth Circuit has only

issued an administrative stay and has not addressed the merits of a stay request.

Defendants cite only one recent order granting a stay of a lower court's preliminary

injunction involving arguably similar facts.  *Ariz. Democratic Party v. Hobbs*, Nos. 20-16759,

20-16766, 2020 WL 5903488 (9th Cir. Oct. 6, 2020).  That case is inapposite, however, because

the Ninth Circuit found a lack of likelihood of success on the merits.  *Id.* at *1.  That fact is not

surprising and has no bearing on this case because Arizona already provides for notice and cure,

whereas South Carolina does not.  *Id.* ("If an early voter returns a ballot with an unsigned

affidavit, Arizona has afforded him or her an opportunity to cure the problem" until "7:00 PM on

Election Day").  This led the Hobbs Court to conclude that the balance of equities favored

granting the stay in light of the "minimal" burden on plaintiffs.  *Id.* at *2.

**D.     By Upsetting the Status Quo During an Ongoing Election, Defendants Have Rendered *Purcell* Inapplicable**

Applying *Purcell* in this circumstance would be particularly curious here because

Defendants themselves have changed the status quo – at least with respect to Charleston County

and similarly-situated counties, *see* Dkt. 48 at 8-9 – through the issuance of Defendant Andino's

October 7 Directive.  *See* Dkts. 41, 41-1, 43-1.  The *Purcell* principle is fundamentally an

equitable principle.  *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[U]nder certain circumstances,

such as where an impending election is imminent and a State's election machinery is already in

progress, equitable considerations might justify a court in withholding the granting of

17

immediately effective relief…").  Here, Plaintiffs seek to restore the status quo that some

counties like Charleston County were already implementing on the date of the lawsuit, a status

quo that was upset by Defendant Andino's Directive.  This Court should not apply *Purcell* where

South Carolina's "election machinery" was operating differently in various counties until

Defendants unilaterally prohibited cure procedures less than two weeks ago – which itself creates

constitutional concerns.  *See Ely v. Klahr*, 403 U.S. 108, 113 (1971) (affirming district court

decision where "the court chose what it considered the lesser of two evils").

      **E.**      **Defendants Ignore Past Precedent Favoring Granting a Preliminary Injunction Under the Current Circumstances**

As noted in Plaintiffs' opening brief, *see* Dkt. 21-1 at 28-29 (collecting cases), courts

have routinely granted relief in similar circumstances or even closer in time to an upcoming

election.  *See, e.g., Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. Oct. 24, 2018) (election on

November 6, 2018), *stay denied sub nom. Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262

(11th Cir. 2019); *Ga. Coal. for the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga.

Nov. 2, 2018) (election on November 6, 2018); *Jaeger*, 2020 WL 2951012 (D.N.D. June 3,

2020) (election on June 9, 2020); *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*,

2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) (election on November 8, 2016); *Fla. Democratic

Party v. Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. Oct. 10, 2016) (same); *cf. Democratic Party of

Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1341 (N.D. Ga. Nov. 2, 2018) (ordering the state

to count "spoiled" ballots in a decision rendered eight days after the election).

**IV.**      <u>**Equitable Considerations and The Doctrine of Laches Do Not Preclude Relief**</u>

Finally, Defendants' invocation of laches and similar equitable considerations to preclude

relief, *see* Dkt. 48 at 16-17, fails because the timing of Plaintiffs' filing is reasonable and has not

18

prejudiced Defendants. The doctrine of laches is an affirmative defense, and Defendants must prove a (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. *Costello v. United States*, 365 U.S. 265, 282 (1961). Courts have been hesitant to bar claims based on laches at a preliminary stage "when there is limited factual information available." *See Martin v. Kemp*, 341 F. Supp. 3d 1326, 1335-36 (N.D. Ga. 2018); *see also Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993) (facts evidencing unreasonableness "can not be decided against the complainant based solely on presumptions); *Jeffries v. Chi. Transit Auth.*, 770 F.2d 676, 679 (7th Cir. 1985) ("Laches is generally a factual question not subject to summary judgment").

Plaintiffs allege the current regime is unconstitutional in all elections, not just the November 2020 election, and Plaintiffs are seeking relief in this motion for all elections held during the pendency of this litigation. In this context, there is no indication whatsoever of the inequity necessary for a finding that laches applies. *See*, *e.g.*, *Kansas v. State of Colorado*, 514 U.S. 673, 689 (1995); *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008). Moreover, Plaintiffs' lawsuit predates Defendant Andino's October 7 Directive and was filed shortly after Governor Henry D. McMaster signed Act 143 (G.5305) (2020) into law on September 16, which expanded absentee voting to all qualified South Carolina voters for the upcoming November election, contributing to the increase in absentee voting. *Compare* Dkt. 48 at 6-7, Dkt. 21-1 at 2, *with Martin*, 341 F. Supp. 3d at 1336 (rejecting laches defense to signature-matching challenge filed less than three weeks before election where plaintiffs brought suit in response to then-recent reports of an expected "surge" in absentee voting); *see also Ga. Coal. for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1259 (N.D. Ga. 2018).

