**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| League of Women Voters of South Carolina, *et al.*, | ) ) ) | |
| Plaintiffs | ) ) | Civil Action No. 2:20-3537-RMG |
| vs. | ) ) | |
| Marci Andino, in her official capacity as Executive Director of the South Carolina State Election Commission, *et al.*, | ) ) ) ) | **ORDER** |
| Defendants. | ) ) ) | |

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction. (Dkt. No. 21). Plaintiffs filed memoranda in support of their motion. (Dkt. Nos. 21-1; 41 ;56). Defendants filed memoranda in opposition. (Dkt. Nos. 46; 48). The Court also received amicus curiae briefs in support of and in opposition to the motion. (Dkt. Nos. 43; 45). The Court conducted oral argument on the motion on October 21, 2020.

## I. Factual Background

Plaintiffs filed this action on October 2, 2020, alleging that the State of South Carolina's lack of a procedure for providing notice and an opportunity to cure for absentee ballot voters whose ballots are not counted because of their failure to include a voter and/or witness signature on their returned absentee ballot envelope violates such voters' rights to due process and equal protection. (Dkt. No. 1). Plaintiffs moved on October 9, 2020, some 24 days before the General Election, for a preliminary injunction mandating that South Carolina election officials implement a court-ordered notice and cure procedure for all absentee ballot voters who omitted one or both of the required signatures on their returned absentee ballot envelopes. (Dkt. No. 21). As

1

requested by Plaintiffs, such an injunction would include altering the date absentee ballot return envelopes are reviewed by county election officials, which is statutorily established to be one calendar day before the general election;  providing sufficient time for election officials to notify absentee ballot voters who have submitted defective ballots via U.S. mail, phone or email; and allowing these absentee ballot voters to cure the signature defects. (Dkt. Nos. 21; 65 at 41-42). Plaintiffs further seek injunctive relief regarding the actions of some county boards to disqualify otherwise timely and complete absentee ballots on the basis of mismatched signatures, the state statutory provision which prohibits persons who submit defective absentee ballots from voting at the polls on election day, and the directive of the State Election Commission to county boards prohibiting individual counties from operating, at their discretion, a notice and cure procedure for absentee ballots missing the required signatures.

South Carolina has a comprehensive statutory scheme for the processing of absentee ballots.  A registered voter seeking to vote by absentee ballot must initially submit an application for an absentee ballot to the voter's county board of voter registration and elections ("county board").  The county board, per South Carolina Code Annotated §7-15-200, then sends a qualified applicant a packet that includes the ballot, an envelope to place the ballot (which includes on the envelope a statement "ballot herein"), a return addressed envelope, and detailed instructions. (Dkt. No. 48-1 at 2, 5-11).  The instructions state that the voter must sign the Voter's Oath on the back of the return addressed envelope and a witness must sign below the voter's signature and provide a home address or the absentee ballot will not be counted.  (Dkt. No. 48-1 at 11).

The voter is instructed to complete the ballot, place the ballot in the "ballot herein" envelope, seal the "ballot herein" envelope, and insert the "ballot herein" envelope into the

return addressed envelope. (*Id.*). The back of the return addressed envelope contains a boldly titled "Voter's Oath," certifying that the voter is duly qualified to vote and has not otherwise voted in the election. S.C. Code Ann. § 7-15-220. (Dkt. No. 48-1 at 9). Below the oath is a signature line for the voter, a place to date the absentee ballot submission, and spaces for the witness' signature and address. According to an affidavit submitted by Plaintiffs in support of their motion for preliminary injunction, .2% of the absentee ballots were rejected because of a missing signature of a voter or witness in the 2018 general election and .1% were rejected in the 2016 general election. (Dkt. No. 21-2 at 5). In other words, despite the multi-step process for completing and submitting absentee ballots in South Carolina, at least 99.8% of the absentee ballots satisfied the signature requirements in the last two election cycles.

At "9:00 a.m. on the calendar day preceding election day," election managers, with duly appointed watchers present, are required to begin the process of examining the returned absentee ballots, "making certain that each oath has been properly signed and witnessed and includes the address of the witness." S.C. Code Ann. § 7-15-420(B). An absentee ballot "may not be counted unless the oath is properly signed and witnessed nor may any ballot be counted which is received by the county board of voter registration and election after time for closing of the polls." *Id.* If the absentee ballot contains the required signatures and is not challenged for other lawful reasons, the "ballot herein" envelope is removed from the returned addressed envelope and placed in a "locked box" for processing as a legitimate ballot. *Id.* On the other hand, if the absentee ballot lacks the voter or witness signature, the return addressed envelope is not opened and the ballot is not counted. *Id.* Furthermore, any person who has been issued an absentee ballot may not vote on election day (whether or not the absentee ballot has been cast) unless the

voter can furnish to his precinct manager "a certificate from the county board . . . that his absentee ballot has been returned to the board unmarked." S.C. Code Ann. § 7-15-430.

