**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 20-2167**

_____

LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA; THE FAMILY UNIT, INC.; GEORGE HOPKINS; ALBERTUS CLEA,

        Plaintiffs – Appellees,

        v.

MARCI ANDINO, in her official capacity as the Executive Director of the South Carolina State Election Commission; HOWARD M. KNAPP, in his official capacity as Director of Voter Services of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; JOANNE DAY, in her official capacity as member of the South Carolina State Election Commission; CLIFFORD J. EDLER, in his official capacity as member of the South Carolina State Election Commission; LINDA MCCALL, in her official capacity as member of the South Carolina State Election Commission; SCOTT MOSELEY, in his official capacity as member of the South Carolina State Election Commission,

        Defendants – Appellants,

REPRESENTATIVE JAMES H. (JAY) LUCAS, in his capacity as Speaker of the South Carolina House of Representatives; SENATOR HARVEY PEELER, in his capacity as President of the South Carolina Senate,

        Intervenors/Defendants – Appellants.

_____

Appeal from the United States District Court for the District of South Carolina, at Charleston. Richard Mark Gergel, District Judge. (2:20-cv-03537-RMG)

_____

Argued: January 25, 2021                        Decided: March 11, 2021

Before KING, FLOYD, and QUATTLEBAUM, Circuit Judges.

---

Dismissed and remanded with instructions by unpublished per curiam opinion.

---

**ARGUED:** William Grayson Lambert, BURR & FORMAN LLP, Columbia, South Carolina; Kevin Hall, WOMBLE BOND DICKINSON (US) LLP, Columbia, South Carolina, for Appellants. Julianne J. Marley, DEBEVOISE & PLIMPTON LLP, New York, New York, for Appellees. **ON BRIEF:** M. Elizabeth Crum, Jane W. Trinkley, BURR & FORMAN LLP, Columbia, South Carolina, for Election Appellants. Susan P. McWilliams, Marc C. Moore, NEXSEN PRUET, LLC, Columbia, South Carolina, for James H. Lucas. M. Todd Carroll, WOMBLE BOND DICKINSON (US) LLP, Columbia, South Carolina, for Appellant Harvey Peeler. Susan K. Dunn, Shirene C. Hansotia, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTH CAROLINA, Charleston, South Carolina; Ezra Rosenberg, John Powers, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C.; Catherine Amirfar, Rhianna Hoover, Anagha Sundararajan, Joshua Burger, DEBEVOISE & PLIMPTON LLP, New York, New York, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Prior to the 2020 presidential election, Plaintiffs-Appellees the League of Women Voters of South Carolina, The Family Unit, George Hopkins, and Albertus Clea (collectively, "the League") brought suit against South Carolina election officials to enjoin the rejection of absentee ballots with signature-based deficiencies. The district court entered a preliminary injunction on October 27, 2020, specifically prohibiting the use of signature matching by county election boards without adequate notice-and-cure procedures. Defendants-Appellants—various South Carolina State Election Commission officials and leaders of the state legislative branch (collectively, "the Officials")[1]— appealed that injunction to this Court. On appeal, the Officials argue that the issue of signature matching became moot hours before the district court entered its injunction. Because the district court has not yet had the opportunity to rule on the question of mootness, we dismiss this appeal and remand to the district court to consider mootness in the first instance.

---

[1] The League initially named the following as Defendants: Marci Andino, in her official capacity as the Executive Director of the South Carolina State Election Commission; Howard M. Knapp, in his official capacity as Director of Voter Services of the South Carolina State Election Commission; John Wells, in his official capacity as Chair of the South Carolina State Election Commission; and Joanne Day, Clifford J. Edler, Linda McCall, and Scott Moseley, in their official capacities as members of the South Carolina State Election Commission. One week later, Speaker of the South Carolina House of Representatives James H. Lucas and South Carolina Senate President Harvey Peeler moved to intervene as Defendants. Because the initial and intervening Defendants filed one set of briefs in this Court, we refer to all Defendants collectively.

I.

A.

South Carolina law established both the South Carolina State Election Commission ("the Commission") and county election boards, which together manage elections in the state. *See* S.C. Code Ann. § 7-3-10 (establishing the Commission); *id.* § 7-5-10 (establishing county boards). County boards are responsible for, among other duties, verifying and counting absentee ballots. *Id.* § 7-15-420. The Commission, through its Executive Director Marci Andino, is responsible for supervising the administration of absentee voting by county boards. *See id.* § 7-3-20(c)(1). When Andino "determines that a county board . . . has failed to comply with applicable state or federal law . . . the State Election Commission, acting through [Andino] or other designee, must supervise . . . the county board to the extent necessary to . . . establish a plan to correct the failure[] and . . . implement the plan to correct the failure." *Id.* § 7-3-25(A). Andino's interpretation of state law controls over any differing interpretation by the county boards. *Id.* § 7-3-25(A)(3) ("In the event of a difference of policy or opinion between a county election official and the State Election Commission . . . the policy or opinion of the State Election Commission shall control.").