19

In effect, Defendants attempt to impose a strict statute of limitations precluding a lawsuit based upon the supposed lack of diligence of a low-literacy voter like Albertus Clea, *see* Dkt 21-5 ¶ 6, and grassroots organizations such as The Family Unit and the League of Women Voters. *See* Dkt. 48 at 16-18.  Defendants' attacks on Plaintiffs' conduct during a period coinciding with the COVID-19 pandemic is not only unfortunate but cynical given that the timing of this suit has not prejudiced Defendants' ability to mount a full defense, *see* Dkts. 47 & 48, has not inhibited intervention in this matter by the Legislative Defendants, *see* Dkt. 46, and has not prevented the filing of an *amicus* brief by the South Carolina Attorney General, Dkt. 45.

Defendants' alternative argument that an injunction is inappropriate because it is "far from certain" a remedy can be implemented in time, *see* Dkt. 48 at 16, is belied by the fact that Charleston County has already been implementing a cure procedure, *see* Dkt. 48 at 9, and the fact that courts have successfully ordered the same remedy in a raft of similar cases without incident.  *See*, *e.g.*, *Martin*, 341 F. Supp. 3d at 1341; *Jaeger*, 2020 WL 2951012, at *10-11.

This Court should rule that relevant equitable considerations support the issuance of an injunction, particularly in light of the irreparable harm that Plaintiffs face – disenfranchisement and the loss of the right to vote – and given that the balance of the equities weigh heavily in Plaintiffs' favor.  *See* Dkt. 21-1 at 26-29 (addressing remaining preliminary injunction factors).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction, as supplemented, *see* Dkts. 21 & 41, should be granted.

20

Dated:  October 19, 2020                        Respectfully submitted,

                                                 ___s/ Susan K. Dunn_____
Julianne J. Marley                               Susan K. Dunn (Fed. Bar #647)
Rhianna Hoover                                   sdunn@aclusc.org
DEBEVOISE & PLIMPTON LLP                         Shirene C. Hansotia (Fed. Bar #12558)
919 Third Avenue                                 shansotia@aclusc.org
New York, NY 10022                               AMERICAN CIVIL LIBERTIES UNION
(212) 909-6000                                   FOUNDATION OF SOUTH CAROLINA
                                                 P.O. Box 20998
*Of Counsel for Plaintiffs*                      Charleston, South Carolina 29413-0998
                                                 Telephone: (843) 282-7953
                                                 Facsimile: (843) 720-1428

                                                 Ezra Rosenberg*
                                                 erosenberg@lawyerscommittee.org
                                                 John Powers^
                                                 jpowers@lawyerscommittee.org
                                                 LAWYERS' COMMITTEE FOR CIVIL
                                                 RIGHTS UNDER LAW
                                                 1500 K Street NW, Suite 900
                                                 Washington, DC 20005
                                                 Phone: (202) 662-8389
                                                 Fax: (202) 783-0857

                                                 Catherine Amirfar^
                                                 camirfar@debevoise.com
                                                 DEBEVOISE & PLIMPTON LLP
                                                 919 Third Avenue
                                                 New York, NY 10022
                                                 (212) 909-6000

                                                 Tara Ganapathy^
                                                 tganapathy@debevoise.com
                                                 DEBEVOISE & PLIMPTON LLP
                                                 801 Pennsylvania Avenue NW
                                                 Washington, DC 20004
                                                 202-383-8000

                                                 *pro hac vice motion forthcoming*
                                                 ^*pro hac vice motion pending*

                                                 *Counsel for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I certify that on October 19, 2020, I filed a copy of the above Reply with the Court's electronic filing system, which will send notice to:

Jane W. Trinkley
jtrinkley@burr.com
BURR AND FORMAN LLP
PO Box 11390
Columbia, SC 29211
803-799-9800

Mary Elizabeth Crum
lcrum@burr.com
William Grayson Lambert
glambert@burr.com
BURR AND FORMAN LLP
1221 Main Street
Suite 1800
Columbia, SC 29201
803-799-9800

*Attorneys for Defendants*

    /s/ Susan K. Dunn

23