Under South Carolina law, the State Election Commission establishes policies and procedures and elects an executive director. S.C. Code Ann. § 7-3-20. Defendant Andino is the Commission's executive director. County boards operate under the supervision of the State Election Commission's executive director and must comply with the Commission's policies and procedures as well as State and federal law. *Id.* In the event there is any disagreement between the county boards and the State Election Commission regarding any aspect of the conduct of elections, "the policy or opinion of the State Election Commission shall control." S.C. Code Ann. § 7-3-25.

South Carolina election laws do not authorize county boards to engage in signature matching processes as a basis to disqualify an absentee ballot otherwise properly completed and timely submitted. (Dkt. No. 65 at 7, 11-12). South Carolina has no standards or rules relating to any signature matching processes and no training has been provided to county boards for conducting signature matching. (Dkt. Nos. 58 at 2; 65 at 7). Defendant Andino initially advised the Court in a Declaration of October 20, 2020 that to her personal knowledge no county board was engaged in signature matching to disqualify otherwise validly completed absentee ballots. (Dkt. No. 58 at 1-2). During oral argument on October 21, 2020, Defendants' counsel advised the Court that any county board engaging in a signature matching process to disqualify or reject otherwise properly completed absentee ballots would be acting without legal authority and in violation of state election laws. (Dkt. No. 65 at 7-12). Defendant Andino informed the Court in a supplemental Declaration of October 26, 2020 that as a result of a survey she conducted since the October 21, 2020 oral argument, she learned that at least nine counties are engaged in

signature matching procedures, with these county boards utilizing a wide variety of procedures when an alleged mismatched signature is identified. (Dkt. No. 66-1).[1]

South Carolina election laws do not include a procedure to provide absentee ballot voters notice if their return addressed envelopes lack one of the required signatures or any process to cure a defectively submitted absentee ballot. Defendants assert that county boards are not authorized to provide notice and cure processes for absentee ballots with missing signatures and have issued a directive to county boards stating that absentee ballot voters with missing signatures "cannot be given the opportunity to cure deficiencies." (Dkt. Nos. 48-1 at 2-3; 53 at 5). Defendant Andino has advised the Court that "[g]iven how close we are to Election Day, it would be difficult to implement a new, uniform, secure process across all 46 counties for curing failures to comply with signature and witness requirements." (Dkt. No. 48-1 at 3).

## II. Legal Standards

A.    Preliminary Injunction Standards:

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also U.S. Dep't of Labor v. Wolf*

---

[1] The nine counties Defendant Andino identified as engaged in signature matching procedures to disqualify otherwise validly completed absentee ballots are Allendale, Anderson, Clarendon, Georgetown, Greenville, Greenwood, Laurens, Marlboro, and Orangeburg Counties. (Dkt. No. 66-1 at 3). An additional county, Spartanburg County, informed Defendant Andino that it initially attempted to conduct signature matching but "could not keep up and stopped checking." (*Id.* at 4). It is not clear if some number of otherwise validly completed absentee ballots were disqualified before the signature matching procedure was discontinued by that county board. Further, Defendant Andino advised the Court that she was unable to obtain information on whether the following counties were engaged in signature matching processes despite repeated efforts to communicate with county board officials: Aiken, Charleston, Dorchester, Lee and Saluda Counties. (*Id.*). One additional county, Berkeley, simply stated it was complying with the law and failed to respond to subsequent efforts by Defendant Andino to obtain clarification whether it was or was not engaged in signature matching. (*Id.*). Defendant Andino stated that 30 counties (65%) were not engaged in any signature matching procedures. (*Id.*).

*Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006). To obtain a preliminary injunction Plaintiff must show:

> (1) a likelihood of success on the merits;
>
> (2) irreparable harm in the absence of preliminary injunctive relief;
>
> (3) the balance of equities tips in the favor of the moving party; and
>
> (4) an injunction is in the public interest.

*Winter*, 555 U.S. at 20. A Plaintiff seeking injunctive relief must show that all four of the *Winter* factors support granting relief. *See id.*; *see also Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (noting that the Plaintiff "bears the burden of establishing that each of these factors supports granting the injunction") (quoting *Technical Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984)).