Typically, only certain South Carolina voters are eligible to vote absentee. *See* S.C. Code Ann. § 7-15-320. Eligible voters may request and receive from their county board an absentee ballot accompanied by printed instructions; a "ballot herein" envelope into which that ballot is placed; a separate, return-addressed envelope; and any other materials required to guarantee the ballot's validity. *Id.* §§ 7-15-330, 370. The return-addressed

4

envelope has printed on it an oath to be signed by the voter and a space for a witness signature. *Id.* § 7-15-380. State law requires county boards to reject absentee ballots that arrive in envelopes not "properly signed [by the voter] and witnessed." *Id.* § 7-15-420(B). Under the Commission's interpretation of state law, county boards must reject any unsigned ballot and may not provide any opportunity for a voter to correct the deficiency. The Commission therefore has instructed county boards that they may not allow voters to cure absentee ballots that do not comply with the signature requirement.

The ongoing health risks posed by COVID-19 led the state to greatly expand eligibility for absentee voting during the 2020 presidential election. *See* 2020 S.C. Acts 143. Anticipating a dramatic increase in the number of absentee ballots cast, the League filed suit on October 2, 2020, alleging that absentee voters risked rejection of their ballots for signature deficiencies in violation of procedural due process and the fundamental right to vote. Relevant to this appeal, the League alleged that some county boards were engaged in signature matching—a process whereby a county board compares the signature on an absentee ballot to that voter's signature in the voter registration database—to reject otherwise-valid absentee ballots.[2] The League contended that this practice, which was not provided for under South Carolina law, similarly violated voters' procedural due process rights and the fundamental right to vote.

---

[2] Other allegations in the Complaint are not before this Court on appeal, and we do not address them.

B.

On October 9, 2020, the League moved for a preliminary injunction against the rejection of absentee ballots with signature deficiencies absent notice and the opportunity to cure the deficiency.[3]  As part of the Officials' response to this motion, Andino submitted a declaration averring that she was unaware of any signature matching by county boards; that the Commission never published any materials, provided any training, or tracked statistics on signature matching during her tenure as Commissioner; and that she knew of no state "statutes, regulations, rules, handbooks, memoranda, or other documents" concerning signature matching.  J.A. 272.  However, Andino acknowledged that the Charleston County Board had previously requested the Commission's permission to purchase signature-matching equipment.

In opposing the League's motion, the Officials represented that the use of signature matching to reject absentee ballots would violate state law.  Following oral argument, the district court ordered Andino to survey the county boards to determine whether any boards were engaged in signature matching and if so, whether those boards had procedural safeguards in place for affected voters.  In response to that survey, nine county boards responded that they were using or planning to use signature matching to reject otherwise-valid absentee ballots; five county boards declined to respond; one county board stated that it tried to use signature matching but could not keep pace with the number of ballots

---

[3] Because the district court only granted the League's request for a preliminary injunction against the use of signature matching, we do not describe the League's other arguments for injunctive relief.

6

received; and one county board indicated only that it would "follow SC Code of Laws Section 7-15-420." J.A. 281. Thirty county boards responded that they did not use signature matching to disqualify absentee ballots. Andino then filed a declaration attaching Directive No. 2020-001, which she had issued to all forty-six county boards. The Directive instructed county boards to cease signature matching because the practice was not permitted by South Carolina law.

Andino's declaration attaching Directive No. 2020-001 was filed on October 26, 2020. The next day, the district court entered an order granting in part and denying in part the League's motion for a preliminary injunction. The district court held, as to signature matching, that the League had satisfied the four-factor preliminary injunction test set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). In so holding, the court found that signature matching violated state law and that the Commission was "genuinely unaware that a minority of counties were engaged in unauthorized signature matching procedures." J.A. 313 n.4. The court preliminarily enjoined the use of signature matching by county boards unless they provided an adequate notice-and-cure procedure to the court. Importantly, the court's order did not consider what effect—if any—Directive No. 2020-01 had on the justiciability or the merits of the League's preliminary injunction motion.

The Officials timely appealed the district court's order, and the parties agreed to stay the portion of the court's injunction permitting county boards to submit notice-and-cure procedures for the court's approval. *See League of Women Voters of S.C. v. Andino*, No. 20-2167, 2020 U.S. App. LEXIS 35114, at *2–4 (4th Cir. Oct. 29, 2020).

II.

A.