B.    *Anderson-Burdick* Standards:

It is well-settled that the federal courts must evaluate constitutional challenges to state election rules under a flexible standard guided by the extent the rule or practice under contest burdens the right to vote. Where the burden is severe, such as use of a poll tax, the state must show a compelling state interest in its election rule under challenge. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Where a state election rule is reasonable and non-discriminatory, a rational basis standard is utilized, and generally reasonable state justifications will support the restrictions. *Burdick*, 504 U.S. at 434. However, where a state election rule falls between these two extremes and burdens the right to vote in a material way, the court must "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments . . . against the precise interests put forward by the State as justification for the burden imposed by its rule . . . ." *Id.*

The *Anderson-Burdick* standard is not a rubber stamp for approval of every state election rule under challenge. Instead, "the rigorousness of [the court's] inquiry . . . depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." *Id*. There is no litmus test, but the court must carefully balance the burdens placed on the right to vote against the state justification for the challenged rule. *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp.3d 1017, 1029 (N.D. Fla. 2018), *aff'd*, 915 F.3d 1312 (11th Cir. 2019). This examination "should not be divorced from reality" and the "burden and legitimate regulatory interest should be evaluated in context." *Obama for Am. v. Husted,* 697 F.3d 423, 441 (6th Cir. 2012) (White, J., concurring).

C.    <u>Due Process Standards under *Mathews v. Eldridge*</u>:

There is no constitutional right to vote by absentee ballot, but if a state elects to allow absentee voting it must do so consistent with the United States Constitution. *Democracy N. Carolina v. N. Carolina State Bd. of Elections,* No. 1:20CV457, 2020 WL 4484063, at *53 (M.D.N.C. Aug. 4, 2020); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006). The right to vote is a protected liberty interest under the Due Process Clause of the Fourteenth Amendment, and a citizen's validly submitted ballot cannot be rejected by the government without notice and an opportunity to be heard. *Frederick v. Lawson*, No. 119CV01959SEBMJD, 2020 WL 4882696, at *12 (S.D. Ind. Aug. 20, 2020); *Self Advocacy Sols. N.D. v. Jaeger ,*No. 3:20-CV-00071, 2020 WL 2951012 (D.N.D. June 3, 2020); *Fugazi v. Padilla*, No. 2:20-CV-00970-KJM-AC, 2020 WL 2615742 (E.D. Cal. May 22, 2020); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1356-57 (D. Ariz. 1990).

"Due process is flexible and calls for such procedural protection as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Supreme Court in *Mathews v.*

*Eldridge*, 424 U.S. 319, 334 (1976) established a four-part test to determine the scope of due process required:  (1) "the private interest that will be affected by the official action"; (2) "the risk of erroneous deprivation of such interest though the procedures used;"

 (3) "probable value, if any, of additional or substitute procedural safeguards; and (4) "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  Courts across the country have relied on *Mathews* in recent decisions to require notice and a right to be heard when state election officials have rejected validly submitted absentee ballots on the basis that the voter's signature allegedly did not match some earlier handwriting sample.  These courts have noted the high risk of erroneous deprivation of the right to vote by unskilled and untrained election officials attempting to match voters' signatures.  *Georgia Muslim Voter Project v. Kemp*, 918 F. 3d 1262,1271 (11th Cir. 2019);   *Frederick*, 2020 WL 4882696, at *13-14; *Democracy N. Carolina*, 2020 WL 4484063, at *53-54; *Jaeger*, 2020 WL 2951012, at *9; *Fugazi v*, 2020 WL 2615742, at *7-8; *Saucedo v. Gardner*, 335 F. Supp.3d 202, 217-20 (D.N.H. 2018).

D.    Standards for Issuance of Late Election Law Injunctions under *Purcell v.   Gonzalez*:

Another important factor for consideration when district courts are reviewing state election law challenges is timing, with a marked reluctance to order a change in election procedures in close proximity to elections.  *Purcell v. Gonzalez*, 549 U.S. 1 (2006).  Not all injunctive relief is foreclosed, particularly where there has been a last-minute change that imposes a substantial burden on the right to vote.  *Democratic Nat'l Comm. v. Bostelmann*, No. 20-2835, 2020 WL 5951359, at *2 (7th Cir. Oct. 8, 2020).  The Supreme Court has also been reluctant to stay late injunctive relief supported by a state.  *Republican Nat'l Comm. v. Common Cause of Rhode Island,* No. 20A28, 2020 WL 4680151 (U.S. Aug. 13, 2020).  With these limited exceptions,

district courts have been directed not to enter late orders granting injunctive relief that alter the status quo and imposes new procedures on state election officials on the eve of an election. *Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.,* 140 S. Ct. 1205, 1207 (2020); *Arizona Democratic Party v. Hobbs*, No. 20-16759, 2020 WL 5903488, at *2 (9th Cir. Oct. 6, 2020).

### III.  Discussion

A.    <u>South Carolina's Lack of Notice and Opportunity to Cure a Defective Absentee Ballot</u>

Plaintiffs assert that South Carolina's lack of a notice and cure procedure when absentee ballot voters fail to provide on the return addressed envelope the requisite signatures of the voter and/or witness violates their rights under the First and Fourteenth Amendment.  Plaintiffs accurately assert that a number of states provide by statute procedures of notice and cure for defective absentee ballots.  These states have staff and processes in place to facilitate the notice and cure process.  South Carolina presently has no such statutory provision and no processes or staff in place in the State's 46 counties to implement a notice and cure procedure.