In their opening brief, the Officials argued only that the district court abused its discretion under *Winter* by entering the preliminary injunction. For the first time in their reply brief, the Officials separately argued that the district court lacked jurisdiction to enter the injunction because Directive No. 2020-001 made the issue of signature matching non-justiciable. In particular, the Officials contend that Directive No. 2020-001 ended any signature matching by county boards and reinforced the Commission's longstanding interpretation that state law forbids its use. The Officials therefore asked this Court to hold that any challenge to the constitutionality of signature matching became moot prior to entry of the injunction.[4] Although the Officials did not raise the issue of mootness before the district court or in their opening brief, we have an obligation to ensure the question of

---

[4] The Officials separately argued that the Directive deprived the League of standing and rendered their challenge to future elections unripe. These arguments are meritless because they rely on the voluntary issuance of Directive No. 2020-01 during the litigation, a question best analyzed under the rubric of mootness. *See, e.g.*, *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (describing mootness as "the doctrine of standing set in a time frame" (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973))); *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018) ("The [Commission] cannot, as it evidently seeks to do here, reframe this case as an unripe challenge to some future iteration of [the state's election procedures] in order to avoid the demanding requirements of demonstrating mootness.").

The Officials also argued that there is no Article III case or controversy because the parties agree that signature matching is prohibited by law. Even assuming the Officials accurately depict the parties' legal positions, their argument confuses the question of legal consensus with the question of whether the League risks suffering a cognizable injury. *See United States v. Windsor*, 570 U.S. 744, 759 (2013).

8

signature matching presented a live case or controversy at the time the district court entered the injunction. *See Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 227–28 (4th Cir. 1997) (raising question of mootness sua sponte).

It is well established that an issue becomes moot when, due to a change in facts or law, "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). The Officials contend that Directive No. 2020-01 ended any signature matching in South Carolina, so the League had no concrete interest in a ruling on its legality at the time of the injunction. But "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). Accordingly, the Officials must overcome the voluntary cessation exception to the mootness doctrine.

Not all voluntary conduct triggers the voluntary cessation exception, which "seeks to prevent 'a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after.'" *Porter*, 852 F.3d at 364 (citing *ACLU of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 54–55 (1st Cir. 2013)). To avoid the conclusion that Directive No. 2020-01 is a mere "litigation tactic," *see 6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 407 (4th Cir. 2019), the Officials "bear[] the formidable burden of showing that it is absolutely clear [signature matching] could not reasonably be expected to recur." *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). The Officials contend

9

both that the Commission lacks the authority to rescind Directive No. 2020-01 in the future because South Carolina law prohibits signature matching and that "voluntary cessation" is not applicable because the Commission has never permitted signature matching.

Given the timing of Directive No. 2020-01, which was issued on the eve of the preliminary injunction, we conclude the district court was not adequately given the chance to consider the issue of mootness. Indeed, this Court does not consider "assurances" on appeal enough to demonstrate the permanent termination of a challenged practice. *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014). Instead, mootness turns on a number of factual questions, including (but not limited to) whether the Directive actually reflects a longstanding interpretation of the Commission, whether the Commission has authority to rescind the Directive, what degree of supervision and enforcement the Commission exercises over the Directive, whether the Commission engaged in any such supervision in the past, and whether any signature matching occurred at the county level in the wake of the Directive. "Because all of the prior litigation was conducted" before the issuance of Directive No. 2020-01, we hold the district court should consider whether the Directive moots the League's preliminary injunction motion in the first instance. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 869 F.3d 286, 290 (4th Cir. 2017).[5] We accordingly dismiss this appeal and remand to the district court to resolve the question of mootness.

---

[5] The League has alleged that other state laws and Commission policies violate voters' constitutional rights. We note that even if the narrow issue of the legality of signature matching is moot, other issues in this case may remain live. *See DOJ v. Provenzano*, 469 U.S. 14, 15 (1984) (per curiam) ("The mootness of the particular issue that was presented to us . . . does not mean that the case[ itself does] not remain alive.").

B.

Not only was the district court unable to consider the issue of mootness in light of the Directive, it also was unable to consider the Directive when applying its *Winter* analysis to determine whether a preliminary injunction should be issued. *See Winter*, 555 U.S. at 20. If the district court determines the case is not moot, the Directive seems plainly relevant to the *Winter* analysis. In particular, the Directive bears on the issues of likelihood of success on the merits and the likelihood plaintiffs will suffer irreparable harm in the absence of an injunction. *Id.* Thus, on remand, if the district court determines the case is not moot, it should re-evaluate the *Winter* factors with the benefit of the Directive and any other pertinent evidence in the record.

*DISMISSED AND REMANDED WITH INSTRUCTIONS*