While one could argue that those states with notice and cure procedures have the better policy, this does not address the legal issue before the Court.  The Court must address the question of whether the United States Constitution requires states to have a notice and cure procedure for absentee ballot voters who submit their ballots without the statutorily required signatures.  Further, if such a procedure is required, is it practical now, a week before the 2020 General Election, for the State to implement a court-ordered notice and cure procedure?

Plaintiffs argue that the risk of erroneous deprivation of the right to vote by the lack of a notice and cure procedure compels a remedy, even one that must be implemented by court injunction on the eve of the General Election.  Plaintiffs primarily point to a series of court

9

decisions across the country requiring a notice and an opportunity to contest the disqualification of otherwise valid absentee ballots on the basis that the voter's signature does not appear to match some sample signature available to election officials. *E.g.*, *Georgia Muslim Voter Project*, 918 F.3d at 1268-75; *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319-20 (11th Cir. 2019); *Zessar*, 2006 WL 642646. These cases note the general lack of skill and training of election officials in handwriting comparison and the high risk of erroneous disqualification of validly submitted absentee ballots by election officials. These mismatch signature cases conclude that it is the *government's* high risk of error that compels some process by which an absentee voter receives notice of the ballot disqualification and an opportunity to contest the finding that the voter's signature is not genuine.

The challenge here regarding the lack of notice and cure procedure differs from the signature matching cases in several significant ways. First, the error of a missing signature is the fault of the voter, not the government. As the Ninth Circuit observed in *Arizona Democratic Party*, 2020 WL 5903488, at *2, "the failure to sign one's ballot is entirely within the voter's control [but] voters are not readily able to protect themselves against the prospect that a polling official might subjectively find a ballot signature not to match a registration signature." *Id*. Second, there is little risk of erroneous processing of the disqualified ballots on the basis of a missing signature. The signature line is blank and can be observed objectively by the voting manager and duly appointed watchers. Third, the procedure sought by Plaintiffs is not a hearing to contest the government's disqualification decision, a standard due process remedy, but the opportunity of the absentee ballot voter to fix the deficient ballot. This proposed remedy sounds more in policy than in law, something reserved for state election officials. It is perhaps not surprising that neither Plaintiffs' counsel nor this Court could find even one reported case where a court ordered

state officials to adopt and implement a notice and cure procedure when state law did not mandate such a process.

In addition to the lack of an underlying constitutional basis to require a state to provide a notice and cure procedure for defectively submitted absentee ballots, there is the very practical problem under *Purcell* of imposing an entirely new procedure on state and county election officials on the eve of the General Election.  Such a remedy is fraught with complications.  South Carolina law provides for the examination of submitted absentee ballots no sooner than 9:00 a.m. on the day before the election.  *See* S.C. Code Ann. § 7-15-420(B).  At that time, the duly appointed election managers and watchers gather and begin the examination process.  Plaintiffs' counsel conceded at oral argument that this statutory deadline would have to move to afford enough time for absentee voters to be notified of their ballot deficiency and an opportunity to cure the defect.  (Dkt. No. 65 at 41-42).  Staffing such a notice and cure process would necessarily be labor intensive and would impose burdens on county election officials at the peak of their efforts, when they are attempting to conduct an election in the midst of a once in a century pandemic and processing an exponential increase in absentee ballots.  As Justice Kavanaugh noted in a concurring opinion supporting a stay in *Andino v. Middleton*, 2020 WL 5887393, at *1, "this Court for many years has repeatedly emphasized that federal courts should not ordinarily alter state election rules in the period close to an election."

A threshold issue for any motion for a preliminary injunction is a showing by the moving party of a likelihood of success on the merits.  Based upon the foregoing, it is clear that Plaintiffs cannot demonstrate a likelihood of success on the merits regarding their claim that they have a constitutional right to notice and an opportunity to cure when absentee ballots are submitted which lack the statutorily required voter and witness signatures.  Further, the issuance of an

injunction mandating court ordered election procedures on the eve of an election is generally to be avoided unless there is a significant burden on the exercise of the right to vote and an insufficient justification for the state practice under challenge.  This situation plainly does not meet that high bar.  Consequently, the Court denies Plaintiffs' motion for an injunction to impose procedures for notice and a right to cure absentee ballots lacking statutorily mandated signatures on state and county election officials.

B.     The Right of Plaintiffs to Compel State Election Officials to Allow Individual County Boards to Provide Notice and an Opportunity to Cure Defective Absentee Ballots

Plaintiffs allege that at least one county board, Charleston County, has previously provided absentee ballot voters notice and an opportunity to cure ballots that were submitted without the required signatures.  (Dkt. No. 53 at ¶ 39).  Plaintiffs assert that a recent directive of the State Election Commission prohibiting any county board from providing such notice and cure procedures constitutes a violation of Plaintiffs' constitutional rights.  (Dkt. Nos. 53 at ¶¶ 53, 60; 58 at 5).  Plaintiffs seek to have the Court enjoin Defendants from enforcing their directive to county boards so as to permit individual county boards to adopt their own notice and cure policies if they wish.  Defendants assert state election laws provide county boards no authority to conduct such procedures, and their directive was for the purpose of maintaining uniform statewide procedures in accordance with statutory law.

The Court earlier found that Plaintiffs have no constitutional right to notice and an opportunity to cure defectively submitted absentee ballots.  In the absence of such a federal constitutional right or the absence of any right to notice and right to cure under state law, it is difficult to see how this Court would have the authority to order Defendants to allow county boards to implement their own notice and cure procedures if they choose.  At oral argument,

Plaintiffs' counsel conceded that the claim regarding individual county discretion depended on the existence of an underlying constitutional right to notice and cure procedures.  (Dkt. No. 65 at 56).  Further, it would be wholly inappropriate under *Purcell* for this Court to order a new procedure regarding local discretion on notice and cure procedures this close to the election, which would surely generate the type of confusion sought to be avoided late in the election cycle process.

The Court finds that Plaintiffs cannot show a likelihood of success on the merits on their claim to a right to local discretion on notice and right to cure procedures.  Therefore, they are not entitled to a preliminary injunction on this issue.

C.     <u>The Denial of the Right of Voters to Cast a Ballot at the Polls if their Absentee Ballot Is Disqualified Due to Missing Signature</u>

Plaintiffs object to longstanding state law that that any person issued an absentee ballot is not allowed to cast a ballot at his or her voting precinct unless the voter presents a certificate from the county board that the absentee ballot "has been returned to the board unmarked."  S.C. Code Ann. § 7-15-430.  The Court shares Plaintiffs' understandable concern that a voter's error in presenting an absentee ballot would deprive the voter of any right to cast a ballot in that election.  In an ideal world, this situation would not arise and every person who sought to vote would have their ballot counted.

The provision of state law at issue, § 7-15-430, is designed to prevent an absentee ballot voter from casting an absentee ballot and also appearing at the polls to vote on election day. Local precinct managers are provided a voter list indicating which voters have been issued an absentee ballot.  This statute fulfills a compelling state interest in preventing double voting.   The State has mitigated the problem under § 7-15-430 of disqualifying persons issued absentee ballots from voting at the polls if they change their minds and elect instead to vote at the polls.

Under such circumstances, the voter can obtain a certificate from the county board stating that the voter has turned in the issued absentee ballot unmarked, and the voter would then be free to cast a ballot at the polls. *Id.* This exception is of no benefit to those who submit their absentee ballots marked but their return addressed envelopes do not contain the requisite signatures.

The South Carolina General Assembly might at a future time consider providing an exception for voters who have submitted a defective absentee ballot to allow them to obtain a certificate from their county boards that would allow them to vote at the polls on election day. But this is a policy question, the very type of issue that is best handled by a state's elected representatives and duly authorized election officials. Under *Purcell*, it would not be proper at this stage of the election process to enjoin enforcement §7-15-430 or attempt to graft a new exception onto the law.

Plaintiffs are unable to show a likelihood of success on the merits regarding the right under these circumstances to cast a ballot at the polls despite having been issued an absentee ballot. Therefore, Plaintiffs' motion for a preliminary injunction on this issue is denied.[2]

D.    Plaintiffs' Claim that Some County Boards are Engaged in Disqualifying Otherwise Validly Submitted Absentee Ballots on the Basis of Mismatched Signatures

Plaintiffs have alleged that certain county boards are planning to "impose a signature mismatching requirement" on all absentee ballots. (Dkt. No. 53 at ¶¶ 40-43). Defendant Andino, responding to questions posed by the Court, stated in a Declaration of October 20, 2020 that she was personally unaware of plans of any county board to conduct signature matching for

---

[2] Looking at this matter realistically, a court ordered change in § 7-15-430 would be of little practical benefit to absentee ballot voters with defective absentee ballots because under state law the review of the absentee ballot return addressed envelopes does not commence until one day before the election. *See* S.C. Code Ann. § 7-15-420(B). Moreover, there is no mechanism to provide the voter timely notice of the determination that the ballot has been rejected.

the purpose of disqualifying otherwise validly submitted absentee ballots.  (Dkt. No. 58 at 1-2).

Defendant Andino further informed the Court that there are no state standards, rules or manuals

relating to reviewing allegedly mismatched signatures, and the State Election Commission has

provided no training for such activities. (*Id*. at 2).  Defendants' counsel advised the Court during

oral argument on October 21, 2020 that any county board disqualifying absentee ballots on the

basis of signature mismatches would be acting without statutory and State Election Commission

authority.  Defendant's counsel further stated that such actions would be unlawful**,** and counties

"should not be doing this." (Dkt. No. 65 at 7, 9).  Defendants' counsel also confirmed the State

Election Commission was unaware of the disqualification of absentee ballots in any prior

election on the basis of an alleged signature mismatches.  (*Id*. at 7).  In response to the Court's

question about whether the Defendant State Election Commission would "tolerate even for a

minute" unauthorized signature matching procedures by county boards, Defendants' counsel

stated:

> Certainly it's fair the Commission would not approve of any county
> doing something that Title 7 [South Carolina's Election Law Title]
> doesn't allow.  And currently Title 7 does not have a provision that permits
> the signature matching that the complaint alleges. (*Id.* at 11-12).

Subsequent to oral argument, Defendant Andino, at the Court's request, conducted a

survey of the 46 county boards to confirm her understanding that no county board was engaged

in the unauthorized matching of absentee ballot signatures.  (Dkt. No. 66).  Defendant Andino

learned that at least nine county boards were engaged in the unauthorized practice of signature

matching to disqualify otherwise validly completed ballots.  (*Id.* at 3).  Six county boards

informed Defendant Andino that they had written procedures in place for addressing alleged

mismatched signatures.  (*Id.* at 4).  These written policies were a hodgepodge of procedures,

some providing no notice to the affected voter and some involving efforts to reach out to the

voter and to provide some method of challenging the signature mismatch determination.  (Dkt. No. 66-1).  One county, Marlboro County, stated it was conducting signature matching procedures with no written policy and three counties failed to disclose those procedures to Defendant Andino.  (Dkt. No. 66 at 4).[3]  Further, the examination of absentee ballots by county election officials for allegedly mismatched signatures prior to the statutorily designated examination period for absentee ballots (the day prior to election day) and without the duly appointed managers and watchers present, is violative of the procedures mandated under S.C. Code Ann. § 7-15-420.[4]

The late discovery of these wildly inconsistent procedures, where a minority of counties are conducting some version of signature matching without the knowledge or approval of the State Election Commission and acting contrary to the Commission's and its Executive Director's plainly stated legal position that such procedures are unlawful under South Carolina law, raises a number of significant legal questions.  First, what is the State's interest in maintaining an unauthorized and unlawful election practice under State law that significantly burdens the right of absentee ballot voters to have their properly submitted ballots counted?  Second, is the *status quo* the authorized, approved, and longstanding practices of the State Election Commission, rather than the unlawful practices of a minority of county boards acting *ultra vires*?  If so, would a federal court injunction maintain, rather than alter, the *status quo*?  Third, does this late

_____

[3]  Greenville and Georgetown County Boards provide no notice to the affected voter. (Dkt. No. 66-1 at 11-14).  Greenwood County policy provides that staff should "try to contact the voter and ask if they signed the document."  If the voter cannot be reached, a new absentee ballot is sent to the voter. (*Id*. at 15-16).  Laurens County provides that if a signature is questioned, "see the director or assistant to have the voter contacted or a provisional ballot issued."  (*Id.* at 17-18).

[4]  The Court is confident that Defendant Andino and the Defendants' counsel were not attempting to mislead the Court and were genuinely unaware that a minority of counties were engaged in unauthorized signature matching procedures.

discovery by the State Election Commission of this unauthorized practice by these nine county boards constitute one of those rare situations under *Purcell* where a federal court injunction in close proximity to election day is proper and necessary?   These and other issues the Court addresses as follows:

1.    *Standing*

A threshold question in every federal case is whether the plaintiff has standing to bring the action.  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).   The plaintiff bears the burden of demonstrating a "personal stake in the outcome of the controversy" that will be sufficient to warrant the party's "invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).   The plaintiff is required to show: (1) she is "under threat of suffering 'injury in fact' that is concrete and particularized"; (2) "the threat [is] actual and imminent,  not conjectural or hypothetical"; (3) the threatened injury is "fairly traceable to the challenged action of the defendant"; and (4) it is likely that "a favorable judicial decision will prevent or redress the injury." *Id.*

To be particularized, an injury "must affect the plaintiff in a personal and individual way."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n. 1 (1992)).   There must be some connection between the plaintiff and the defendant that differentiates the plaintiff so that his injury is not common to all members of the public.  *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (quoting *United states v. Richardson*, 418 U.S. 166, 177 (1974)).   "The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad, and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Voters who allege facts showing disadvantage to themselves as individuals have standing to sue. *Baker v. Carr*, 369 U.S. 186, 206 (1962).   Accepting as true the allegations contained in the complaint, the individual plaintiffs have shown they are registered voters in the State of South Carolina and allege injury that their absentee ballots have been or are at risk of being rejected  on the basis of unlawful signature matching procedures without notice and an opportunity to contest the determination. (Dkt. Nos. 21-4, Decl. George Hopkins; 21-5, Decl. Albertus Clea).  The alleged injuries are particular, actual, and traceable to Defendants' lack of notice and process for absentee ballots rejected on the basis of signature mismatches.  The Court finds the individual plaintiffs have established standing.

A determination as to whether an organization has standing in its own right is separate from an analysis of the standing of its members. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005).  Harm occurs if an organization's ability to function or to provide its core services is impaired by an allegedly unlawful action, and it suffers "the consequent drain of [its] resources" as a result, that organization has standing to bring suit.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 369, 378-379 (1982) (superseded on other grounds by statute 42 U.S. §3613(a)(1)(A)).  Accepting the allegations in the complaint as true, organizational plaintiffs allege their ability to provide advocacy services essential to their missions such as voter registration, educational assistance, and fundraising have been impaired by Defendants' failure to provide notice and process when absentee ballot voters have their ballots rejected on the basis of alleged unauthorized signature mismatches.  (Dkt. Nos. 21-6 at ¶ 22, Decl. Holley H. Ulbrich; Dkt. No. 21-7 at ¶ 16, Decl. Brenda C. Williams, M.D.).  The Court finds that the organizational plaintiffs have established standing.

2.    *Likelihood of Success on the Merits*

Whether this issue is analyzed under the *Anderson-Burdick* or *Mathews* standards, it is apparent that these challenged signature matching procedures cannot stand. Under the *Anderson-Burdick* line of cases, the Court must first determine the severity of the burden imposed by the challenged practice. Here, absentee ballots, which meet all statutory requirements under South Carolina law, may nonetheless be disqualified on the basis of a subjective judgment that the voter's signature does not match some sample relied upon by county election officials. Moreover, a number of the counties conducting signature matching procedures have no or ill-defined procedures for providing affected voters timely notice of a signature mismatch determination or a timely procedure for challenging that determination. This is obviously a significant burden on Plaintiffs' voting rights and must be weighed against the State's interest in maintaining the challenged practice. Since the State has no interest in promoting an unlawful and unauthorized practice by a minority of county boards, the balance of interests tips decidedly in the direction of the Plaintiffs.[5] Plaintiffs have shown a likelihood of success on their claim under the *Anderson-Burdick* standard.

Under the *Mathews* due process standard, the Court must first look to the private interest affected by the challenged action. The interest is the right of a voter to have his or her validly cast absentee ballot counted. *Mathews*, 424 U.S. at 334. This is plainly a significant private interest. The Court next examines the "risk of erroneous deprivation of such interest through the

---

[5] The State has an obvious interest in preventing voter fraud with absentee ballots and has built into its statutory scheme multiple provisions to prevent abuse of the absentee voting process. Any application for an absentee ballot is mailed by county boards to the residence of the registered voter. S.C. Code Ann. § 7-15-200. The voter must certify under oath that he or she is the person identified and faces potential criminal prosecution by submitting an absentee ballot in the name of another voter. S.C. Code Ann. § 7-15-220. A witness signature is required with the home address included on the submission. Any person who is issued an absentee ballot is prevented from casting a ballot at the polls on election day. S.C. Code Ann. § 7-15-430. These are the State authorized anti-fraud provisions regarding absentee ballots adopted by the South Carolina General Assembly.

procedures used." *Id.* Numerous cases have found that the process of untrained election officials conducting signature examinations without established standards and protocols carries a very high risk of error. *Georgia Muslim Project*, 918 F.3d at 1271; *Frederick*, 2020 WL 4882696, at \*13-14; *Democracy N. Carolina*, 2020 WL 4484063, at \*53-54; *Jaeger*, 2020 WL 2951012, at \*9; *Fugazi*, 2020 WL 2615742, at \*7-8; *Saucedo*, 335 F. Supp.3d at 217-20. The Court is then directed to determine the probable value of additional or substitute procedural safeguards. *Mathews,* 424 U.S. at 334. These could include either the discontinuance of the unlawful signature matching process or the establishment of a procedure for timely notice of the signature mismatch decision and an opportunity to timely contest the decision before a fair tribunal. Such remedial steps would significantly reduce or eliminate the Plaintiffs' injuries. Finally, the Court must determine the administrative burden placed on the State by the required procedure. *Id*. This burden would either be minimal (simple discontinuance of the unauthorized procedure) or would require the provision of administrative procedures for timely notice and an opportunity to contest a disqualification of a voter's signature. Under the *Mathews* standard, these factors weigh heavily in favor of Plaintiffs.

Defendant Intervenors contend there is no liberty interest in the right to vote absentee or to have one's validly cast absentee ballot counted. (Dkt. No. 46 at 4). This is contrary to a large body of case law, which recognizes that the franchise is a fundamental right and the cornerstone of a citizen's liberty. *E.g.*, *Georgia Muslim Voter Project*, 918 F.3d at 1267-68; *Democracy N. Carolina*, 2020 WL 4484063, at \*53; *Jaeger*, 2020 WL 2951012, at \*8; *Fugazi*, 2020 WL 2615742, at \*7. A few outlier cases have recently argued an extremely constricted view of liberty that does not include voting rights. *E.g.*, *Richardson v. Texas Sec'y of State*, No. 20-50774, 2020 WL 6127721, at \*7-8 (5th Cir. Oct. 19, 2020). At the preliminary injunction stage,

it is sufficient to point to the majority view that liberty and voting rights are inextricably linked. Indeed, it would be a sad day in American constitutional history to cabin principles of liberty so narrowly that the right of every citizen to the franchise is somehow deemed unconnected to the core concept of liberty under the Fourteenth Amendment.

The bottom line is that under both the *Anderson-Burdick* and *Mathews* standards, Plaintiffs have shown a likelihood of success on the merits on the issue of the unauthorized matching of voter signatures and the absence of established procedures for notice and an opportunity to contest a determination that a voter's signature is not genuine.

        3.     *Irreparable Injury*

"Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). When constitutional rights, such as the right to vote, "are threatened or impaired, irreparable injury is presumed." *Obama for Am.*, 697 F.3d at 436. Here, the threatened action, a refusal to count a voter's validly submitted absentee ballot under state law, would constitute irreparable injury.

        4.     *The Balance of Equities*

Under these facts, the Plaintiffs' interest in having their lawfully completed absentee ballots counted is weighed against the State's interest, which appears to share the common goal with Plaintiffs to have absentee ballots processed in accordance with State law. The interest of a minority of county boards, acting *ultra vires*, should be accorded minimal, if any weight. The balance of equities tips decidedly in favor of Plaintiffs.

        5.     *The Public Interest*

The Plaintiffs and the Defendants share a common interest in the fair and consistent administration of state election laws and the preservation of a voter's right to have a validly submitted absentee ballot counted.  An injunction preventing the violation of long-established state statutory procedures and upholding a voter's right to have his or her validly completed absentee ballot counted are certainly in the public's interest.

6.    *Entry of a Late Injunction in Close Proximity to the Election*

The entry of a federal court injunction in close proximity to an election is generally to be avoided under *Purcell* unless unusual and compelling circumstances are present, including a late change in election procedures that disrupts the *status quo* or where the State's interest is promoted by the entry of injunctive relief.  *Republican Nat'l Comm.*, 2020 WL 4680151; *Bostelmann*, 2020 WL 5951359, at *2.

The highly unusual circumstances present here meet the high bar for the entry of a late injunction.  First, the injunction would both protect the voting rights of the Plaintiffs while upholding consistently administered and non-discriminatory State election laws.  Second, the actions of a minority of the county boards in engaging in unauthorized signature matching procedures disrupt the existing *status quo*, which allows examination of absentee ballots under a fixed set of statutory standards on an established timetable.  The entry of an injunction would maintain, not alter, the *status quo*.  Indeed, Defendants' counsel acknowledged at oral argument that the actions of any county boards in implementing a signature matching procedure would be in violation of State law and that there would be no harm to the State if a federal court injunction required the county boards "to follow the law" since "they should be doing that anyway."  (Dkt. No. 65 at 7-10).

**Conclusion**

Based on the foregoing, the Court hereby **ENJOINS** the State and any of its affiliate county boards from utilizing signature matching procedures to disqualify otherwise validly submitted absentee ballots unless affected voters are provided timely notice of the disqualified ballot and a timely procedure to contest that determination before a neutral tribunal. Should any county board seek to continue conducting signature matching procedures, it must first submit to this Court for approval its proposed procedures for timely notice and an opportunity to contest any disqualification of an absentee ballot otherwise validly submitted on the basis of an alleged signature mismatch. Any validly completed absentee ballots shall be processed without the use of signature matching procedures unless the county board has first obtained approval of this Court of its procedures to provide timely notice and timely opportunity to contest a determination that the voter's signature is not genuine. Any validly completed absentee ballots which have not been processed by a county board or were disqualified prior to the entry of this Order because of an alleged mismatched signature must now be reviewed and processed *de novo* in accord with this Order. Defendants are directed to promptly provide a copy of this Order to county boards and to confirm receipt. Further, as set forth above, the Court **DENIES** Plaintiffs' motion for injunctive relief on all other grounds, as set forth in Sections III (A), (B), and (C) above. (Dkt. Nos. 21; 41).

      **AND IT IS SO ORDERED**.

           s/ Richard Mark Gergel
           Richard Mark Gergel
           United States District Judge

October 27, 2020
Charleston, South Carolina